FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

FT. MYERS DIVISION

04 FEB 20  AM 8:03

MICHAEL H. HAWKINS, Individually,       )
RUSSELL WAGGONER, Individually,         )
DON FEE, Individually, KEN HALL,        )
Individually, STEVE BANNON,             )
Individually, DAVID OTTO, Individually, )
TOM G. AMON, Individually, EVERETT      )
C. SETSER, Individually, TERRY          )
TURNER, Individually, DR. KENNETH       )
BADOLATO, Individually, DR. DAVID W.    )
BADOLATO, Individually, HARVEY          )
HENDLER, Individually, CINCO            )
HABANEROS, INC., a foreign corporation, )
DIESPITER LTDA, a foreign corporation,  )
BOSTON MEDICAL INVESTORS, LLC, a        )
Nevada limited liability company,       )
SPARTACUS HEALTHCARE                    )
PARTNERS IV, a Nevada corporation,      )
GAMI, LLC, a Florida limited liability  )
corporation, BIG GAMES HOLDINGS,        )
INC., a foreign corporation, and CROWN  )
IV HOLDINGS, INC., a foreign            )
corporation,                            )
                                        )
        Plaintiffs,                     )
                                        )
vs.                                     )
                                        )
CHARLES FUST, Individually, STACEY      )
MALONEY FUST, Individually, ROBERT      )
DUPONT, Individually, RUSSELL R. LEE,   )
III, Individually, and SINO FRESH       )
HEALTHCARE, INC., a Delaware            )
corporation,                            )
                                        )
        Defendants.                     )
_____ )
                                        )

CASE NO.: 2:04-cv-95-FtM-29SPC

FILED DEE CO. FLORIDA
CLERK OF COURT
2004 FEB 20  AM 8: 23
BY _____ D.C.

## CLASS ACTION COMPLAINT

Lead Plaintiffs, by and through their attorneys, as and for their Class Action Complaint, allege the following upon personal knowledge as to themselves and their acts, and as to other matters upon information and belief based upon, *inter alia*, the investigation made by and through their attorneys, including the review of the public filings of SINO FRESH HEALTHCARE, INC. (the "Company" or "SFHC") with the U.S. Securities & Exchange Commission ("SEC"), published reports and news articles, interviews with former employees of the company, reviews of the Asset Purchase Agreement ("APA") between Sino Fresh Laboratories, Inc., an Alabama corporation ("SF Labs") and "SFHC" and a review of court filings from prior lawsuits involving Defendant, RUSSELL R. LEE, III ("LEE").

## I. THE PARTIES, JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this matter in that it involves matters arising under the Securities laws of the United States.   Accordingly, pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over this matter.

2.      Plaintiff, MICHAEL H. HAWKINS is a resident of the State of Florida and is a shareholder of SINO FRESH HEALTHCARE, INC. (the "Company" or "SHFC") and is otherwise *sui juris*

3.      Plaintiff, RUSSELL WAGGONER is a resident of Sarasota County, Florida and is a shareholder of SFHC and is otherwise *sui juris*.

4.      Plaintiff, RON FEE is a resident of Sarasota County, Florida and is a shareholder of SFHC and is otherwise *sui juris*.

5.      Plaintiff, KEN HALL is a resident of Sarasota County, Florida and is a shareholder of SFHC and is otherwise *sui juris*.

LAW OFFICES OF DAVID B. HABER, P.A.

6.      Plaintiff, STEVE BANNON is a resident of Los Angeles County, California and is a shareholder of SFHC, an Independent Director of SFHC and a member of the Audit Committee of SFHC and is otherwise *sui juris*.

7.      Plaintiff, DAVID OTTO is a resident of Seattle, Washington and is a shareholder of SFHC, a Member of the Board of Directors of SFHC and a member of the Audit Committee of SFHC and is otherwise *sui juris*.

8.      Plaintiff, TOM G. AMON is a resident of New York, New York and is a shareholder of SFHC, and a former officer of SFHC and is otherwise *sui juris*.

9.      Plaintiff, EVERETT C. SETSER ("SETSER") is a resident of Volusia County, Florida and is a shareholder of SFHC, and is otherwise *sui juris*.

10.     Plaintiff, TERRY TURNER ("TURNER") is a resident of Fulton County, Florida and is a shareholder of SFHC, and is otherwise *sui juris*.

11.     Plaintiff, DR. KENNETH BADOLATO ("K. BADOLATO") is a resident of Sarasota County, Florida and is a shareholder of SFHC, and is otherwise *sui juris*.

12.     Plaintiff, DR. DAVID W. BADOLATO ("D. BADOLATO") is a resident of Sarasota County, Florida and is a shareholder of SFHC, and is otherwise *sui juris*.

13.     Plaintiff, HARVEY HENDLER, is a resident of Passaic, New Jersey and is shareholder of SFHC and is otherwise *sui juris*.

14.     Plaintiff, CINCO HABANEROS, INC., ("CHI") is a foreign corporation which is a shareholder of SFHC and is otherwise *sui juris*.

15.     Plaintiff, DIESPITER, LTDA ("DIESPITER") is a foreign corporation which is a shareholder of SFHC and is otherwise *sui juris*.

16.     Plaintiff, BOSTON MEDICAL INVESTORS, LLC ("BMI") is a Nevada limited liability company which is a shareholder of SFHC and is otherwise *sui juris*.

17.     Plaintiff, SPARTACUS HEALTHCARE PARTNERS IV ("SHP") is a Nevada corporation which is a shareholder of SFHC and is otherwise *sui juris*.

18.     Plaintiff, GAMI, LLC ("GAMI") is a Florida limited liability corporation located in Brevard County, Florida which is a shareholder of SFHC and is otherwise *sui juris*.

19.     Plaintiff, BIG GAMES HOLDINGS, INC. ("BIG GAMES") is a foreign corporation which is a shareholder of SFHC and is otherwise *sui juris*.

20.     Plaintiff, CROWN IV HOLDINGS, INC., is a foreign corporation which is a shareholder of SFHC and is otherwise *sui juris*.

21.     All Plaintiffs will be collectively referred to as "Lead Plaintiffs".

22.     Defendant, CHARLES FUST ("FUST") is a resident of Charlotte County, Florida and is the Chairman and CEO of SFHC and is otherwise *sui juris*.

23.     Defendant, STACEY MALONEY FUST ("MALONEY FUST") is a resident of Charlotte County, Florida, is a shareholder of SFHC and is a member of the Board of Directors of SFHC and is otherwise *sui juris*.

24.     Defendant, ROBERT DUPONT ("DUPONT") is a resident of Charlotte County, Florida, is a shareholder of SFHC and is a member of the Board of Directors of SFHC and is otherwise *sui juris*.

25.     Defendant, RUSSELL R. LEE, III ("LEE") is a resident of Sarasota County, Florida, is a shareholder of SFHC, and is the CFO of SFHC and is otherwise *sui juris*.

26.     Defendant, SINO FRESH HEALTHCARE, INC. ("SFHC") is a Delaware corporation with its principal place of business in Charlotte County, Florida which has as its principal business the manufacturing, marketing, development and sale of sinus care products.

27.     Venue is appropriate in this jurisdiction as the acts complained of and set forth below took place in this jurisdiction, the acts and omissions by the Defendants took place in this jurisdiction, the acts of self-dealing took place in this jurisdiction and in Ft. Lauderdale, Florida. Monies were removed from the bank accounts of the Company in this jurisdiction. Acts of self-dealing occurred by the Inside Directors (as defined below) in this jurisdiction. The failure to disclose occurred by the filings with the SEC (via preparation of the 10Q) in this jurisdiction and the cover-up of actions of the Inside Directors occurred mainly in this jurisdiction. Obviously, however, to the extent that there are shareholders in other jurisdictions, the misrepresentations and/or omissions did obviously occur elsewhere as well.

## INTRODUCTION

28.     This is a Class Action for securities violations and other matters being brought by Lead Plaintiffs, on behalf of themselves and all persons as described below (the "Class"), other than Defendants and related parties, who purchased the publicly traded shares of SFHC, common stock between January 1, 2003 and February 19, 2004 (the last trading day before the Independent Directors requested the SEC to hold all trading because of material irregularities in SFHC's financial status and disclosures at issue in this case) inclusive (the "Class Period").

29.     Defendant, SFHC is a public company that, until recently, primarily manufactured, marketed and distributed "Sino Fresh" products in the United States. SFHC is principally controlled by Defendants, FUST, MALONEY FUST and DUPONT (the "Inside Directors").

30.     FUST is a scientist who developed and discovered the patents utilized by SFHC. FUST had a prior corporation by the name of Sino Fresh Labs, Inc. ("SF Labs"), which previously sold the product known as Sino Fresh, which product is now being manufactured, produced, distributed and marketed by SFHC.   However, FUST has always kept the foreign patents in his own name.

31.     In or about December, 2002, SF Labs executed with SFHC an Assert Purchase Agreement ("APA") to transfer and deliver all patents for Sino Fresh to SFHC, the Company, and to the other two (2) related SF Entities, Sino Fresh Healthcare Asia, Inc. ("SF Asia") and Sino Fresh Healthcare Europe, Inc. ("SF Europe").   Those representations were made to all three (3) SF Entities, their auditors and their shareholders, as well as to the SEC.   Those representations are contained in the closing documents of the APA as having been already effectuated.

32.     To date, despite all of those representations, all marketing materials and dissemination of those materials to the public, to the SFHC shareholders, to the news media and to third parties that the patents have been transferred, the foreign patents have still not yet been transferred by FUST.   In fact, up until February 9, 2004, those foreign patents still remained in FUST's name, despite repeated demands by a former officer and director of SFHC, Andrew Badolato and his consulting firm, Sargon Capital, Inc. ("Sargon"), that the patents be transferred.

33.     Sargon and Badolato brought these matters to the attention of the Independent Directors, STEVE BANNON ("BANNON") and DAVID OTTO ("OTTO") on February 9, 2004 by a letter written pursuant to F.S. § 607.1074(1)(2).   This letter was also sent to FUST, MALONEY FUST and DUPONT, the Inside Directors.   See the letter of February 9, 2004 attached hereto as Exhibit "A" and incorporated herein by reference.

34.    Badolato and Sargon had previously made this and other matters known to the Inside Directors on numerous occasions -- to no avail.  These matters included the following:

A.    FUST and the other Inside Directors have continued to act as if SFHC is FUST's personal company, despite it being a public traded NASDAQ/OTC BB company.  In fact, despite taking money from independent investors in this publicly traded company, FUST has continued to breach his fiduciary duty and act in a self-dealing manner as it relates to the Company, SFHC.

B.    FUST and the other Inside Directors of SFHC spent approximately $300,000.00 of SFHC's funds in fees, registration and licensing fees for the above-referenced patents to be registered internationally as well as for licensing and legal fees associated with same (the "foreign patent registrations") – during which time FUST maintained **individual ownership** of said foreign patents and repeatedly refused Badolato's and the independent consultant's, Sargon's, requests to turnover the foreign patents to the other two (2) SF entities, (SF Asia and SF Europe) – despite repeated promises by FUST to do so and the APA's requirements that he do so.  Other examples of self-dealing by the Inside Directors and violations of Sarbanes-Oxley are set forth below.

C.    SF Labs executed an Indemnification Agreement for various matters that it was obligated to pay to SFHC (the Company) as part of the closing documents and as part of the APA.  A copy of the APA is attached hereto and incorporated herein by reference as Composite Exhibit "B".  To date, SFHC has paid liabilities of SF Labs which were to be indemnified as part of the APA.  Those expenses include, but are not limited to, attorneys' fees involving two (2) different litigations, specifically the Cabral litigation in Alabama and the threatened Mullins

litigation (FUST's former girlfriend) – which two (2) litigations are estimated at approximately $100,000.00. These are violations of and a breach of the APA.

      D.     In fact, the dispute with Mullins was resolved by FUST utilizing cash and stock in SFHC as payment to Mullins at the expense of SFHC's other shareholders. This was not properly disclosed to shareholders and was not approved of by the Independent Directors of the Company, as required by Sarbanes-Oxley.

      E.     As the Chairman and CEO, and as an officer and director of SFHC, FUST purchased an engagement ring for MALONEY FUST with corporate funds of SFHC and attempted to cover up same. This was ultimately uncovered by the former CFO of SFHC, Bruce Harmon ("Harmon") and brought to FUST's attention. Shortly thereafter, Harmon was terminated.

      F.     Furthermore, LEE objected to the Independent Directors (who served as the Audit Committee), having direct oversight over the auditor and having the auditor report directly to the Audit Committee – which is a requirement of the Sarbanes-Oxley Act. LEE demanded that the auditor report directly to him, an inside person – which is improper pursuant to Sarbanes-Oxley.

      G.     Furthermore, as an inside director, officer, CEO and chairman, FUST coerced execution of an Employment Agreement for MALONEY FUST, his former girlfriend and now wife of less than twelve (12) months. MALONEY FUST had no college degree, no qualifications in the field and no prior relevant experience for the job at issue, which employment pays a salary and options of more than $350,000.00. MALONEY FUST was also given a seat on the Board of Directors of SFHC, a publicly traded NASDAQ/OTC BB company. This Employment Agreement was not approved with full disclosure to and approval of an

independent committee of the Board of Directors of SFHC.  This is a violation of Sarbanes Oxley.

H.     In addition, the Inside Directors allowed SFHC (and the two (2) other SF Entities) to lease space at a questionable building location for fifteen (15) years, not necessarily suitable for the business purpose of SFHC and/or for the industry in which it participates, at a building location which is equitably owned by FUST and DUPONT (through a corporate entity), without accurately and completely and/or fully disclosing this conflict of interest to the remaining Independent Directors of the Board and without having the remainder of the Board of the three (3) SF entities vote on the lease without input by FUST and/or DUPONT (i.e. – by a vote solely of Independent Directors) of the three (3) SF entities.  This is also a violation of Sarbanes-Oxley.

I.     The Inside Directors also failed to disclose to SFHC's Board of Directors that SF Labs, FUST's prior entity, entered into an agreement for a lease obligation in Ft. Lauderdale, Florida despite SF Labs having no operations at said location, which location had been utilized with FUST's direct knowledge as a "boiler room" "chop shop" for SF Labs to raise money through the sale of unregistered securities with unlicensed agents.  Unknown to the Independent Directors of SFHC, this procedure of paying the rent continued after the APA was executed by SFHC.  SFHC continued making those payments by and through FUST signing the checks, without the remainder of the Independent Directors' approval and/or knowledge – resulting in sanctions from the State of Pennsylvania's Securities Regulators for State law securities violations.

J.     Paying $1,250.00 per month for "rent" of a "corporate apartment" at 2224 Bahia Vista Street, Sarasota, FL 34239, which apartment is a condominium owned by

MALONEY FUST. The apartment rent is "above market" and the apartment serves no valid business purpose. This arrangement was done solely because MALONEY FUST moved in with FUST. These payments were neither disclosed to, nor approved by, the Independent Directors.

35.     Once this and other matters were brought to FUST's attention by the former CFO of SFHC, Robert Harmon, said CFO was discharged by FUST.  In his place, FUST retained LEE, a person for whom FUST failed to do a background check upon, who was sued for securities violations in conjunction with Gencor Industries, Inc. ("Gencor"), U.S. District Court, Middle District of Florida, Orlando Division, Case Nos. 99-106-CIV-ORL-19(B) consolidated with 99-165-CIV-ORL-18(B), 99-194, 99-236, 99-253, 99-266, 99-279, 99-364, and 99-410 (Consolidated Lee Securities Lawsuits"); which Consolidated Lee Securities Lawsuits resulted in a settlement and payment of attorneys' fees in excess of $560,000.00 to the Plaintiffs' Class Action attorneys.  In fact, Gencor filed for bankruptcy protection and was required to be delisted from the American Stock Exchange and had to re-audit their books for two (2) or three (3) full years of time for which LEE had been its Chief Financial Officer (CFO).   None of this information was disclosed to the Independent Directors who also are the sole members of the Audit Committee of the Company by LEE nor FUST, nor to the other shareholders of SFHC. The failure to disclose LEE's background is another material misrepresentation on the part of FUST, MALONEY FUST and DUPONT, the Inside Directors.

36.     Thereafter, on January 30, 2004, FUST, MALONEY FUST and DUPONT (the "Inside Directors") retained the law firm of Greenberg, Traurig to send a letter to BANNON and OTTO (the "Independent Directors") demanding their resignation from the Board, allegedly on the grounds that they were "not independent", allegedly because they had contact with Badolato

and Sargon.  A copy of the January 30, 2004 correspondence is attached hereto and incorporated herein by reference as Exhibit "C".

37.    NASDAQ defines "independence" as one who has not been employed by the company or any parent or subsidiary at any time within the past three (3) years or who has a family member who has been employed as an executive officer of the company or any other parent or subsidiary at any time within the past three (3) years.  In addition, a director is not "independent" if he or she or any family member has accepted more than $60,000.00 in payments from the company, a parent or subsidiary during the current fiscal year or any of the last three (3) fiscal years, subject to certain "exceptions", which exceptions included compensation for Board or Committee service.  One is not independent if one is a partner in or a controlling shareholder or executive officer of a for-profit or non-for profit organization that had made payments to the company or who has received payments from the company in excess of five (5%) of the recipient's gross revenues or $200,000.00 for property or services during the current fiscal year, is part of an interlocking director relationship or as a partner of the company's outside auditor or was a partner or employee of the auditor who worked on the company's audit at any time during the past three (3) years.  Neither BANNON nor OTTO have any of those conflicts and thus are "independent" for purposes of the NASDAQ definition of "independent director" under the revised NASDAQ rules.

38.    The obvious intention of the Inside Directors, Greenberg, Traurig and LEE was to attempt to remove the Independent Directors who also serve as the Audit Committee from bringing to the attention of the outside Auditor those matters which Sargon and Badolato had previously brought to the attention of the Inside Directors and the Company and were bringing to their attention (the Independent Directors), i.e. – the above-referenced matters referenced in

paragraphs 34A through J and paragraphs 35 and 36, all of which were breaches for fiduciary duty and self-dealing by FUST and the other Inside Directors, MALONEY FUST and DUPONT.

39.    On February 2, 2004, Mr. Otto responded to the January 30, 2004 correspondence via U.S. Mail and fax demanding copies of the Written Consents to elect to terminate the directorships of the Independent Directors. A copy of said correspondence is attached hereto and incorporated herein as Exhibit "D".

40.    On February 10, 2004, subsequent to receipt of Exhibit "A", the Independent Directors and Audit Committee members of SFHC scheduled a Special Board Meeting for February 13, 2004 at 7:00 p.m., EST. A copy of the letter dated February 10, 2004 and the attached Notice of Meeting for February 13, 2004 are attached hereto and incorporated herein by reference as Composite Exhibit "E".

41.    To date, according to OTTO, pursuant to SEC Regulation 14C, despite notification on January 30, 2004 from Greenberg, Traurig that Greenberg, Traurig represented shareholders "owning shares representing more than a majority of votes have acted" to remove the company's only Independent Directors, no Shareholder Consents were filed with the SEC pursuant to Regulation 14C, nor were same provided to the Independent Directors despite repeated requests for same by Independent Directors, BANNON and OTTO.

42.    Furthermore, on February 13, 2004, LEE the new CFO of the Company who had previously been a "Director of Finance" filed with the SEC the attached Information Statement which stated that as of February 10, 2004, "the requisite number of Written Consents to take the shareholder actions were executed on various dates and delivered to the Company by the consenting shareholders on February 10, 2004" to remove directors, BANNON and OTTO. This is inconsistent with the prior letter of January 30, 2004 stating that the consents had been

LAW OFFICES OF DAVID B. HABER, P.A.

received prior to January 30, 2004. A copy of the February 13, 2004 filed Information Statement is attached hereto and incorporated herein by reference as Composite Exhibit "F".

43.   To date, no Shareholder Consents have been filed with the SEC as required pursuant to Regulation 14C. In fact, pursuant to attached Exhibit "F", it appears as if the Inside Directors improperly issued additional shares and/or improperly issued options without the consent of the full Board and/or without calling proper Board Meetings so as to attempt to obtain the necessary consents of the "majority of shares" to oust the Independent Directors. The Inside Directors illegally did so solely in order to retain "majority control" for the sole purpose of getting rid of the Independent Directors and members of the Audit Committee – who are in the midst of investigating improprieties, acts of self-dealing, alleged violations of the Sarbanes-Oxley Act, and other SEC violations and improprieties such as violations of the APA, failure to turnover the foreign patents and other fraudulent misrepresentations by the Inside Directors, including Chairman and CEO, FUST.

44.   Rather than disclosing this adverse information to the shareholders, the public and the SEC, the above-referenced Defendants actively concealed same and directed accounting manipulations and improprieties that were intended to mask these severe problems.

45.   These Defendants made these materially false misleading statements, and while doing, upon information and belief, issued inappropriate options to themselves and others without disclosing the material adverse facts about SFHC and its business which were known to them and only to them.

46.   The financial statements and the materials provided to the public, to the shareholder and to the SEC do not properly reflect the company's true financial condition, do not reflect that the foreign patents are not held by SF Asia and SF Europe and do not reflect a fair

statement of the interim reporting periods of January 1 through September 30, 1993. See the 10Q, a copy of which is attached hereto and incorporated herein by reference as Exhibit "G". Furthermore, during the Class Period, Defendants failed to file financial statements which conform to GAAP such that the financial statements will be presumably misleading and inaccurate pursuant to Regulation S-X, 17 CFR 210.0401(A)(1).

47.    As a result of accounting irregularities and other misstatements, the companies reported financial results (and the individual Defendants) also violated at least the following provisions of GAAP for which each Defendant is necessarily responsible:

A.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, paragraph 34);

B.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and affects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, paragraph 40);

C.    **The principle that financial reporting should provide information about how management of an enterprise discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.** To the extent that **management** offers securities of the enterprise to the public, it **voluntarily accepts wider responsibilities for accountability to prospective investors and the public in general** (FASB Statement of Concepts No. 1, paragraph 50) [Emphasis added];

D.    The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information

about the past to help and assessing the prospects of an enterprise.  Thus, although credit and investment decisions reflect investors' expectations about future enterprise performance, those expectations were commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, paragraph 42);

      E.    The principle that **financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable** as well as relevant to a notion that is central to accounting (FASB Statement of Concepts No. 2, paragraphs 58-59) [Emphasis added];

      F.    **The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions** (FASB Statement of Concepts No. 2, paragraph 79) [Emphasis added]; and

      G.    The principle that conservatism be used as a prudent reaction uncertainty to try to ensure that certainties and risks inherent in business situations are adequately considered.  **The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent** (FASB Statement of Concepts No. 2, paragraphs 95 and 97) [Emphasis added].

      48.    Defendants' false representations and material omissions were made with scienter in that:

      A.    The individual Inside Directors, including FUST, MALONEY FUST, DUPONT, as well as LEE directed that the company conceal from shareholders, the market and the SEC the above-referenced self-dealing by the Inside Directors set forth in paragraphs 34A through J, and paragraphs 35 and 36, the improper issuance of options and/or shares in order to

attempt to oust the Independent Directors in or about the end of January and/or the beginning of February, 2004 in conjunction with the filing of the 14C on February 13, 2004 and the misleading statements issued to the public and the false financial information filed in the 10Q on November 15, 2003 for the financial reporting period through September 30, 2003.  See also the 10Q, Exhibit "G".

49.    All conditions precedent to the bringing of this action have been performed, have been waived, have occurred and/or have been excused.

## COUNT I

### VIOLATION OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT AND RULE 10(B-5) THEREUNDER

50.    Lead Plaintiffs repeat and reallege paragraphs 1 through 49 above and paragraphs 70 through 72 below as if fully set forth herein.

51.    Throughout the Class Period, the Inside Directors singularly and in concert directly or indirectly engaged in the common plans, scheme and course of conduct described above and herein, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices and the course of business which operated as a fraud upon Lead Plaintiffs and the other members of the Class, made various false statements of material facts and/or omitted to state material facts to make the statements made appear not misleading to Lead Plaintiffs and the other members of the Class; and employed manipulative and/or deceptive devices and contrivances in connection with the purchase and sale of SFHC common stock.

52    The purpose and affect of the Inside Directors' plan, scheme and course of conduct was to prevent the Independent Directors who were also the sole members of the Audit Committee, the remaining shareholders and the public from finding out about the related party

transactions of the Inside Directors set forth in paragraphs 34A through J, including but not limited to the following:

      A.     FUST purchasing of the engagement ring for MALONEY FUST;

      B.     The related party transaction with regard to the lease of SFHC's office space from the corporation owned by Inside Directors FUST and DUPONT;

      C.     The utilization of approximately $300,000.00 of SFHC funds to register, file and license patents internationally which were to benefit SF Asia and SF Europe, without turning over the patents to those entities, in violation of the APA;

      D.     Misrepresenting the status of the patents for SF Asia and SF Europe to the public and the use of SFHC's funds for said purpose;

      E.     Violation of the Indemnification Agreement as part of the APA and expending approximately $100,000.00 of SFHC's funds to resolve two (2) litigations and/or threatened litigation matters which should have been paid by SF Labs for the APA;

      F.     Entering into a related party transaction with MALONEY FUST for an advantageous salary and options of more than $300,000.00 when she had no qualifications in the field, no prior relevant experience and no college degree without outside director and/or Audit Committee approval;

      G.     Payment for the Ft. Lauderdale lease and covering up same for an operation that created sanctions in the State of Pennsylvania Securities regulators for State securities law violations which had previously raised money for SF Labs through the sale of unregistered securities with unlicensed agents, again without Independent Director review and approval;

H.     Payment for the MALONEY FUST condominium in Sarasota, Florida as a "business apartment" for $1,250.00 per month, at an "above market" price, solely because MALONEY FUST moved in with FUST, without Independent Director knowledge, consent and approval.

I.     Attempting to maneuver the removal of Independent Directors BANNON and OTTO, the sole members of the Audit Committee for attempting to investigate the above-referenced allegations of items A-H above and seeking their ouster for properly investigating these matters pursuant to Section 301 of Sarbanes-Oxley and Section 10(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(f).   When the Independent Directors who were the sole members of the Audit Committee attempted to schedule a meeting of the Board of Directors so as to investigate the matters sent to them by shareholders in the February 9, 2004 correspondence (Exhibit "A" hereto) and which they previously communicated to the Inside Directors, the Inside Directors conspired to try to oust the Independent Directors from the Board by asserting that "a majority of the shareholders of the corporation had consented to their removal".   The Inside Directors then forwarded the alleged notification of their removal pursuant to Rule 14C of the Act to the SEC.   This was signed by LEE; however, upon information and belief, the Inside Directors knew and LEE knew that a majority of the shareholders of the Company did not consent to the removal of the Independent Directors and the sole members of the Audit Committee, and if they did consent, they did not do so without full knowledge of the facts set forth above in paragraphs 34A through J and 35 and 36 above.

53.     Upon information and belief, in attempting to solicit consents for the removal of Independent Directors, BANNON and OTTO, the Inside Directors and LEE failed to disclose to

the independent shareholders the facts set forth above in paragraph 34A through J and paragraphs 35, 36 and 52 and in the letter of February 9, 2004.

54.    The purpose and intent of the Inside Directors and LEE's plan, scheme and course of conduct was to keep them in place and maintain their position of control of SFHC. The Inside Directors, FUST, MALONEY FUST, DUPONT, and LEE had actual knowledge of the material omissions and/or the falsity of the material statements set forth above (in paragraphs 34-36 and 52), and intended to deceive the Lead Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made to the shareholders, to the public, to the SEC, to the Lead Plaintiffs and to the other members of the Class.

55.    Furthermore, when the 10Q was filed on November 15, 2003, none of the above-referenced information was included in same, nor that LEE had been sued previously for violations of Federal Securities laws and that two (2) and/or three (3) prior years of audits he had prepared for Gencor had to be redone and restated by auditors and that the company he worked for, Gencor, filed bankruptcy. LEE, and the Inside Directors, knew or should have known of these material omissions and/or the falsity of these material statements and acted with reckless disregard for the truth when it failed or refused to ascertain and disclose these true facts to the SEC, Lead Plaintiffs and other members of the Class. LEE signed the 14C on February 13, 2004.

56.    The above facts alleged herein provide a strong inference that the Defendants made material false and misleading statements to the investing public with scienter in that the Defendants knew that the public statements issued or disseminated in the name of the Company were material, false and misleading. The Inside Director and LEE recklessly and with disregard

of the truth of such statements assisted in the issuance and dissemination of the 10Q to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violators of the Federal Securities laws.

57.     The undisclosed adverse information set forth above is the type of information which, because of SEC regulations, regulations with the National Stock Exchanges and customary business practices, are expected by investors and securities analyst to be disclosed and are known by corporate officers and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.  For example:

A.     Under Item 303 of Regulation S-K, 17 C.F.R. § 229.303, et seq., promulgated by the SEC under the Exchange Act, there is a duty to disclose in periodic reports filed with the SEC, the existence of "known trends or any known demands, commitments, events or uncertainties" at SFHC that would "result in or that are reasonably likely" to have a material impact on the company's net sales, revenues, income from operations or liquidity, or cause previously reported financial results not necessarily indicative of future operating results.  17 C.F.R. § 229.303(a)(1)-(3) and Instruction 3.  In addition to the periodic reports required under the Exchange Act, management of a public company has a duty promptly "to make full and prompt announcements of material facts regarding the company's financial condition".  Release No. 34-8995 (October 15, 1970) 3 Fed. Sec. L. Rep. (CCH) ¶23, 120A, at 17,095, 17 C.F.R. § 241.8995.  The SEC has repeatedly stated that the anti-fraud provisions of the federal securities laws, which are intended to ensure that the investing public is provided with "complete and accurate information about companies" whose securities are publicly traded," apply to all public statements by persons speaking on behalf of publicly traded companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience."

Release No. 33-6504 (January 13, 1984) 3 Fed. Sec. L. Rep. (CCH) ¶23, 120B, at 17, 095-3, 17

C.F.R. §241.20560.  The SEC has emphasized that "[i]nvestors have legitimate expectations that

public companies are making, and will continue to make, prompt disclosure of significant

corporate developments."   Release No. 18271 (November 19, 1981) [1981-1982 Transfer

Binder] Fed.Sec.L.Rep. (CCH) ¶83,049, at 84,618.

58.     As a result of the foregoing, the market price of SFHC has been harmed during

the Class Period.  In ignorance of the falsity of the reports and statements and the deceptive and

manipulative devices and contrivances employed by the Defendants, Lead Plaintiffs and other

members of the Class relied, to their damage, on the reports and statements described above

and/or in the integrity of the 10Q filed by the Inside Directors and the information provided by

the Inside Directors during the Class Period in purchasing and acquiring and holding their stock

at prices which were affected as a result of Defendants' false and misleading statements.

Furthermore, to the extent that the Inside Directors have made private inside deals for themselves

at the expense of the Company, monies need to be disgorged by the Inside Directors for the

engagement ring, the Ft. Lauderdale and Sarasota leases, the contract with MALONEY FUST,

the foreign patents need to be turned over, the lease payments for Ft. Lauderdale and Sarasota

need to be returned, CFO LEE who was retained without a proper background investigation

needs to be terminated and the Independent Directors need to be reinstated to their positions

(although it is unclear if their termination was even proper in the first place).  Defendant, FUST

sold stock during the Class Period in or about approximately February, 2003 without properly

disclosing the facts set forth above.  Defendants' concealment of the material information set

forth above served only to harm Lead Plaintiffs and the other members of the Class who owned

SFHC securities in ignorance of the financial risks to them as a result of such non-disclosures.

As a result of the wrongful conduct alleged herein, the Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

59.     By reason of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiffs and the other members of the Class for the substantial damages which they suffered in connection with their purchase of SFHC securities during the Class Period.

WHEREFORE, Lead Plaintiffs on behalf of themselves and the other members of the Class demand judgment against the Defendants as follows:

A.     Determining that this action is properly maintainable as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Certifying Lead Plaintiffs as the Class Representative and their counsel as Class Counsel;

C.     Declaring and determining that that the Defendants violated the Federal Securities laws by reason of their conduct as alleged herein;

D.     Awarding monetary damages against all of the Defendants, jointly and severally, in favor of Lead Plaintiffs and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, including punitive damages where appropriate, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

E.     Awarding Lead Plaintiffs the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' fees and expert fees; and

F.     Awarding Lead Plaintiffs and the other members of the Class such other and further relief as this Court may deem just and proper in light of the circumstances of this case.

**COUNT II**

**VIOLATIONS OF SECTION 20(a) OF THE
SECURITIES EXCHANGE ACT**

60.     Lead Plaintiffs repeat and reallege paragraphs 1 through 49, 52I, 54-57 above and 70-72 below as if fully set forth herein.

61.     During the Class Period, each of the Inside Directors and LEE, by virtue of them being officers and/or directors of and LEE being the Director of Finance of SFHC and thereafter CFO and their specific acts set forth above were controlling persons of SFHC within the meaning of Section 20(a) of the Exchange Act.

62.     Each of the individual Defendants' positions made them privy to, and provided him or her with actual knowledge of, the materials facts which SFHC concealed from Lead Plaintiffs and the other members of the Class during the Class Period.

63.     Each of the individual Defendants had the power and influence, and exercised the same, to cause SFHC to engage in the unlawful conduct and practices complained of herein by causing SFHC to disseminate the false and misleading information referred to above.

64.     By virtue of the foregoing, the individual Defendants violated Section 20(a) of the Exchange Act.

65.     By virtue of the conduct alleged above, the Defendants are liable to the Lead Plaintiffs and the other members of the Class for the substantial damages which they suffered in connection with their purchase of SFHC common stock during the Class Period.

23
LAW OFFICES OF DAVID B. HABER, P.A.

WHEREFORE, Lead Plaintiffs on behalf of themselves and the other members of the Class demand judgment against the Defendants as follows:

A.    Determining that this action is properly maintainable as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Certifying Lead Plaintiffs as the Class Representative and their counsel as Class Counsel;

C.    Declaring and determining that that the Defendants violated the Federal Securities laws by reason of their conduct as alleged herein;

D.    Awarding monetary damages against all of the Defendants, jointly and severally, in favor of Lead Plaintiffs and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, including punitive damages where appropriate, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

E.    Awarding Lead Plaintiffs the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' fees and expert fees; and

F.    Awarding Lead Plaintiffs and the other members of the Class such other and further relief as this Court may deem just and proper in light of the circumstances of this case.

## BREACH OF FIDUCIARY DUTY

66.    Lead Plaintiffs repeat and reallege paragraphs 1 through 49 above and 70-72 below as if fully set forth herein.

67.    Defendants, Inside Directors, FUST, MALONEY FUST and DUPONT, had a fiduciary duty to the Lead Plaintiffs and to the other shareholders pursuant to Sarbanes-Oxley

and other SEC regulations and corporate laws to act in the best interest of the company and not in their own self interest. As officers and directors of SFHC, the Inside Directors owed a fiduciary duty to the Lead Plaintiffs and the other shareholders of SFHC to act with fidelity and the utmost care, to undertake to give the Company the benefit of their best care and judgment and to exercise their powers in the best interests of the company and to its shareholders.

68.    The above-stated actions and/or omissions of the Inside Directors and Defendant, LEE, the Director of Finance and then CFO constituted violations of their fiduciary duty to SFHC and to the Lead Plaintiffs and the other shareholders of SFHC. Said breaches of fiduciary duty are unlawful acts which are unfairly prejudicial and damaging to the Lead Plaintiffs and the remaining shareholders of SFHC, entitling the Lead Plaintiffs and the remaining shareholders to equitable and legal relief, including disgorgement of all acts of self-dealing, compensatory damages against the Inside Directors and LEE, interests, costs and any other and further relief this Court deems just and proper.

WHEREFORE, Lead Plaintiffs on behalf of themselves and the other members of the Class demand judgment against the Defendants as follows:

A.    Determining that this action is properly maintainable as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Certifying Lead Plaintiffs as the Class Representative and their counsel as Class Counsel;

C.    Declaring and determining that that the Defendants violated the Federal Securities laws by reason of their conduct as alleged herein;

D.    Awarding monetary damages against all of the Defendants, jointly and severally, in favor of Lead Plaintiffs and the other members of the Class for all losses and

damages suffered as a result of the acts and transactions complained of herein, including punitive damages where appropriate, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

E.  Awarding Lead Plaintiffs the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' fees and expert fees; and

F.  Awarding Lead Plaintiffs and the other members of the Class such other and further relief as this Court may deem just and proper in light of the circumstances of this case.

## COUNT IV

### UNAUTHORIZED TRANSACTIONS, RESCISSION

69.  Lead Plaintiffs repeat and reallege paragraphs 1 through 49 above as if fully set forth herein.

70.  Pursuant to the new Sarbanes-Oxley Act, specifically Section 301, Section 10(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(f) as amended, auditors and Audit Committees are to be independent and are to establish procedures for unanimous submissions by employees concerning questionable accounting or auditing matters.  Each Audit Committee has the authority to engage independent counsel and other advisors to carry out its duties.  It is clear that the Inside Directors attempted to undermine the Sarbanes-Oxley Act, specifically Section 301, by preventing the Independent Directors and sole Audit Committee Members (BANNON and OTTO) from fulfilling their duties in investigating the matters as set forth in Exhibit "A", by preventing the Board of Directors Meeting of February 13, 2004 from going forward, by attempting to terminate their independent directorships and by otherwise attempting to improperly issue options and other shares of the Company in favor of the Inside Directors and/or

third parties under their control so as to obtain a "majority of shareholder consent" in favor of terminating the Independent Directors and sole members of the Audit Committee.

71.    The sole purpose of this was to get rid of the Independent Directors who were properly investigating the complaints pursuant to Section 301(4) of the Sarbanes-Oxley Act.

72.    Pursuant to the Sarbanes-Oxley, the Inside Directors no longer have the ability to vote on matters of self-dealing, such as leases to their own corporation for the corporate offices, paying rent on the Ft. Lauderdale space and the lease of MALONEY FUST's condominium in Sarasota, Florida, purchasing the engagement ring for MALONEY FUST, paying $300,000.00 for the licensing and registration of the international patents which are still in the name of FUST rather than SF Asia and SF Europe as required by the APA and the other matters set forth above. The Inside Directors have entered into unauthorized transactions for which the Independent Directors sought to investigate and which the Inside Directors and LEE through their actions have attempted to prevent.

73.    The Lead Plaintiffs on behalf of themselves and the other shareholders of SFHC believe the above-referenced transactions are void and should be set aside and rescinded pursuant to Sarbanes-Oxley as being inappropriate and illegal since they were not approved by the Independent Directors and/or with the knowledge of the Independent Directors at the time they occurred.

74.    As a result, the Lead Plaintiffs on behalf of themselves and the shareholders of SFHC upon legal and equitable grounds are entitled to rescind the transactions set forth above and are entitled for the Inside Directors to disgorge those funds and those transactions referenced above for the benefit of SFHC if same are not approved by the Independent Directors without the influence of the Inside Directors, since they are all acts of self-dealing.

WHEREFORE, the Lead Plaintiffs seek to rescind and void the transactions set forth in paragraphs 34A through J above as acts of self-dealing to have the Inside Directors disgorge those funds, and to seek attorneys' fees for having to bring this action and any interests, costs and other and further relief this Court deems just and proper.

## COUNT V

## ACCOUNTING AND CONSTRUCTIVE TRUST

75. Lead Plaintiffs repeat and reallege paragraphs 1 through 49 and 70 through 72 above as if fully set forth herein.

76. The Lead Plaintiffs are shareholders of SFHC.

77. On behalf of themselves and the other shareholders of SFHC, the Lead Plaintiffs seek a full accounting of the Inside Directors' financial management of SFHC and an Order requiring them to repay funds improperly diverted from SFHC to the Company for all matters of self-dealing as set forth in paragraphs 34A through I and 52.

WHEREFORE, the Lead Plaintiffs, on behalf of themselves and the other shareholders of SFHC, request that this Court enter judgment individually against the Inside Directors and LEE as follows:

A. Enter an Order requiring the Lead Plaintiffs to account for and repay to the Company all compensation benefits, stock or other business assets diverted from the Company which have not been approved by Independent Directors and/or shareholders;

B. A declaratory judgment declaring that the options and shares improperly issued by the Inside Directors and LEE as set forth in the February 13, 2004 14C be done without Independent Director approval and that same are void and/or of no affect;

C.    Declaring that the Independent Directors pursuant to Sarbanes-Oxley have proper standing to appoint independent counsel to further investigate any necessary claims without fear of retaliation pursuant to Section 806 of the Sarbanes-Oxley Act,

D.    An award of damages against the Inside Directors for the monies improperly taken for actions of self-dealing;

E.    An award of attorneys' fees and costs for counsel for the Lead Plaintiffs;

F.    An award of any other further relief this Court deems just and appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Lead Plaintiffs demand a jury trial for all issues so triable.

**DATED** this *19th* day of February, 2004.

Respectfully submitted,

**DAVID B. HABER, P.A.**
Attorneys for Lead Plaintiffs
One S.E. Third Avenue, Suite 1820
Miami, Florida 33131
Tel: (305) 379-2400
Fax: (305) 379-2100

By: _____
     DAVID B. HABER
     Florida Bar No.: 435368

I:\clients-all\3495-Badolato\Pleadings\Complaint - Fust, et. al..doc

LAW OFFICES
of

# DAVID B. HABER, P.A.

SUNTRUST INTERNATIONAL CENTER • SUITE 1820
ONE SOUTHEAST THIRD AVENUE
MIAMI, FLORIDA 33131

TELEPHONE: (305) 379-2400
TELEFAX: (305) 379-1106

DHABER@DHABERLAW.COM

February 9, 2004

**Via E-Mail and Facsimile**

David Otto, Esq.
General Counsel
Sino Fresh Healthcare, Inc.
Sino Fresh Healthcare Asia, Inc.
Sino Fresh Healthcare Europe, Inc.
900 4th Avenue
Suite 3140
Seattle, WA 98165

Mr. Steve Bannon
Director
9465 Wilshire Boulevard
Beverly Hills, CA 90212

Mr. Charles Fust
Chairman and CEO
Sino Fresh Healthcare, Inc.
516 Paul Morris Drive
Englewood, FL 34223

Ms. Stacey Maloney
Sino Fresh Healthcare, Inc.
516 Paul Morris Drive
Englewood, FL 34223

Mr. Robert DuPont
Sino Fresh Healthcare, Inc.
516 Paul Morris Drive
Englewood, FL 34223

EXHIBIT
"A"
tabbies

Re:   **Sino Fresh Healthcare, Inc., et. al.**

Dear Sirs/Madam:

        This letter is written on behalf of Andrew M. Badolato ("Badolato"), Michael H. Hawkins ("Hawkins"), Sargon Capital, Inc. ("Sargon"), Russell "Bud" Waggoner ("Waggoner"), Don Fee ("Fee") and Ken Hall ("Hall"). Hawkins, Waggoner, Fee and Hall shall hereinafter collectively be referred to as Shareholders ("Shareholders"). Hawkins, Waggoner and Fee are Shareholders of Sino Fresh Healthcare, Inc. ("SF Healthcare"), Sino Fresh Europe, Inc. ("SF Europe"), and Sino Fresh Asia, Inc., ("SF Asia") (collectively the "SF Entities"). Additionally, Badolato is a former President, founder and former director of SF Healthcare and a current officer and director of SF Europe and SF Asia. Sargon is a consultant to all of the SF Entities referenced above. Therefore, this letter is being written pursuant to F.S. § 607.07401 (2) and 448.102 (1)-(3), 448.103 and 448.104. According to our clients, the SF Entities, their Boards and their officers and directors must immediately investigate the following charges and report back to their Shareholders, including the above-referenced Shareholders within thirty (30) days:

        1.    Sino Fresh Labs, Inc. (SF Labs) and/or Mr. Charles Fust ("Fust") represented to all shareholders of the SF Entities, including the Shareholders, that patents were transferred to the SF Entities pursuant to the Asset Purchase Agreement ("APA") executed between and amongst said SF Entities and SF Labs, though said patents have not yet actually been transferred. Those representations have been made to all three SF Entities, their auditors and their

David Otto, Esq.
Mr. Steve Bannon
Mr. Charles Fust
Ms. Stacey Maloney
Mr. Robert DuPont
February 9, 2004
Page 2

shareholders, as well as to the SEC. These representations are contained in the closing documents of the APA as having been effectuated. To date, despite those representations, the patents have still not yet been transferred. In fact, to date, these patents remain in Fust's name, despite repeated demands by Sargon, Badolato and the independent directors for Fust to transfer same to the SF Entities. Accordingly, either these representations were fraudulent inducements by Fust or, alternatively, Fust and SF Labs have breached their agreements with the SF Entities.

2.      Utilizing the corporate assets of SF Healthcare of approximately $300,000.00 for fees so as to register and file the above referenced patents internationally, as well as for licensing and legal fees associated with same (during which time Fust has maintained individual ownership of said patents and has repeatedly refused Badolato's, independent directors' and independent consultant Sargon's requests to turn over said patents to the SF Entities – despite repeated promises by Fust to do so and the APA's requirements that he do so).

3.      SF Labs executed an Indemnification Agreement for various matters that it was obligated to pay SF Healthcare as part of the closing documents and as part of the APA. To date, SF Healthcare has paid liabilities of SF Labs which were to be indemnified as part of the APA. Those include expenses and liabilities for attorney's fees involving two (2) litigations, specifically the Cabral litigation in Alabama and the threatened Mullins litigation (Fust's former girlfriend) – which are estimated at approximately $100,000.00. This is a breach of the APA.

4.      Resolution of the dispute with Mullins by payment of cash and stock to Mullins at the expense of SF Healthcare.

5.      The three SF Entities are in violation of their Consulting Agreement with Sargon. Sargon is owed monies for accrued and unpaid consulting fees and expenses which the SF Entities have failed to pay and/or address.

6.      The SF Entities have also failed to pay Sargon and/or its designees approximately $160,000.00 in finder's fees as part of the closing of the reverse merger transaction as has been customary in the SF Entities' prior financing transactions.

7.      Breach of fiduciary and self-dealing by Fust as an officer and director of SF Healthcare by purchasing an engagement ring for Stacey Maloney with corporate funds of SF Healthcare and covering up same as an expense of said corporation.

8.      Breach of fiduciary duty and self-dealing by Fust as an officer and director of SF Healthcare by forcing and coercing the execution of an Employment Agreement with Stacey Maloney, his former girlfriend (now wife of less than twelve (12) months), who has no college degree, no qualifications in the field and no prior relevant experience for the job at issue. This employment pays a salary and options of more than $350,000.00. Ms. Maloney was also given a seat on the Board of Directors of SF Healthcare, a publicly traded NASDAQ/OTC BB company.

David Otto, Esq.
Mr. Steve Bannon
Mr. Charles Fust
Ms. Stacey Maloney
Mr. Robert DuPont
February 9, 2004
Page 3

This Employment Agreement was not approved with full disclosure to and approval of an independent committee of the Board of Directors of SF Healthcare.

9.     Breach of fiduciary duty and self-dealing by Fust as an officer and director of all SF Entities by having a Lease executed whereby the  all three SF Entities lease space at a questionable location not necessarily suitable for their business purpose and for this industry – which building is owned (through a corporation) by Fust and Mr. Dupont, without accurately and completely disclosing this conflict of interest,  and without having the remainder of the Boards of the three SF Entities  vote on the Lease without input by Fust and/or Mr. Dupont (i.e. – a vote solely of independent directors).

10.     Fust's breach of fiduciary duty in failing to disclose to SF Healthcare's Board of Directors that SF Labs had entered into an agreement for a lease obligation in Ft. Lauderdale, Florida, despite SF Labs having no operations at that location, which Ft. Lauderdale location was utilized with Fust's knowledge as a "boiler room" chop shop for SF Labs to raise money through the sale of unregistered securities with unlicensed agents.  This procedure of paying the rent continued after the APA was executed. SF Healthcare continued to make those payments (by Fust signing the checks) without the remainder of the Board's approval or knowledge – resulting in sanctions from the State of Pennsylvania's securities regulators for State securities law violations.

11.     Fust's defaming and slandering Badolato and Sargon without any factual basis-- due to a prior State of Florida investigation/inquiry wherein documents were requested – when in fact the inquiry surrounded the sale of shares of mere common stock of which Fust himself participated.  Fust has now attempted to twist this prior "inquiry" regarding documents into a witch-hunt to remove any and all "independent officers and directors" (i.e. – Bannon and Otto), as well as  any and all former officers and/or directors (Badolato), who seek to uphold their fiduciary duty to the three (3) SF Entities.

12.     Fust's latest maneuver was that of January 30, 2004, in demanding the resignations of Bannon and Otto.  This should be similarly viewed in this same light, since they along with my clients, have pointed out all of the above-referenced matters to Fust -- to no avail. Accordingly, upon notifying Mr. Fust of their position on these issues verbally (especially after notification of same by my clients), Fust immediately demanded their resignations.  On the "no good deed goes unpunished" theory, they have been "blasted" by Fust and Fust apparently retained a law firm ("Greenberg, Traurig") for SF Healthcare without "board authority or approval", which law firm has now demanded said independent directors' ouster.

Luckily, subsequent to institution of the Sarbanes – Oxley Act, all directors have an independent duty, as do counsel, to investigate the above-referenced matters.

Each and every one of the above-referenced items (1-12) require an immediate investigation by independent members of the Boards of Directors of each of the SF Entitites,

DAVID B. HABER, P.A.

David Otto, Esq.
Mr. Steve Bannon
Mr. Charles Fust
Ms. Stacey Maloney
Mr. Robert DuPont
February 9, 2004
Page 4

their counsel and independent committees of each of the companies Boards to report back to the Boards as to whether the facts set forth above warrant immediate action, suit against SF Labs, Fust or require other corporate actions by each of the Boards.

If a report is not turned over within thirty (30) days to our Firm and our clients, our Firm has been instructed to file a shareholders' derivative action pursuant to F.S. § 607.07401 (2), which suit will include a verification and which will allege with particularity that demand was made to obtain action by the Boards of Directors of each of the three (3) SF Entities and that demand was refused and/or ignored.

Additionally, please place the errors and omissions carrier for each of the Boards of Directors on notice of the specific claims, including but not limited to the claim against Mr. Fust for failure to turnover the patents in violation and breach of the APA and for failure to notify the auditors specifically that the patents which the SF Entities advised the auditors which are assets of the corporations are still not yet in the corporations' names as of this date.

Also, please immediately notify the corporations' auditors as to the status of the patents and that the patents are not in the corporations' name as of this date so that the corporations' auditors have a full and complete picture of the corporations' assets and liabilities. Please amend all disclosures to the Securities and Exchange Commission ("SEC") for SF Healthcare so as to properly reflect the assets and liabilities of that company accordingly.

Finally, please be advised that pursuant to F.S.§ 448.102 (1)-(3), 408.103 and 448.104, any negative actions taken against Badolato as an officer and director of any of the SF Entities and/or against Sargon are in violation of the Florida Whistle Blower Act and in violation of the corresponding Federal Statute. To the extent that any retaliatory action is taken against Badolato and/or Sargon for disclosure of these matters, appropriate civil suits will be filed against the corporations under appropriate State and/or Federal Whistle Blower Statutes, for which damages, attorneys' fees and costs will be due and owing.

This letter is written reserving all rights of Badolato, Sargon and the above-referenced Shareholders of the SF Entities, without limitation.

PLEASE GOVERN YOURSELVES ACCORDINGLY.

Very truly yours,

DAVID B. HABER, P.A.

DAVID B. HABER

DBH:lsb
cc:   Scott Salberg, CPA
clients-all\3495-Badolato\Correspondence\D. Otto 2-9-04 Ltr..doc

DAVID B. HABER, P.A.

SOKOLOW, DUNAUD, MERCADIER
& CARRERAS LLP
DECEMBER 24, 2002

## ASSET PURCHASE AGREEMENT

BETWEEN

### SINOFRESH LABORATORIES, INC.
an Alabama corporation,

and

### SINOFRESH HEALTHCARE, INC.
a Delaware corporation,

DATED:

December ___, 2002

EXHIBIT

"B"

# TABLE OF CONTENTS

1.  Definitions.................................................................................................................1

2.  Purchase and Sale of Assets.....................................................................................4

    2.1   Purchase and Sale ...........................................................................................4
    2.2   Purchased Assets..............................................................................................4
    2.3   Excluded Assets ...............................................................................................4
    2.4   Assumption of Certain Liabilities ....................................................................5
    2.5   Excluded Liabilities ..........................................................................................5

3.  Purchase Price and Payment ....................................................................................5

    3.1   Purchase Price...................................................................................................5
    3.2   Tax and Accounting Consequences ..................................................................6
    3.3   Price Reduction Upon Certain Events ..............................................................6

4.  Pre-Closing Matters .................................................................................................6

    4.1   Operation of Purchased Assets .........................................................................6
    4.2   Consents ............................................................................................................7
    4.3   Notification of Certain Events ..........................................................................7
    4.4   Access to Information ........................................................................................8
    4.5   Public Announcements ......................................................................................8

5.  Conditions to Closing ...............................................................................................8

    5.1   Transferor's Conditions ....................................................................................8
    5.2   Acquiror's Conditions.......................................................................................9

6.  Closing....................................................................................................................10

    6.1   Time and Place of Closing ..............................................................................10
    6.2   Closing Deliveries...........................................................................................10
    6.3   Closing Cost ....................................................................................................11
    6.4   Possession .......................................................................................................11
    6.5   Bridge Loan .....................................................................................................11

7.  Representations and Warranties..............................................................................11

    7.1   Transferor's Representations and Warranties ..................................................11
    7.2   Acquiror's Representations and Warranties .....................................................19

i

| 8.   | Additional Covenants | 20 |
|------|----------------------|----|
|      | 8.1  Covenants by Each Party | 20 |
|      | 8.2  Indemnification | 20 |
|      | 8.3  Retention of and Access to Books and Records | 21 |
| 9.   | Termination | 21 |
|      | 9.1  Termination Events | 21 |
|      | 9.2  Effect of Termination | 21 |
| 10.  | Default; Remedies | 21 |
|      | 10.1  Time of Essence | 21 |
|      | 10.2  Remedies | 21 |
| 11.  | Survival of Representations and Warranties; Escrow | 22 |
|      | 11.1  Survival of Representations and Warranties | 22 |
|      | 11.2  Stockholder Escrow Arrangements | 22 |
| 12.  | Escrow Agent's Duties | 26 |
| 13.  | Limitation on Liability | 27 |
| 14.  | Construction and Interpretation | 27 |
| 15.  | Miscellaneous Provisions | 28 |
|      | 15.1  Survival of Covenants | 28 |
|      | 15.2  Expenses | 28 |
|      | 15.3  Binding Effect | 28 |
|      | 15.4  Assignment | 28 |
|      | 15.5  Notices | 28 |
|      | 15.6  Waiver | 29 |
|      | 15.7  Amendment | 29 |
|      | 15.8  Severability | 29 |
|      | 15.9  Integration | 29 |
|      | 15.10  Governing Law | 29 |
|      | 15.11  Arbitration | 30 |
|      | 15.12  Execution | 30 |
|      | 15.13  Waiver of Conflicts | 30 |
|      | 15.14  Incorporation of Recitals, Exhibits, and Schedules | 30 |
|      | 15.15  Further Assurances | 30 |
|      | 15.16  No Third Party Beneficiaries | 30 |
|      | 15.17  Bulk Sales | 31 |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into this ___th day of December with effect as of November 15, 2002 (the "Effective Date") by and between SinoFresh Laboratories, Inc., an Alabama corporation ("LABS")("Transferor") and SinoFresh HealthCare, Inc., a Delaware corporation ("SinoFresh" or "Acquiror").

## RECITALS

A.      LABS is in the business of producing, marketing and distributing proprietary products for the prevention and treatment of Sinusitis and related disorders. (the "Business").

B.      Transferor wishes to sell to Acquiror certain assets as described in Section 2.2 associated with Transferor's Business and Acquiror wishes to purchase such assets from Transferor, in each case on the terms and conditions set forth in this Agreement (this term and all other capitalized terms used herein having the respective meanings set forth in this Agreement).

## AGREEMENTS

In consideration of the foregoing, the mutual covenants of the parties set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.      Definitions.  As used in this Agreement, the following terms have the respective meanings set forth below:

"Agreement" shall mean this Asset Purchase Agreement.

"Acquiror" shall have the meaning set forth in the preamble to this Agreement.

"Acquiror's Knowledge" shall mean that any of the officers or directors of Acquiror are actually aware of a particular fact or other matter.

"Assumed Liabilities" shall have the meaning set forth in Section 2.4.

"Best Efforts" shall mean the efforts that a prudent Person who wishes to achieve a result would use in similar circumstances to achieve such result as expeditiously as reasonably possible.

"Bill of Sale" shall mean the document described in Section 6.2.1(a).

"Books and Records" shall mean all books and records of Transferor that are necessary to conduct the Business, the ownership, use, and operation of the Purchased Assets, or the payment or performance of the Assumed Liabilities, including any such records maintained on computer and all related computer software.

1

"Breach" shall mean any material inaccuracy in or material breach of, or any material failure to perform or comply with, any representation, warranty, covenant, obligation, or other provision of this Agreement or any document delivered pursuant to this Agreement.

"Business" shall have the meaning set forth in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday, or other day on which commercial banks in Seattle, Washington are authorized or required by applicable Legal Requirements to be closed.

"Closing" shall mean the closing of this transaction, at which the events set forth in Section 6.2 shall occur.

"Closing Date" shall mean the date on which the Closing occurs.

"Preferred Stock" shall have the meaning set forth in Section 3.1.

"Consent" shall mean any approval, consent, ratification, waiver, or other authorization, including any Governmental Authorization.

"Contract" shall mean any agreement, contract, lease, obligation, promise, or understanding, whether written or oral and whether express or implied, that is legally binding.

"Damages" shall have the meaning set forth in Section 8.2.

"Effective Date" shall have the meaning set forth in the preamble to this Agreement.

"Excluded Assets" shall have the meaning set forth in Section 2.3.

"Governmental Authority" shall mean any national, federal, state, provincial, county, municipal, or local government, foreign or domestic, or the government of any political subdivision of the any of the foregoing, or any entity, authority, agency, ministry, or other similar body exercising executive, legislative, judicial, regulatory, or administrative authority or functions of or pertaining to the government, including any quasi-governmental entity established to perform any such functions.

"Governmental Authorization" shall mean any Consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"Intellectual Property" shall mean (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, trade names, and corporate names, together with all translations, adaptation, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c)

2

all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) all computer software (including data and related documentation) and (g) all other proprietary rights.

"InvestLinc" shall mean InvestLinc Equity Fund II, L.P., a Nevada Limited Partnership and InvestLinc Energy Growth Equity Fund I, LLC, a Nevada Limited Liability Company.

"InvestLinc Obligations" shall mean the obligations of transfer to InvestLinc under those certain promissory notes, aggregating $500,000 in principal.

"Legal Requirement" shall mean any federal, state, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, rule, statute, or treaty.

"Lien" shall mean a monetary encumbrance against a Purchased Asset.

"Ordinary Course of Business" shall mean any action taken by a Person if, and only if, such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person.

"Organizational Documents" shall mean (i) the articles or certificate of incorporation and the bylaws of a corporation, (ii) the partnership agreement and any statement of partnership of a general partnership, (iii) the limited partnership agreement and certificate of limited partnership of a limited partnership, (iv) any charter, operating agreement, or similar document adopted or filed in connection with the creation, formation, or organization of a Person, and (v) any amendment to any of the foregoing.

"Permitted Encumbrances" shall mean those encumbrances incurred in the ordinary course of business or otherwise in existence as of the Closing Date.

"Person" shall mean an individual, partnership, corporation, limited liability company, joint stock company, trust, unincorporated organization or association, joint venture, or other organization, whether or not a legal entity, or a Governmental Authority.

"Possession Date" shall mean 12:01 a.m., on the day following the Closing Date.

"Proceeding" shall mean any action, arbitration, audit, hearing, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority, arbitrator, or mediator.

"Purchase Price" shall have the meaning set forth in Section 3.1.

3

"Purchased Assets" shall have the meaning set forth in Section 2.2.

"Release Agreement" shall mean the Agreement described in Section 8.1.1.

"Representative" shall mean, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of or to such Person, including such Person's attorneys, accountants, and financial advisors.

"SDMC" means Sokolow, Dunaud, Mercadier & Carreras LLP.

"SinoFresh Bridge Loan" shall mean the loan or loans made by SinoFresh and its designees to LABS as of the date hereof.

"Transferor" shall have the meaning set forth in the preamble to this Agreement.

"Transferor Shareholders" shall have the meaning set forth in Section 3.2.

"Transferor's Knowledge" shall mean that any of the officers or directors of Transferor are actually aware of a particular fact or other matter.

"Tax" shall mean any tax (including any income tax, capital gains tax, value-added tax, sales tax, excise tax, property tax, gift tax, or estate tax), levy, assessment, tariff, duty (including any customs duty), deficiency, or other fee, and any related charge or amount (including any fine, penalty, interest, or addition to tax), imposed, assessed, or collected by or under the authority of any Governmental Authority or payable pursuant to any tax-sharing agreement or other Contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency, or fee.

2.    Purchase and Sale of Assets.

2.1    Purchase and Sale. Transferor agrees to transfer and sell the Purchased Assets to Acquiror, and Acquiror agrees to acquire the Purchased Assets from Transferor, in each case for the price and on the terms and conditions set forth in this Agreement. Upon payment of the Purchase Price as described in Section 3 hereof and the satisfaction of the other terms of this Agreement, Transferor shall sell, transfer, assign and deliver the Purchased Assets to Acquiror on the Closing Date free and clear of any and all liens, encumbrances, security interests or obligations, except for Permitted Encumbrances.

2.2    Purchased Assets. The assets to be sold by Transferor to Acquiror pursuant to this Agreement (the "Purchased Assets") shall be all of the Transferor's assets described on Exhibit A attached hereto, with the exception of the Excluded Assets described in Section 2.3.

2.3    Excluded Assets. All assets of Transferor not specifically included in the Purchased Assets (the "Excluded Assets") shall not be acquired by Acquiror pursuant to this Agreement.

4

2.4    Assumption of Certain Liabilities. Acquiror shall at Closing assume the liabilities of Transferor described on Exhibit B (the "Assumed Liabilities"), but excluding any other liabilities of Transferor whatsoever.

2.5    Excluded Liabilities. Acquiror shall not assume any of the liabilities of Transferor not identified in Section 2.4 above. Without limiting the generality of the foregoing, Acquiror shall not assume any liabilities:

(a)    attributable to any of the Excluded Assets;

(b)    liabilities for any income, gain, profit or similar Tax arising out of or resulting from the sale, conveyance, transfer, assignment and delivery of the Purchased Assets provided for in this Agreement;

(c)    all Taxes imposed on or with respect to the Business for all Pre-Closing Periods;

(d)    liabilities for any sales, exercise, transfer or other tax on or arising out of the sale, conveyance, transfer, assignment or delivery of the Purchased Assets;

(e)    liabilities and obligations pursuant to any agreements relating to the employment of any individual in connection with Transferor's business, including, but not limited to liabilities for any option, warrant, bonus, performance severance, golden parachute, consulting, or similar liability;

(f)    liabilities and obligations (whether fixed or contingent) with respect to the Employee Benefit Plans; and

(g)    all liabilities and obligations arising out of the Excluded Assets.

(h)    liability of Transferor for its lease for premises at 313 S. Seaboard Ave., Venice FL 34292 ; and

(i)    liability for any contract not assigned to Acquiror;

(j)    liability for any employee or stockholder loan;

(k)    liability for any pending lawsuits, including those listed on Schedule 7.1.15; and

(l)    liability for Transferor's costs, fees, and expenses of this transaction.

3.    Purchase Price and Payment.

3.1    Purchase Price. In consideration of (i) the sale, transfer and conveyance to Acquiror of the Purchased Assets, Acquiror shall, at the Closing, transfer to Transferor One

5

Million Seven Hundred and Fifty Thousand (1,750,000) shares of SinoFresh Series A Preferred Stock (the "Preferred Stock") to be issued by Acquiror (the "Shares"). The number of Shares to be transferred to Transferor shall be appropriately adjusted to reflect the effect of any stock split, reverse split, stock dividend, reorganization, recapitalization or other like change with respect to Transferor's Preferred Stock occurring after the Effective Date and prior to Closing, so as to provide Transferor the same economic effect as contemplated by this Agreement prior to such stock split, reverse split, stock dividend, reorganization, recapitalization, or like change. The consideration described in this Section 3.1 is herein referred to as the "Purchase Price."

3.2  Tax and Accounting Consequences. As a result of the transfer of the Shares to Transferor, in accordance with the terms and conditions set forth in this Agreement, there may be certain Tax and accounting consequences to the shareholders of the Transferor (the "Transferor Shareholders"), who will be the ultimate recipients of the Shares.

**ACQUIROR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, NOR ARE ANY INTENDED OR SHOULD ANY BE INFERRED, REGARDING THE ECONOMIC RETURN OR THE TAX CONSEQUENCES TO THE TRANSFEROR SHAREHOLDERS WHO WILL ACQUIRE THE SHARES. ACQUIROR, THEREFORE, RECOMMENDS THAT THE TRANSFEROR SHAREHOLDERS CONSULT THEIR OWN ATTORNEYS, ACCOUNTANTS AND FINANCIAL ADVISORS ABOUT THE LEGAL AND TAX CONSEQUENCES AND THE FINANCIAL RISKS AND MERITS OF RECEIVING THE SHARES.**

3.3  Price Reduction Upon Certain Events. In the event of any damage to or destruction or condemnation of any of the Purchased Assets (excluding damage or destruction caused by Acquiror or any of its affiliates), or any taking of any of the Purchased Assets by eminent domain, between the Effective Date and the Closing Date, Acquiror shall have the right, by notice given to Transferor within five (5) days of such event (but in any case prior to the Closing Date), to terminate this Agreement. If Acquiror does not elect to terminate this Agreement, the Purchase Price shall be reduced by an amount equal to the resulting reduction in the value of the Purchased Assets, which shall be attributed to the Transferor whose respective Purchased Assets were so damaged, destroyed or condemned. Transferor shall be entitled to retain any insurance proceeds or condemnation awards paid or payable on account of such damage or destruction or such taking. Transferor and Acquiror agree to negotiate in good faith regarding the reduction in value resulting from any damage to or destruction or condemnation of the Purchased Assets.

4.  Pre-Closing Matters.

4.1  Operation of Purchased Assets. Between the Effective Date and the Closing Date, Transferor, with respect to the Business, shall:

4.1.1  Conduct the Business and operate and maintain the Purchased Assets in the Ordinary Course of Business;

6

4.1.2    Not sell, lease, or otherwise transfer or dispose of any Purchased Assets, or any interest therein, other than transfers and dispositions made in the Ordinary Course of Business or transfers and dispositions otherwise authorized by its President;

4.1.3    Not permit or allow any Purchased Assets to become subject to any additional Lien (other than Permitted Encumbrances);

4.1.4    Maintain the levels of Inventories and supplies in the Business at customary levels; and

4.1.5    Use its Best Efforts to maintain the relations and goodwill with suppliers, customers, and others having business relationships with Transferor in connection with the Business.

4.2    Consents.

4.2.1    Schedule 4.2.1 to this Agreement sets forth a complete and accurate list of all Consents to transfer required under (i) all material Contracts (a) to which Transferor is a party and which relate to Transferor's Business or the ownership, use, or operation of the Purchased Assets, or (b) by which any of the Purchased Assets is bound; and (ii) all material Governmental Authorizations that are held by Transferor and relate to Transferor's Business or the ownership, use or operation of the Purchased Assets.  Acquiror and Transferor shall use their respective Best Efforts, each at its own expense, to obtain all such Consents as soon as practicable after the Effective Date.  In the event any such Consent is not obtained by the Closing Date, Transferor agrees to continue to use its Best Efforts thereafter, in cooperation with Acquiror, to obtain such Consent as soon as practicable.

4.2.2    Acquiror shall provide all cooperation reasonably requested by Transferor in connection with obtaining the Consents described on Schedule 4.2.1, including the provision of any information relating to Acquiror that may be requested by the Person from whom any such Consent is required.

4.3    Notification of Certain Events.

4.3.1    By Transferor.  Between the Effective Date and the Closing Date, Transferor shall give prompt notice to Acquiror in the event Transferor becomes aware of (i) any fact or condition that causes or constitutes a Breach of any representation or warranty of Transferor set forth herein as of the Effective Date, (ii) any fact or condition that would cause or constitute a Breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition, (iii) the occurrence of any Breach of any covenant of Transferor in this Agreement, or (iv) the occurrence of any event that Transferor believes will make the satisfaction of any of the conditions set forth in Section 5 impossible or unlikely. In the event that any fact or condition of the type described in the foregoing clause (i) or (ii) would have required any change in any of the Schedules or Exhibits to this Agreement if such fact or condition had occurred or been known as of the Effective Date, Transferor shall promptly deliver to Acquiror a supplement to such Schedule or Exhibit specifying the necessary change.

7

4.3.2  By Acquiror. Between the Effective Date and the Closing Date, Acquiror shall give prompt notice to Transferor in the event Acquiror becomes aware of (i) any fact or condition that causes or constitutes a Breach of any representation or warranty of Acquiror set forth herein as of the Effective Date, (ii) any fact or condition that would cause or constitute a Breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition, (iii) the occurrence of any Breach of any covenant of Acquiror in this Agreement, or (iv) the occurrence of any event that Acquiror believes will make the satisfaction of any of the conditions set forth in Section 5 impossible or unlikely. In the event that any fact or condition of the type described in the foregoing clause (i) or (ii) would have required any change in any of the Schedules or Exhibits to this Agreement if such fact or condition had occurred or been known as of the Effective Date, Acquiror shall promptly deliver to Transferor a supplement to such Schedule or Exhibit specifying the necessary change.

4.3.3  No Effect on Remedies. The delivery of a notice or supplement pursuant to Sections 4.3.1 and 4.3.2 shall have no effect on the remedies of any party hereunder.

4.4  Access to Information. Between the Effective Date and the Closing Date, Transferor shall, upon reasonable notice from Acquiror, (i) give Acquiror and its representatives access (during normal business hours), in a manner so as not to interfere with Transferor's normal operations and subject to reasonable restrictions imposed by any such representative, to all key employees and to the Purchased Assets, including the Books and Records relating thereto, and (ii) cause its representatives to make available to Acquiror for the purpose of making copies thereof such financial and operating data and other information with respect to the Business and the Purchased Assets as Acquiror may reasonably request.

4.5  Public Announcements. Except as otherwise required by applicable Legal Requirements, any public announcement or similar publicity with respect to this Agreement or this transaction shall be issued, if at all, only with such contents, at such time and in such manner as the parties may agree. If a party believes that it is required by applicable Legal Requirements to make any such public announcement, it shall first provide to the other party the content of the proposed announcement, the reasons such announcement is required to be made, and the time and place that the announcement will be made.

5.  Conditions to Closing.

5.1  Transferor's Conditions. Transferor's obligation to close this transaction shall be subject to and contingent upon the satisfaction (or waiver by Transferor in writing in its sole discretion) of each of the following conditions:

5.1.1  All representations and warranties of Acquiror set forth in this Agreement and each such representation and warranty shall have been accurate in all respects as of the Effective Date and shall be accurate in all respects as of the Closing Date, as if made on the Closing Date.

5.1.2  (i) All of the covenants and obligations that Acquiror is obligated to perform or comply with pursuant to this Agreement prior to or at the Closing and each such

8

covenant and obligation (considered individually) shall have been performed and complied with in all respects; and (ii) Acquiror shall have made the deliveries of documents required to be made pursuant to Section 6.2.2; provided, however, that with respect to the covenants and obligations described in this Section 5.1.2, a failure of the foregoing condition shall not be deemed to have occurred unless (a) Transferor has given Acquiror notice specifying the nature of any Breach of such covenants or obligations in reasonable detail, and (b) either (y) Acquiror has failed to cure such Breach within ten (10) Business Days after such notice is given, or (z) if such Breach cannot be cured solely by the payment of money and cannot reasonably be cured within ten (10) Business Days despite the exercise of Best Efforts, Acquiror has failed to commence curative action within ten (10) Business Days after such notice is given or thereafter fails to complete the cure of such Breach as soon as practicable.

    5.2    Acquiror's Conditions. Acquiror's obligation to close this transaction shall be subject to and contingent upon the satisfaction (or waiver by Acquiror in its sole discretion) of each of the following conditions:

    5.2.1    All representations and warranties of Transferor set forth in this Agreement shall have been accurate as of the Effective Date and shall be accurate as of the Closing Date, as if made on the Closing Date.

    5.2.2    All of the covenants and obligations that Transferor are obligated to perform or comply with pursuant to this Agreement prior to or at the Closing shall have been performed and complied with; and (ii) Transferor shall have made the deliveries of documents required to be made pursuant to Section 6.2.1.

    5.2.3    To the extent, if any, that Acquiror is required to obtain any Governmental Authorizations that relate to the Businesses or the ownership, use, and operation of the Purchased Assets, Acquiror shall have obtained such Governmental Authorizations and such Governmental Authorizations shall be in full force and effect as of the Closing Date or subject to issuance to Acquiror upon consummation of this transaction.

    5.2.4    As of the Closing Date, there shall not be in effect any legal requirement or any injunction or other order that prohibits the transfer of any portion of the Purchased Assets by Transferor to Acquiror.

    5.2.5    Between the Effective Date and the Closing Date, there shall have been no damage to or destruction of any of the Purchased Assets (excluding damage or destruction (i) caused by Acquiror or any of its affiliates; or (ii) that does not have a material adverse effect on the Businesses), nor any taking of any material portion of the Purchased Assets by eminent domain.

    5.2.6    Since the Effective Date, there shall not have been commenced or threatened against Acquiror or Transferor or any related person of Acquiror or Transferor any proceeding (i) seeking damages or other relief in connection with, any aspect of this transaction, or (ii) that could reasonably be expected to have the effect of preventing this transaction or making this transaction illegal.

5.2.7   Transferor shall have executed a Release Agreement, on terms and conditions acceptable to Acquiror.

5.2.8   Transferor shall have executed all documents necessary to transfer and assign any of the Transferor's Intellectual Property which is being transferred pursuant to this Agreement.

5.2.9   InvestLinc shall have consented to the transaction and the transfer of the InvestLinc obligations to SinoFresh.

5.2.10   5.2.10   The Shareholders of Transferor shall have approved the transaction.

6.   Closing.

6.1   Time and Place of Closing.   The Closing shall take place at the offices of LABS or at such other location as the parties may mutually agree.  Subject to the provisions of Section 7, the Closing shall take place commencing at 2:00 p.m. (Eastern Standard Time) on December ____, 2002, unless Transferor, in its sole discretion, determines that shareholder approval of the transactions contemplated by this Agreement is necessary or desirable, in which case Closing shall take place on December 20, 2001 or, in either case, on such other date as is mutually acceptable to the parties.

6.2   Closing Deliveries.

6.2.1   At the Closing, Transferor shall deliver, or cause to be delivered, to Acquiror:

(a)   A fully executed Bill of Sale and Assignment and Assumption in the form of Exhibit C to this Agreement (the "Bill of Sale") conveying to Acquiror all personal property to be acquired by Acquiror pursuant to this Agreement and providing for (i) the assignment to Acquiror of the contract rights, and all other intangible personal property included in the Purchased Assets and (ii) Acquiror's assumption of the Assumed Liabilities;

(b)   A Certificate of an officer of Transferor (i) certifying to the attached resolutions of the board of directors and shareholders, if the board of directors deems it necessary, of Transferor authorizing this transaction, and (ii) attesting to the incumbency of the authorized officers of Transferor executing this Agreement and the Transferor's closing documents;

(c)   A duly authorized and executed Release Agreement required by Section 8.1.1;

(d)   A Certificate of an authorized officer of the Transferor certifying as to the accuracy of the Transferor's representations and warranties under Section 7.1;

10

(e) All Consents necessary to permit Transferor to transfer the Purchased Assets to Acquiror; and

(f) All necessary documents to transfer and assign any Intellectual Property which is being transferred pursuant to this Agreement; and

(g)     all of the books and records of Transferor.

6.2.2     At the Closing, Acquiror shall deliver, or cause to be delivered, to Transferor:

(a)     A counterpart copy of the Bill of Sale, executed by Acquiror;

(b)     A Certificate of an authorized officer of Acquiror (i) certifying attached resolutions of the boards of directors and shareholders of Acquiror authorizing this transaction, and (ii) attesting to the incumbency of the authorized officer of Acquiror executing this Agreement and the Acquiror's closing documents;

(c)     A duly authorized and executed Release Agreement as required by Section 8.1.1;

(d)     A Certificate of an authorized officer of the Acquiror certifying as to the accuracy of the Acquiror's representations and warranties under Section 7.2;

(e)     A Certificate of an authorized officer of the Acquiror certifying the number of shares that Transferor shall be entitled to in accordance with the terms and conditions of this Agreement; and

(f) A counterpart copy of necessary documents to transfer and assign any Intellectual Property which is being transferred pursuant to this Agreement.

6.3     Closing Costs. Transferor and Acquiror shall each pay one-half (1/2) of the following costs associated with the Closing: (i) recording fees with respect to the assignment of any Intellectual Property and (ii) all sales and excise taxes due in connection with this transaction.

6.4     Possession. Acquiror shall be entitled to possession of the Purchased Assets on the Possession Date as that term is defined in Section 1.

6.5     SinoFresh Bridge Loan. At the Closing, the SinoFresh Bridge Loan shall be converted to shares of Preferred Stock on the basis of $.50 per share.

7.     Representations and Warranties.

7.1 Transferor's Representations and Warranties. Transferor represents and warrants to Acquiror as follows:

11

7.1.1  Organization and Good Standing.  Transferor is a corporation, duly formed, validly existing and in good standing under the laws of the State of Alabama and is the successor in interest to SinoFresh Laboratories. Transferor has the corporate power to own its properties and to carry on its business as now being conducted. Transferor is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction in which the failure to be so qualified would have a material adverse effect on the business, assets (including intangible assets), prospects, financial condition or results of operations of Transferor (hereinafter referred to as a "MATERIAL ADVERSE EFFECT"). Transferor has delivered a true and correct copy of its Articles of Incorporation and By-laws, each as amended to date, to Acquiror.

7.1.2  Title to Purchased Assets.  Transferor has good and marketable title to the Purchased Assets, free and clear of all mortgages, pledges, liens, encumbrances, security interests, equities, charges and restrictions of any nature whatsoever, except such Permitted Encumbrances, as that term is defined in Section 1. By virtue of the deliveries made at the Closing, Acquiror will obtain good and marketable title to the Purchased Assets, free and clear of all liens, mortgages, pledges, encumbrances, security interests, equities, charges and restrictions of any nature whatsoever, except any Permitted Encumbrances.

7.1.3  Authority: No Conflict.

(a) This Agreement constitutes the legal, valid, and binding obligation of Transferor, enforceable against Transferor in accordance with its terms. Upon its execution and delivery by Transferor at the Closing, the Transferor's closing documents will constitute the legal, valid, and binding obligations of Transferor, enforceable against Transferor in accordance with its respective terms. Transferor has full corporate power, authority, and capacity to execute and deliver this Agreement and Transferor's closing documents and to perform its obligations hereunder and thereunder. Without limiting the generality of the foregoing, the Boards of Directors, and shareholders, if the Boards of Directors deems it necessary, of Transferor has approved this Agreement and the transactions contemplated hereby.

(b) Neither the execution and delivery of this Agreement, nor the performance of any of Transferor's obligations hereunder, nor the consummation of the transactions contemplated by this Agreement will, directly or indirectly (with or without notice, lapse of time, or both), (i) contravene, conflict with or result in a violation of any provision of Transferor's Organizational Documents or any resolution adopted by the Boards of Directors or shareholders of Transferor; (ii) contravene, conflict with, or result in a violation of, or give any Governmental Authority or other person the right to challenge this transaction or to exercise any remedy or obtain any relief under, any legal requirement or any order to which Transferor or any of the Purchased Assets is subject; (iii) contravene, conflict with, or result in a violation of any of the terms or requirements of any governmental authorization; (iv) contravene, conflict with, or result in a violation or breach of any provision of, or give any person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to

12

cancel, terminate, or modify, any Contract; or (v) result in the imposition or creation of any lien upon or with respect to any of the Purchased Assets; except, in the case of clauses (i), (ii) and (iii) above, for contraventions, conflicts or violations which do not have a material adverse effect on the ability of Transferor

(c) to consummate the transactions contemplated hereby.

(d) Transferor represents and warrants that it is not and will not be required to give any notice to, make any filing with, or obtain any material Consent from any person in connection with the execution and delivery of this Agreement, the performance of its obligations hereunder, or the consummation of this transaction, other than the Consents described on Schedule 4.2.1. except, for Consents, the failure of which to obtain would not have a material adverse effect on the ability of the Transferor to consummate the transactions contemplated hereby.

7.1.4 Books and Records. The Books and Records are complete and correct in all material respects and have been maintained in accordance with sound business practices.

7.1.5 Possession of Purchased Assets. The Purchased Assets are assets of the Transferor as of the Effective Date and are in Transferor's possession as of the Effective Date, and that Transferor has all requisite title or license to convey the Purchased Assets to Acquiror as contemplated by the Agreement.

7.1.6 No Material Adverse Changes. There have been no material adverse changes to Transferor's business, operations or financial condition other than as disclosed to Acquiror.

7.1.7 Certain Proceedings. No proceeding is pending or, to Transferor's Knowledge, has been threatened against Transferor that challenges, or could reasonably be expected to have the effect of preventing, making illegal, or otherwise materially interfering with, this transaction.

7.1.8 Transferor Financial Statements. (a) Transferor has heretofore furnished Acquiror with audited balance sheets in respect of the Business for the two years ended May 31, 2002 and unaudited balance sheets in respect of the Business for the five and one-half month period ended November 15, 2002 and the related audited and unaudited income statements for the period then ended, which in each case are subject to the footnotes stated therein and do not reflect intracorporate charges. The unaudited balance sheet in respect of the Business as at November 15, 2002 is hereinafter referred to as the "Balance Sheet" and November 15, 2002 is hereinafter referred to as the "Balance Sheet Date" copies of which are attached hereto as Exhibit A. Such financial statements have been prepared from the books and records of Transferor and on a consistent basis for each of the periods presented in all material respects.

7.1.9 To the Knowledge of Transferor, since the Balance Sheet Date, (i) there has been no material adverse change in the Condition of the Business, (ii) the Business has,

13

in all material respects, been conducted in the ordinary course of business consistent with past practice, (iii) there has not been any material obligation or liability (contingent or otherwise) incurred by Transferor with respect to the Business other than obligations and liabilities incurred in the ordinary course of business, (iv) there has not been any purchase, sale or other disposition, or any agreement or other arrangement, oral or written, for the purchase, sale or other disposition, of any properties or assets having a value in excess of $5,000 in any case other than in the ordinary course of business, and (v) none of the assets of Transferor have been used to reduce liabilities which are not being assumed by Acquiror.

7.1.10  No Undisclosed Liabilities.  Except as set forth in Schedule 7.1.10 or set forth on the Balance Sheet, Transferor does not have any liability, indebtedness, obligation, expense, claim, deficiency, guaranty or endorsement of any type, in excess of $5,000 individually or $10,000 in the aggregate, whether accrued, absolute, contingent, matured, unmatured or other (whether or not required to be reflected in financial statements in accordance with generally accepted accounting principles).

7.1.11  Tax and Other Returns and Reports.

(a)  Definition of Taxes.  For the purposes of this Agreement, "TAX" or, collectively, "TAXES," shall have the meaning set forth in Article 1 hereof.

(b)  Tax Returns And Audits.  Except as set forth in Schedule 7.1.11:

(i) Transferor as of the Closing Date will have prepared and filed all required federal, state, local and foreign returns, estimates, information statements and reports ("RETURNS") relating to any and all Taxes concerning or attributable to Transferor or its operations and such Returns will be true and correct in all material respects and will have been completed in accordance with applicable law in all material respects.

(ii) Transferor as of the Closing Date: (A) will have paid or accrued all material Taxes it is required to pay or accrue and (B) will have withheld with respect to its employees all federal and state income taxes, FICA, FUTA and other Taxes required to be withheld.

(iii) Transferor has not been adjudicated delinquent by any Tax Authority in the payment of any Tax nor is there any Tax deficiency outstanding, proposed or assessed against Transferor, nor has Transferor executed any waiver of any statute of limitations on or extending the period for the assessment or collection of any Tax.

(iv) No audit or other examination of any Return of Transferor is presently in progress, nor has Transferor been notified of any request for such an audit or other examination.

14

(v) Transferor does not have any material liabilities for unpaid federal, state, local and foreign Taxes which have not been accrued or reserved against on the current Balance Sheet, whether asserted or unasserted, contingent or otherwise, and Transferor has no knowledge of any basis for the assertion of any such liability attributable to Transferor, its assets or operations.

(vi) Transferor has provided to Acquiror copies of all federal and state income and all state sales and use Tax Returns filed for fiscal years 2000 and 2001.

(vii) There are (and as of immediately following the Closing there will be) no material liens, pledges, charges, claims, security interests or other encumbrances of any sort ("LIENS") on the assets of Transferor relating to or attributable to Taxes.

(viii) Transferor has no knowledge of any basis for the assertion of any claim relating or attributable to Taxes, which if adversely determined, would result in any Lien on the assets of Transferor.

(ix) None of Transferor's assets are treated as "tax-exempt use property" within the meaning of Section 168(h) of the Code.

(x) As of the Closing Date, Transferor will not be a party to any contract, agreement, plan or arrangement, including but not limited to the provisions of this Agreement, covering any employee or former employee of Transferor that could obligate Transferor to pay any amount that would not be deductible pursuant to Section 280G of the Code.

(xi) Transferor has not filed any consent agreement under Section 341(f) of the Code nor agreed to have Section 341 (f)(2) of the Code apply to any disposition of a subsection (f) asset (as defined in Section 341(f)(4) of the Code) owned by Transferor.

(xii) Transferor is not a party to a tax sharing or allocation agreement nor does Transferor owe any amount under any such agreement.

(xiii) Transferor is not, and has not been at any time, a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

(xiv) Transferor's tax basis in its assets for purposes of determining its future amortization, depreciation and other federal income tax deductions is accurately reflected on Transferor's tax books and records in all material respects.

7.1.12 Agreements, Contracts And Commitments. Except as set forth on Schedule 7.1.12, Transferor does not have, is not a party to nor is it bound by:

15

(i) any collective bargaining agreements,

(ii) any agreements or arrangements that contain any severance pay or post-employment liabilities or obligations,

(iii) any bonus, deferred compensation, pension, profit sharing or retirement plans, or any other employee benefit plans or arrangements,

(iv) any employment or consulting agreement, contract or commitment with an employee or individual consultant or salesperson or consulting or sales agreement, contract or commitment with a firm or other organization,

(v) any agreement or plan, including, without limitation, any stock option plan, stock appreciation rights plan or stock purchase plan, any of the benefits of which will be increased, or the vesting of benefits of which will be accelerated, by the occurrence of any of the transactions contemplated by this Agreement or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated by this Agreement,

(vi) any fidelity or surety bond or completion bond,

(vii) any lease of personal property having a value individually in excess of $5,000,

(viii) any agreement of indemnification or guaranty,

(ix) any agreement, contract or commitment containing any covenant limiting the freedom of Transferor to engage in any line of business or to compete with any person,

(x) any agreement, contract or commitment relating to capital expenditures and involving future payments in excess of $5,000,

(xi) any agreement, contract or commitment relating to the disposition or acquisition of material assets or any interest in any business enterprise outside the ordinary course of Transferor's business,

(xii) any mortgages, indentures, loans or credit agreements, security agreements or other agreements or instruments relating to the borrowing of money or extension of credit, including guaranties referred to in clause (viii) hereof,

(xiii) any purchase order or contract for the purchase of raw materials involving $10,000 or more other than purchases in the ordinary course of business,

(xiv) any construction contracts,

16

(xv) any distribution, joint marketing or development agreement, or

(xvi) any other agreement, contract or commitment that involves $5,000 or more and is not cancelable without penalty within thirty (30) days.

(xvii) Except for such alleged breaches, violations and defaults, and events that would constitute a breach, violation or default with the lapse of time, giving of notice, or both, all as noted in Schedule 7.1.12, Transferor has not breached, violated or defaulted under, or received notice that it has breached, violated or defaulted under, any of the terms or conditions of any agreement, contract or commitment to which it is a party or by which it is bound and which are required to be set forth in Schedule 7.1.12 (any such agreement, contract or commitment, a "CONTRACT") except for breaches, violations or defaults that will not have a Material Adverse Effect. Each agreement, contract or commitment set forth in any of Transferor Schedules is in full force and effect and, except as otherwise disclosed in Schedule 3.12(b), is not subject to any default thereunder of which Transferor has knowledge by any party obligated to Transferor pursuant thereto.

7.1.13  Interested Party Transactions. Except as set forth on Schedule 7.1.13, to the knowledge of Transferor, no director, officer or stockholder of Transferor (nor to the knowledge of Transferor any ancestor, sibling, descendant or spouse of any of such persons, or any trust, partnership or corporation in which any of such persons has an interest), has, directly or indirectly, (i) a direct interest in any entity which finished or sold, or finishes or sells, services or products that Transferor finishes or sells, or proposes to finish or sell, or (ii) a direct interest in any entity that purchases from or sells or finishes to, Transferor, any goods or services or (iii) a beneficial interest in any contract or agreement set forth in Schedule 7.1.15; PROVIDED, that ownership of no more than one percent (1%) of the outstanding voting stock of a publicly traded corporation shall not be deemed an "interest in any entity" for purposes of this Section 3.13.

7.1.14  Governmental Authorization. Schedule 3.14 accurately lists each material consent, license, permit, grant or other authorization issued to Transferor by a governmental entity (i) pursuant to which Transferor currently operates or holds any interest in any of its properties or (ii) which is required for the operation of its business or the holding of any such interest (herein collectively called "TRANSFEROR AUTHORIZATIONS"), which Transferor Authorizations are in full force and effect and constitute all Transferor Authorizations required to permit Transferor to operate or conduct its business substantially as it is currently and has been conducted or hold any interest in its properties or assets.

7.1.15  Litigation. Except as set forth in Schedule 7.1.15, there is no action, suit, claim or proceeding of any nature pending or, to the knowledge of Transferor, threatened against Transferor, its properties or any of its officers or directors in their capacity as such, nor, to the knowledge of Transferor, is there any basis therefore. Except as set forth in Schedule 7.1.15, there is no investigation pending or to the knowledge of Transferor, threatened against Transferor, its properties or any of its officers or directors (nor, to the Knowledge of Transferor, is there any basis therefore) by or before any governmental entity. Schedule 7.1.15

17

sets forth, with respect to any pending or threatened action, suit, proceeding or investigation, the forum, the parties thereto, the subject matter thereof and the amount of damages claimed or other remedy requested. Except as set forth in Schedule 7.1.15, no governmental entity has at any time challenged or questioned the legal right of Transferor to manufacture, offer or sell any of its products in the present manner or style thereof. Neither Transferor nor any of the Purchased Assets is subject to any material order, writ, injunction, judgment or decree of any court or other governmental agency or authority.

  7.1.16 <u>Accounts Receivable</u>. Schedule 7.1.16 lists Transferor's Accounts Receivable as at November 15, 2002; including an aging report. All of such accounts receivable except for reserves noted on Schedule 7.1.16 are collectible within thirty days except as noted on Schedule 7.1.16.

  7.1.17 <u>Minute Books</u>. The minutes of corporate proceedings and consents of Transferor and Subsidiary made available to counsel for Acquiror are the only minute books of Transferor and Subsidiaries and contain a reasonably accurate summary of the meetings of directors (or committees thereof) referred to therein.

  7.1.18 <u>Environmental Matters</u>.

   (a) <u>Hazardous Material</u>.   No underground storage tanks and no amount of any substance that has been designated by any Governmental Entity or by applicable federal, state or local law to be radioactive, toxic, hazardous or otherwise a danger to health or the environment, including, without limitation, PCBs, asbestos, petroleum, urea-formaldehyde and all substances listed as hazardous substances pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, or defined as a hazardous waste pursuant to the United States Resource Conservation and Recovery Act of 1976, as amended, and the regulations promulgated pursuant to said laws, (a "HAZARDOUS MATERIAL"), but excluding office and janitorial supplies or similar items, are present in any material quantities, as a result of the deliberate actions of Transferor, or, to Transferor's knowledge, as a result of any actions of any third party or otherwise, in, on or under any property, including the land and the improvements, ground water and surface water thereof, that Transferor has at any time owned, operated, occupied or leased, except for such presence as will not have a Material Adverse Effect.

   (b) <u>Hazardous Materials Activities</u>. Transferor has not transported, stored, used, manufactured, disposed of, released or exposed its employees or others to Hazardous Materials in violation of any law in effect on or before the Closing Date, nor has Transferor disposed of, transported, sold, or manufactured any product containing a Hazardous Material (collectively "HAZARDOUS MATERIALS ACTIVITIES") in violation of any rule, regulation, treaty or statute promulgated by any Governmental Entity in effect prior to or as of the date hereof to prohibit, regulate or control Hazardous Materials or any Hazardous Material Activity, except for such Hazardous Material Activity as would not have a Material Adverse Effect.

18

(c)     Permits. Transferor currently holds all environmental approvals, permits, licenses, clearances and consents (the "ENVIRONMENTAL PERMITS") necessary for the conduct of Transferor's Hazardous Material Activities and other businesses of Transferor as such activities and businesses are currently being conducted.

(d)     Environmental Liabilities. No material action, proceeding, revocation proceeding, amendment procedure, writ, injunction or claim is pending, or to Transferor's knowledge, threatened concerning any Environmental Permit, Hazardous Material or any Hazardous Materials Activity of Transferor. Transferor is not aware of any fact or circumstance which could involve Transferor in any material environmental litigation or impose upon Transferor any material environmental liability.

(e)     Capital Expenditures. Transferor is not aware of any material capital expenditures which are required in order for it to comply with Environmental Laws.

7.2     Acquiror's Representations and Warranties. Acquiror represents and warrants to Transferor as follows:

7.2.1   Organization and Good Standing.  Acquiror is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

7.2.2   Authority; No Conflict.

(  )     This Agreement constitutes the legal, valid, and binding obligation of Acquiror, enforceable against Acquiror in accordance with its terms. Upon their execution and delivery by Acquiror at the Closing, the Acquiror's closing documents will constitute the legal, valid, and binding obligations of Acquiror, enforceable against Acquiror in accordance with their respective terms. Acquiror has full corporate power, authority, and capacity to execute and deliver this Agreement and the Acquiror's closing documents and to perform its obligations hereunder and thereunder. Without limiting the generality of the foregoing, the Board of Directors of the Acquiror has approved this Agreement and the transactions contemplated hereby.

(a) Neither the execution and delivery of this Agreement, nor the performance of any of Acquiror's obligations hereunder, nor the consummation of this transaction will, directly or indirectly (with or without notice, lapse of time, or both), (i) contravene, conflict with, or result in a violation of any provision of Acquiror's Organizational Documents or any resolution adopted by the Board of Directors or the shareholders of Acquiror; or (ii) give any Person the right to prevent or otherwise interfere with this transaction pursuant to any legal requirement or order to which Acquiror is subject or any Contract to which Acquiror is a party or by which it or any of its assets is bound.

19

7.2.3   Certain Proceedings.  No proceeding is pending or, to Acquiror's Knowledge, has been threatened against Acquiror that challenges, or could reasonably be expected to have the effect of preventing, making illegal, or otherwise materially interfering with, this transaction.

7.2.4   Title to Shares.  The Shares are duly authorized and, when issued, upon the consummation of the transactions set forth herein, Transferor will own the Shares free and clear of all liens and encumbrances whatsoever.

8.   Additional Covenants.

8.1 Covenants by Each Party.

8.1.1   Release of Acquiror and Transferor.  At Closing, Acquiror and Transferor shall enter into a release agreement (the "Release Agreement") in the form of Exhibit D attached hereto.

8.1.2   Cooperation.  Each of the parties hereto shall cooperate with the other parties in every reasonable way in carrying out the transactions contemplated herein, and in delivering all documents and instruments deemed reasonably necessary or useful by counsel for each party hereto.

8.1.3   Expenses.  Except as otherwise provided in this Agreement, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs or expenses.

8.1.4   Further Assurances.  From time to time after the Closing, Transferor will, at its own expense, execute and deliver, or cause to be executed and delivered, such documents to Acquiror as Acquiror may reasonably request in order more effectively to vest in Acquiror good title to the Purchased Assets and otherwise to consummate the transactions contemplated by this Agreement, and from time to time after the Closing, Acquiror will, at its own expense, execute and deliver such documents to Transferor as Transferor may reasonably request in order more effectively to consummate the assumption of the Assumed Liabilities by Acquiror and otherwise to consummate the transactions contemplated by this Agreement.

8.2   Indemnification.

8.2.1   By Acquiror.  In the event the Acquiror (i) breaches or is deemed to have breached any of the representations and warranties contained in this Agreement or (ii) fails to perform or comply with any of the covenants and agreements set forth in this Agreement, then the Acquiror shall hold harmless, indemnify and defend Transferor, and each of its directors, officers, shareholders, attorneys, representatives and agents, from and against any Damages incurred or paid by Transferor to the extent such Damages arise or result from a breach by the Acquiror of any such representations and warranties or a violation of any covenant in this Agreement.

8.2.2   By Transferor.  In the event Transferor (i) breaches or is deemed to have breached any of the representations and warranties contained in this Agreement or (ii) fails

20

to perform or comply with any of the covenants and agreements set forth in this Agreement, Transferor shall hold harmless, indemnify and defend Acquiror, and each of its directors, officers, shareholders, attorneys, representatives and agents, from and against any Damages incurred or paid by the acquirer to the extent such Damages arise or result from a breach by Transferor of any such representations or warranties or a violation of any covenant in this Agreement. For purposes of this Section 8.2, "Damages" shall mean any and all costs, losses, damages, liabilities, demands, claims, suits, actions, judgments, causes of action, assessments or expenses, including interest, penalties, fines and attorneys' fees and expenses incident thereto, incurred in connection with any claim for indemnification arising out of this Agreement, and any and all amounts paid in settlement of any such claim.

8.3    Retention of and Access to Books and Records.  Transferor agree to retain the Books and Records for a period of five (5) years after the Closing Date and to make them available to Acquiror for the purpose of making copies thereof at Acquiror's expense of.

9.    Termination.

9.1 Termination Events. Except as otherwise provided for, this Agreement may, by notice given prior to or at the Closing (which notice shall specify the grounds for termination), be terminated by mutual written agreement of both Transferor and Acquiror.

9.2    Effect of Termination.  Each party's right of termination under Section 9.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination shall not constitute an election of remedies. If this Agreement is terminated pursuant to Section 9.1, all further obligations of the parties under this Agreement shall thereupon terminate, except that Sections 10 and 12 shall survive; provided, however, that if this Agreement is terminated by a party because of a material Breach of this Agreement by any of the parties or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of any party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies shall survive such termination unimpaired.

10.    Default; Remedies.

10.1    Time of Essence.  Time is of the essence of the parties' obligations under this Agreement.

10.2    Remedies.  If any party fails to perform its obligations under this Agreement, the other party shall be entitled to pursue all remedies available at law or in equity, including, in the case of a failure to consummate this transaction following satisfaction (or waiver) of the conditions set forth in Section 6.1 or 6.2, as applicable, the remedy of specific performance; provided, however, that except with respect to a failure to close this transaction as provided herein, a party shall not be in default hereunder unless (i) the non-Breaching party has given the Breaching party notice specifying the nature of the Breach in reasonable detail, and (ii) the Breaching party either (a) has failed to cure such Breach within ten (10) Business Days after such notice is given, or (b) if such Breach cannot be cured solely by the payment of money and cannot reasonably be cured within ten (10) Business Days despite the exercise of Best Efforts,

has failed to commence curative action within ten (10) Business Days after such notice is given or thereafter fails to complete the cure of such Breach as soon as practicable.

11.   Survival of Representations and Warranties; Escrow

11.1   Survival Of Representations And Warranties.   The representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Closing and continue until November 15, 2005.

11.2   Stockholder Escrow Arrangements.

(a) Escrow Funds.   At the Closing, 25% of the Acquiror's Common Stock to be issued to Transferor ("Escrow Amount") will be deposited into an escrow account with Sokolow, Dunaud, Mercadier & Carreras LLP (the "ESCROW AGENT"), such deposit to constitute an escrow fund (the "ESCROW FUND"). The terms upon which the Escrow Agent will serve in such capacity shall be as provided in an Escrow Agreement to be mutually agreed upon by Acquiror and Transferor, and which will be consistent with the provisions of Section 8.2 and Article 11 (the "ESCROW AGREEMENT"). The Escrow Fund is to be governed by the terms set forth in the Escrow Agreement and maintained at Acquiror's sole cost and expense (the "STOCKHOLDER ESCROW").

(b) Purpose.   The Escrow Fund shall be available to compensate Transferor and its affiliates for any claim, loss, expense, liability or other damage, including reasonable attorneys' fees, to the extent of the amount of such claim, loss, expense, liability or other damage (collectively "LOSSES") that Acquiror or any of its affiliates has incurred or reasonably anticipates incurring (in the case of an extension of the Stockholder Escrow period pursuant to Section 11.2(c)) by reason of the breach by Transferor of any representation, warranty, covenant or agreement of Transferor contained herein, including the indemnities provided for in Section 8.2 hereof and the covenants contained in Section 8.1 hereof. Losses shall not include amounts recovered from insurance. Acquiror shall undertake commercially reasonable efforts to claim and collect insurance to which it is entitled with respect to any Losses.

(c) Termination And Distribution Of Escrow Fund. The Escrow shall terminate on November 15, 2003; PROVIDED HOWEVER, that such portion of the Stockholder Escrow, which, in the reasonable judgment of Acquiror, subject to the objection of the Transferor and the subsequent arbitration of the matter in the manner provided in Section 11.2(i) hereof, is necessary to satisfy any identified but unsatisfied Losses specified in any Officer's Certificate theretofore delivered to the Escrow Agent prior to termination of the Stockholder Escrow, shall remain in the Stockholder Escrow (and the Stockholder Escrow shall remain in existence) until the earlier of (i) the expiration of the statute of limitations applicable to such claims or (ii) the resolution of such claims. As soon as all such claims have been resolved or the statute of limitations has expired, the Escrow Agent shall deliver to the appropriate security holders of Transferor the remaining

22

portion of the Stockholder Escrow not required to satisfy such claims. Deliveries of Escrow Amounts to the Transferor's stockholders pursuant to this Section 11.2(c) shall be made according to each stockholder's Proportionate Escrow Interest as certified to the Escrow Agent by the Transferor Stockholder Agent.

(d)   Protection Of Escrow Fund.   The Escrow Agent shall hold and safeguard the Escrow Funds during their existence, shall treat such fund as a trust fund in accordance with the terms of this Agreement and not as the property of Acquiror and shall hold and dispose of the Escrow Funds only in accordance with the terms hereof.

(e)   Claims Upon Escrow Fund.   In the event Acquiror incurs or becomes aware of any Losses or potential Losses for which it is entitled to indemnity under Article 8.2 and this Article 11, it shall deliver to the Escrow Agent and the Transferor Stockholder Agent a certificate signed by any officer of Acquiror (an "OFFICER'S CERTIFICATE"): (A) stating that Acquiror has (i) incurred or (ii) for purposes of extending the Escrow pursuant to Section 11.2(c) above, reasonably anticipates that it will have to incur Losses, (B) specifying in reasonable detail the individual items of Losses included in the amount so stated, the date each such item was paid or properly incurred, or the basis for such anticipated liability, and either the nature of the misrepresentation, breach of warranty or claim or the litigation matter to which such item is related. Upon the receipt of a certificate pursuant to clause (A)(i) above and after compliance with the provisions of Sections 11.2(f), (g) and (h) hereof, and if there is no written objection by Transferor as further provided in subsection (g) hereof, the Escrow Agent shall deliver to Acquiror out of the Escrow Fund, as promptly as practicable, such amounts held in the Escrow Fund equal to such Losses incurred. In determining the number of shares of Acquiror Common Stock to be paid out by the Escrow Agent pursuant to this Article V, such shares shall be valued by the Escrow Agent at the value of $1.00 per share.

(f) Acquiror shall not be entitled to receive any disbursement or cause any amount to be retained in Escrow with respect to any Losses arising in respect of any individual occurrence or circumstance unless the aggregate amount of all Losses shall exceed $10,000; provided that in the event the aggregate amount of such Losses of Acquiror shall exceed $10,000, then Acquiror shall be entitled to recover from the Escrow Fund only Losses in excess of $10,000.

(g) Objections To Claims. At the time of delivery of any Officer's Certificate to the Escrow Agent, a duplicate copy of such certificate shall be delivered to the Transferor Stockholder Agent (as defined in Section 11.2(i)). The Escrow Agent shall make no delivery to Acquiror of any amounts out of the Escrow Fund, pursuant to Section 11.2(e)(A)(i) hereof, unless and until the Escrow Agent shall have received written authorization from the Transferor Stockholder Agent to make such delivery or unless the claim shall have been resolved pursuant to Section 11.2(h). If the Transferor Stockholder Agent shall

23

object to the claim made in the Officer's Certificate, the Transferor Stockholder Agent shall do so in a written statement to such effect delivered to the Escrow Agent. The Transferor Stockholder Agent shall approve or object to any such claim within a reasonable time after actual receipt of the Officer's Certificate.

(h) Resolution Of Conflicts; Arbitration.

(i) In case the Transferor shall so object in writing to any claim or claims made in any Officer's Certificate, the Transferor and Acquiror shall attempt in good faith to agree upon the rights of the respective parties with respect to each of such claims. If the Transferor and Acquiror should so agree, a memorandum setting forth such agreement shall be prepared and signed by both parties and shall be furnished to the Escrow Agent. The Escrow Agent shall be entitled to rely on any such memorandum and distribute amounts from the Escrow Funds in accordance with the terms thereof.

(ii) If no such agreement can be reached after good faith negotiation, the matter shall be arbitrated before the American Arbitration Association. Either Acquiror or the Transferor may demand arbitration of the matter unless the amount of the damage or loss is at issue in pending litigation with a third party, in which event arbitration shall not be commenced until such amount is ascertained upon the conclusion of such litigation or both parties agree to arbitration, and in either such event the matter shall be settled by binding arbitration conducted by three arbitrators. Acquiror and the Transferor shall each select one arbitrator, and the two arbitrators so selected shall select a third arbitrator. The arbitrators shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, adequate in the sole judgment of the arbitrators, to discover relevant information from the opposing parties about the subject matter of the dispute. The arbitrators shall rule upon motions to compel or limit discovery and shall have the authority to impose sanctions, including attorneys' fees and costs, to the same extent as a court of competent law or equity, should the arbitrators determine that discovery was sought without substantial justification or that discovery was refused or objected to without substantial justification. The decision of the arbitrators as to the validity and amount of any claim in such Officer's Certificate shall be binding and conclusive upon the parties to this Agreement, and notwithstanding anything in this Section 11.2(h); the Escrow Agent shall be entitled to act in accordance with such decision and make or withhold payments out of the Escrow Fund in accordance therewith. Such decision shall be written and shall be supported by written findings of fact and conclusions of law, which shall set forth the award, decree or order of the arbitrators.

24

(iii) Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction. Any such arbitration shall be held at the discretion of Acquiror in Sarasota or Tampa Florida, under the rules then in effect of the American Arbitration Association.

(i)     Agent Of Transferor's Stockholders; Power Of Attorney.

(i) Upon execution and delivery of this Agreement, without further act of any stockholder of Transferor, Charles Fust shall be appointed as agent and attorney-in-fact (the "TRANSFEROR STOCKHOLDER AGENT") for each stockholder of Transferor on whose behalf any Acquiror Common Stock was deposited into the Escrow Fund for and on behalf of stockholders of Transferor, to give and receive notices and communications, to authorize delivery to Acquiror of Acquiror Common Stock from the Escrow Fund in satisfaction of claims by Acquiror, to object to such deliveries, to agree to, negotiate, enter into settlements and compromises of, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims, and to take all actions necessary or appropriate in the judgment of the Transferor Stockholder Agent for the accomplishment of the foregoing. Such agency may be changed by the stockholders of Transferor from time to time upon not less than thirty (30) days prior written notice to Acquiror; provided that the Transferor Stockholder Agent may not be removed unless holders of a two-thirds interest of the Escrow Funds agree to such removal and to the identity of the substituted agent. No bond shall be required of the Transferor Stockholder Agent, and the Transferor Stockholder Agent shall not receive compensation for his services. Notices or communications to or from the Transferor Stockholder Agent shall constitute notice to or from each of the stockholders of Transferor.

(ii) The Transferor Stockholder Agent shall not be liable for any act done or omitted hereunder as Agent while acting in good faith and in the exercise of reasonable judgment. The stockholders of Transferor on whose behalf the amounts were contributed to the Escrow Funds shall severally indemnify the Transferor Stockholder Agent and hold the Transferor Stockholder Agent harmless against any loss, liability or expense incurred without negligence or bad faith on the part of the Transferor Stockholder Agent and arising out of or in connection with the acceptance or administration of the Transferor Stockholder Agent's duties hereunder, including the reasonable fees and expenses of any legal counsel retained by the Transferor Stockholder Agent.

(j) Actions Of The Transferor's Stockholder Agent. A decision, act, consent or instruction of the Transferor Stockholder Agent shall constitute a decision of all the stockholders for whom a portion of the amounts otherwise issuable to them are deposited in the Escrow Funds and shall be final, binding and

25

conclusive upon each of such stockholders, and the Escrow Agent and Acquiror may rely upon any such decision, act, consent or instruction of the Transferor's Stockholder Agent as being the decision, act, consent or instruction of each and every such stockholder of Transferor. The Escrow Agent and Acquiror are hereby relieved from any liability to any person for any acts done by them in accordance with such decision, act, consent or instruction of the Transferor Stockholder Agent.

(k) Third-Party Claims. If during The Escrow Period, a third-party asserts a claim which gives rise to a claim to The Escrow supported by an Officer's Certificate, Acquiror shall have the right in its sole discretion to defend and to settle such third-party claim, provided, however, that any counsel retained to defend a third-party claim to be satisfied from the Escrow Fund shall be reasonably acceptable to the Transferor Stockholder Agent and Acquiror shall not settle any such third party claim without the prior consent of the Transferor Stockholder Agent, which consent shall not be unreasonably withheld.

## 12. Escrow Agent's Duties.

(a) The Escrow Agent shall be obligated only for the performance of such duties as are specifically set forth herein, and as set forth in any additional written escrow instructions which the Escrow Agent may receive after the date of this Agreement which are signed by an officer of Acquiror and the Transferor Stockholder Agent, and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent shall not be liable for any act done or omitted hereunder as Escrow Agent while acting in good faith and in the exercise of reasonable judgment, and any act done or omitted pursuant to the advice of counsel shall be conclusive evidence of such good faith

(b) The Escrow Agent is hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person, excepting only orders or process of courts of law, and is hereby expressly authorized to comply with and obey orders, judgments or decrees of any court. In case the Escrow Agent obeys or complies with any such order, judgment or decree of any court, the Escrow Agent shall not be liable to any of the parties hereto or to any other person by reason of such compliance, notwithstanding any such order, judgment or decree being subsequently reversed, modified, annulled, set aside, vacated or found to have been entered without jurisdiction.

(c) The Escrow Agent shall not be liable in any respect on account of the rights of the parties executing or delivering or purporting to execute or deliver this Agreement or any documents or papers deposited or called for hereunder.

(d) The Escrow Agent shall not be liable for the expiration of any rights under any statute of limitations with respect to this Agreement or any documents deposited with the Escrow Agent.

(e) The Escrow Agent may resign at any time upon giving at least thirty (30) days written notice to Acquiror and the Transferor Stockholder Agent to this Agreement; PROVIDED, HOWEVER, that no such resignation shall become effective until the appointment of a successor escrow agent which shall be accomplished as follows: Acquiror and the Transferor Stockholder Agent shall use their best efforts to mutually agree upon a successor agent within thirty (30) days after receiving such notice. If the parties fail to agree upon a successor escrow agent within such time, Acquiror shall have the right to appoint a successor escrow agent. The successor escrow agent selected in the preceding manner shall execute and deliver an instrument accepting such appointment and it shall thereupon be deemed the Escrow Agent hereunder and it shall without further acts be vested with all the estates, properties, rights, powers, and duties of the predecessor Escrow Agent as if originally named as Escrow Agent. Thereafter, the predecessor Escrow Agent shall be discharged from any further duties and liabilities under this Agreement.

13. <u>Limitation On Liability</u>. Notwithstanding any other provision of this Agreement to the contrary, absent fraud or bad faith, the liability of Transferor with respect to any claim for a breach of any representation, warranty, covenant or agreement contained in this Agreement shall be limited to the assets of the Escrow Fund, and no Principal Stockholder shall have any liability to Acquiror or arising from any breach after the termination of the Escrow other than with respect to claims made prior to such termination under Section 11.2(c) (and liability with such claims shall be limited to the amount held in the Escrow as a result thereof).

14.    <u>Construction and Interpretation</u>..

14.1 The headings or titles of the sections of this Agreement are intended for ease of reference only and shall have no effect whatsoever on the construction or interpretation of any provision of this Agreement. References herein to sections are to sections of this Agreement unless otherwise specified.

14.2 Meanings of defined terms used in this Agreement are equally applicable to singular and plural forms of the defined terms. The masculine gender shall also include the feminine and neutral genders and vice versa.

14.3 As used herein, (i) the term "party" refers to a party to this Agreement, unless otherwise specified, (ii) the terms "hereof," "herein," "hereunder," and similar terms refer to this Agreement as a whole and not to any particular provision of this Agreement, (iii) the term "this transaction" refers to the transaction contemplated by this Agreement, (iv) the term "including" is not limiting and means "including without limitation," (v) the term "documents" includes all instruments, documents, agreements, certificates, indentures, notices, and other writings, however evidenced, and (vi) the term "property" includes any kind of property or asset, real, personal, or mixed, tangible or intangible.

27

14.4 In the event any period of time specified in this Agreement ends on a day other than a Business Day, such period shall be extended to the next following Business Day. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including."

14.5 This Agreement is the product of arm's length negotiations among, and has been reviewed by counsel to the parties and is the product of all the parties. Accordingly, this Agreement shall not be construed for or against any party by reason of the authorship or alleged authorship of any provision hereof.

15.    Miscellaneous Provisions.

15.1    Survival of Covenants. Each covenant or agreement of the parties set forth in this Agreement which by its terms expressly provides for performance after the Closing Date shall survive the Closing and be fully enforceable thereafter.

15.2    Expenses. Except as otherwise provided, each party shall bear its own expenses incurred in connection with the preparation, execution, and performance of this Agreement and this transaction, including all fees and expenses of its own Representatives or any other similar payment in connection with this transaction.

15.3    Binding Effect. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties and, subject to the restrictions on assignment set forth herein, their respective successors and assigns.

15.4    Assignment. Neither party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other party. No assignment of this Agreement shall release the assigning party from its obligations under this Agreement.

15.5    Notices. All notices under this Agreement shall be in writing. Notices may be (i) delivered personally, (ii) transmitted by facsimile, (iii) delivered by a recognized national overnight delivery service, or (iv) mailed by certified United States mail, postage prepaid and return receipt requested. Notices to any party shall be directed to its address set forth below, or to such other or additional address as any party may specify by notice to the other party. Any notice delivered in accordance with this Section 13.5 shall be deemed given when actually received or, if earlier, (a) in the case of any notice transmitted by facsimile, on the date on which the transmitting party receives confirmation of receipt by facsimile transmission, telephone, or otherwise, if sent during the recipient's normal business hours or, if not, on the next Business Day, (b) in the case of any notice delivered by a recognized national overnight delivery service, on the next Business Day after delivery to the service or, if different, on the day designated for delivery, or (c) in the case of any notice mailed by certified U.S. mail, two (2) Business Days after deposit therein.

If to LABS             SinoFresh Laboratories, Inc.
                       SinoFresh Technology Center
                       313 S. Seaboard Ave.

)                                            )

|                         |                                            |
|-------------------------|--------------------------------------------|
|                         | Venice FL 34292                            |
|                         | Attn: Charles Fust                         |
| With a copy to:         | Leighton Deming, Esq.                      |
|                         | 877 Buford Road                            |
|                         | Suite 600                                  |
|                         | Cumming, GA 30041                          |
| If to SinoFresh:        | SinoFresh HealthCare, Inc.                 |
|                         | 7820 South Holiday Drive                   |
|                         | Suite 320                                  |
|                         | Sarasota, Fl 34231                         |
| With a copy to:         | Sokolow, Dunaud, Mercadier                 |
|                         | & Carreras LLP                             |
|                         | 770 Lexington Avenue                       |
|                         | 6th Floor                                  |
|                         | New York, NY 10021                         |
|                         | Attn: Thomas G. Amon                       |

15.6    Waiver.  Any party's failure to exercise any right or remedy under this Agreement, delay in exercising any such right or remedy, or partial exercise of any such right or remedy shall not constitute a waiver of that or any other right or remedy hereunder. A waiver of any Breach of any provision of this Agreement shall not constitute a waiver of any succeeding Breach of such provision or a waiver of such provision itself. No waiver of any provision of this Agreement shall be binding on a party unless it is set forth in writing and signed by such party.

15.7    Amendment.  This Agreement may not be modified or amended except by the written agreement of the parties.

15.8    Severability.  If any provision of this Agreement is held invalid, illegal, or unenforceable, then (i) such provision shall be enforceable to the fullest extent permitted by applicable law, and (ii) the validity and enforceability of the other provisions of this Agreement shall not be affected and all such provisions shall remain in full force and effect.

15.9    Integration.  This Agreement, including the Exhibits and Schedules hereto, contains the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements with respect thereto. The parties acknowledge and agree that there are no agreements or representations relating to the subject matter of this Agreement, either written or oral, express or implied, that are not set forth in this Agreement, in the Exhibits and Schedules to this Agreement.

15.10   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida (without regard to the principles thereof relating to conflicts of laws).

29

15.11  Arbitration.  All disputes or claims arising out of or relating to this Agreement, or the breach hereof, including disputes as to the validity and/or enforceability of this Agreement or any portion thereof, and any claims for indemnification under the provisions of this Agreement, shall be resolved by binding arbitration conducted in Sarasota, Florida. Any arbitration pursuant to this Section 12.11 shall be conducted, upon the request of any party, before a single arbitrator selected by the parties or, failing agreement on the choice of an arbitrator within thirty (30) days of service of written demand for arbitration, by an arbitrator designated by the Presiding Judge of the Superior Court for Sarasota County, Florida. The arbitrator shall be a practicing attorney licensed to practice in one or more of the fifty (50) states, with substantial experience in commercial and/or commercial litigation matters, who has been in active practice for at least ten (10) years. Such arbitration shall be conducted in accordance with the laws of the State of Florida and pursuant to the commercial arbitration rules of the American Arbitration Association (although not under the auspices of the American Arbitration Association) and such of the federal rules of civil procedure as the arbitrator may determine. The arbitration shall be conducted within forty-five (45) days of the selection of the arbitrator and the arbitrator shall render his or her decision within twenty (20) days after conclusion of the arbitration. The prevailing party in the arbitration shall be entitled as a part of the arbitration award to the costs and expenses (including reasonable attorneys' fees and the fees of the arbitrator) of investigating, preparing, and pursuing or defending the arbitration claim as such costs and expenses are awarded by the arbitrator. The duty to arbitrate shall survive a termination or cancellation of this Agreement and shall be specifically enforceable under applicable federal law and the prevailing arbitration law of the State of Florida. The decision of the arbitrator shall be final and binding upon the parties and enforceable in any court of competent jurisdiction.

15.12  Execution.  This Agreement may be executed in any number of counterparts, all of which together shall constitute one and the same agreement. Each party may rely upon the signature of each other party on this Agreement that is transmitted by facsimile as constituting a duly authorized, irrevocable, actual, current delivery of this Agreement with the original ink signature of the transmitting party.

15.13  Waiver of Conflicts  The parties acknowledge that certain of the principals of LABS may have independent agreements with SinoFresh providing for their employment after the Closing. The terms and conditions of these agreements have been negotiated in good faith and at arms-length. Any conflict of interest, whether real or implied resulting from these prior agreements are deemed by the parties hereto to be waived.

15.14  Incorporation of Recitals, Exhibits, and Schedules.  The Recitals to this Agreement and all Exhibits and Schedules to this Agreement are incorporated herein by this reference.

15.15  Further Assurances.  Each party agrees to execute and deliver such additional documents and instruments as may reasonably be required to effect this transaction fully, so long as the terms thereof are consistent with the terms of this Agreement.

15.16  No Third Party Beneficiaries.  This Agreement is made and entered into for the sole protection and legal benefit of Transferor and Acquiror, and, subject to the restrictions on assignment set forth herein, their respective successors and assigns, and no other

30

Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement.

15.17  <u>Bulk Sales</u>  Acquiror hereby waives compliance by transferor with the provisions of any applicable bulk sales law (including the applicable sections of the Uniform Commercial Code of any state, and transferor hereby agrees to indemnify and hold Acquiror harmless for any liability, cost and expenses resulting from any such non-compliance.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

LABS:                      SINOFRESH LABORATORIES, INC.
                           An Alabama corporation

                           By:    _____
                           Name:  CHARLES A. FUST
                           Its:   CHAIRMAN/CEO


SINOFRESH:                 SINOFRESH HEALTHCARE, INC,
                           a Delaware corporation

                           By:    _____
                           Name:  Andrew Badolato
                           Its:   Director, President

31

## EXHIBIT A
## PURCHASED ASSETS

The following are the assets owned by LABS, which under the terms and conditions of this Agreement are being acquired by SinoFresh.

**[Asset list to be inserted]**

1

**SinoFresh Laboratories, Inc.**
Accounts Receivable
As of November 15, 2002

| | |
|---|---:|
| Advanced Pharmacy Solutions, Inc. | |
| AmeriDrug (4802 Armenia Ave.) | 342.00 |
| AmeriDrug (Carrollwood) | 171.00 |
| Ansley's Natural Marketplace (101) | 171.00 |
| Ansley's Natural Marketplace (102) | 171.00 |
| Apple Pharmacy | 55.80 |
| Barclay's Pharmacy | 691.20 |
| Bay Isle Pharmacy | 1,069.20 |
| Bertha's Health Food | 342.00 |
| Carrollwood Pharmacy | 171.00 |
| Cigar Room | 118.80 |
| Davidson Drugs | 55.80 |
| Eagleson's | 1,069.20 |
| Edison Prescription Shoppe | 178.20 |
| Family Pharmacy | 171.00 |
| Gaiam, Inc. | 876.60 |
| Gene's Prescription Shop | 928.00 |
| GNC - Store #2150 | 1,230.30 |
| Harrington's Pharmacy | 698.40 |
| Hedges Prescription Shop | 171.00 |
| Keen, Peter Dr. | 178.20 |
| Lemon Bay Drugs, East | 236.90 |
| Medicine Shoppe | 178.20 |
| Medicine Shoppe (Port Richey) | 356.40 |
| Mother Nature | 178.20 |
| Publix (409 - Sarasota) | 342.00 |
| Publix (696 - Sarasota) | 349.20 |
| Publix (709 - Bradenton) | 171.00 |
| St. Armands Medical Center | 171.00 |
| St. Armands Pharmacy, Inc. | 171.00 |
| Super Value | 684.00 |
| The Health Nut | 178.20 |
| Transdermatech, Inc. | 171.00 |
| Webbs, Ft. Myers Prescription Shop | 1,607.00 |
| | 171.00 |

| | |
|---|---:|
| **Total Accounts Receivable** | 13,824.80 |
| **Allowance for Bad Debt** | (1,000.00) |
| **Net Accounts Receivable** | 12,824.80 |

Approved:
Initials _AD_
Initials _____

**Umortesn Laboratories, Inc.**
**Balance Sheet - Unaudited**
**November 15, 2002**

| | November 15, 2002 | May 31, 2002 | Activity June - November | Prelim. Audited May 31, 2002 | Adjusted November 15, 2002 | SF HC Opening Balance Sheet |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| **Current Assets:** | | | | | | |
| Cash | 47,231 | 14,075 | 33,156 | 14,054 | 47,210 | 47,210 |
| Accounts Receivable, net | 15,055 | 10,732 | 4,323 | 9,132 | 13,455 | 12,825 |
| Inventory | 55,305 | 104,475 | (49,170) | 104,475 | 55,305 | 55,305 |
| Prepaid Expenses | 5,673 | 3,458 | 2,215 | 12,350 | 14,565 | 14,565 |
| Total Current Assets | 123,264 | 132,740 | (9,476) | 140,011 | 130,535 | 129,905 |
| | | | | | | |
| Fixed Assets, net | 112,782 | 128,289 | (15,507) | 135,133 | 119,626 | 27,000 |
| Assets - Trf. To Research (b) | | | | | | 16,885 |
| Trf. To Research (b) | | | | | | (16,885) |
| | | | | | | |
| **Other Assets:** | | | | | | |
| Goodwill | | | | | | 2,136,873 |
| Note Receivable - officer | | | | 84,088 | 84,088 | - |
| Deposits - other | 2,405 | - | 2,405 | 15,945 | 18,350 | 18,350 |
| Total Other Assets | 2,405 | - | 2,405 | 100,033 | 102,438 | 2,155,223 |
| | | | | | | |
| **TOTAL ASSETS** | 238,451 | 261,029 | (22,578) | 375,177 | 352,599 | 2,312,128 |
| | | | | | | |
| **LIABILITIES** | | | | | | |
| **Current Liabilities:** | | | | | | |
| Note Payable | 85,500 | 60,500 | 25,000 | 60,500 | 85,500 | 60,500 |
| Convertible Debenture | 500,000 | 500,000 | - | 500,000 | 500,000 | 500,000 |
| Accounts Payable, net | 184,431 | 120,514 | 63,917 | 123,385 | 187,302 | 40,336 |
| A/P - Trf. To SF Res. Labs (b) | | | | | | 50,735 |
| Trf. To SF Res. Labs (b) | | | | | | (50,735) |
| Accrued Expenses and Taxes | 68,907 | 60,497 | 8,410 | 86,382 | 94,792 | 26,611 |
| Unearned Income | 17,878 | 17,878 | - | 17,199 | 17,199 | 17,199 |
| Contingent Liability (a) | | | | | | 34,000 |
| Capitalized Lease Obligations | | | - | 5,358 | 5,358 | 5,358 |
| Total Current Liabilities | 856,516 | 759,189 | 97,327 | 792,824 | 890,151 | 684,004 |
| | | | | | | |
| **Long-Term Liabilities:** | | | | | | |
| Capitalized Lease Obligations | | | - | 11,785 | 11,785 | 11,785 |
| Total Long-Term Liabilities | - | - | - | 11,785 | 11,785 | 11,785 |
| | | | | | | |
| **TOTAL LIABILITIES** | 856,516 | 759,189 | 97,327 | 804,609 | 901,936 | 695,789 |
| | | | | | | |
| **STOCKHOLDERS' EQUITY** | | | | | | |
| Common Stock | 1,342,248 | 1,021,586 | 320,662 | 1,021,586 | 1,342,248 | 1,616,339 |
| Accumulated Deficit | (1,960,313) | (1,519,746) | (440,567) | (1,451,018) | (1,891,585) | - |
| Total Stockholders' (Deficit) | (618,065) | (498,160) | (119,905) | (429,432) | (549,337) | 1,616,339 |
| | | | | | | |
| **TOTAL LIABILITIES & STOCKHOLDERS' (DEFICIT)** | 238,451 | 261,029 | (22,578) | 375,177 | 352,599 | 2,312,128 |

Approved: Initials _____ Initials _____

**SinoFresh Laboratories, Inc.**
**Balance Sheet - Unaudited**
 **November 15, 2002**
**Page Two**

(a) Contingent Liability relates to the consulting fees billed by Dr. Cabral to SinoFresh Laboratories, Inc. ("Labs"). Labs does not consider the claims to be of value and has contracted with legal counsel to vigorously defend against such claims.

(b) Certain assets (i.e. vehicles, water and packaging equipment) are related to activities to be performed by SinoFresh Research Labs, LLC ("Research"). Thus, these assets will simultaneously transfer from Labs to SinoFresh HealthCare, Inc. ("HealthCare") then to Research. Certain liabilities (i.e. patent related) are related to activities to be performed by Research, thus, these liabilities will simultaneously transfer from Labs to HealthCare to Research.

Note:  The November 15, 2002 and May 31, 2002 (Column 1 and 2, respectively), were derived from internal financial statements.  The period June 1, 2002 through November 15, 2002 (column 3) is derived from a calculation of the difference between columns 1 and 2.  The Preliminary Draft Audited May 31, 2002 numbers were provided by Liebman, Drogin, et al and are subject to change.  The Adjusted November 15, 2002 balance in Column 5 is derived from Column 3 and 4.  These numbers are subject to change either / or by additional ajustments to Column 4 or after the June 1, 2002 through November 15, 2002 activity has been audited.  These numbers are for discussion purposes only.

As of November 15, 2002, SinoFresh HealthCare, Inc. had in an escrow account funds totaling $250,000 related to the Preferred Stock - Series C Investments.  Some expenditures had been incurred prior to November 15, 2002. In a post-closing transaction, the accounting of these funds would be made on HealthCare's books.

Approved:
Initials _____
Initials _____

# SinoFresh Laboratories, Inc.
## Asset Valuation for Asset Purchase Agreement
## Prior to Acquisition vs. Purchase Price

| ASSET | 31-May-02 Book Value | Deprec. 31-May | Monthly June - Oct. | Total Accum. Deprec. | Nov. 15, 02 Net Book Value | Nov. 15, 2002 Acquired By SinoFresh HealthCare | Nov. 15, 2002 Sold To SinoFresh Res. Labs | Nov. 15, 2002 Net Assets Acquired by SF HealthCare |
|---|---|---|---|---|---|---|---|---|
| **Vehicles:** | | | | | | | | |
| 1990 GMC Truck | 7,500 | 3,900 | 690 | 4,590 | - | - | - | - |
| 1997 GMC Truck | 22,500 | 7,960 | 2,070 | 10,030 | 12,470 | - | 8,885 | - |
| 1989 Pace Trailer | 2,450 | 1,274 | 225 | 1,499 | 951 | - | 500 | - |
| Total | 32,450 | 13,134 | 2,985 | 16,119 | 16,331 | - | 9,185 | - |
| | | | | | | | | |
| Furniture & Fixtures | 118,788 | 46,454 | 10,825 | 57,279 | 62,509 | 62,509 | | 25,000 |
| | | | | | | | | |
| **Other:** | | | | | | | | |
| Computer & Phone Equipment | 10,305 | 4,724 | 659 | 5,383 | 4,922 | 4,922 | 2,500 | 2,000 |
| Water System | 10,858 | 1,552 | 695 | 2,247 | 8,611 | - | 5,000 | - |
| Packaging Equipment | 25,636 | 3,663 | 1,641 | 5,304 | 20,332 | - | | 2,000 |
| Total | 46,789 | 9,939 | 2,995 | 12,834 | 33,865 | 4,922 | 7,500 | 2,000 |
| | | | | | | | | |
| **TOTAL** | 199,037 | 69,527 | 16,805 | 86,332 | 112,705 | 67,431 | 16,685 | 27,000 |

Approved:
Initials _____
Initials _____

# SinoFresh Laboratories, Inc.
## Asset Valuation for Asset Purchase Agreement
### Prior to Acquisition vs. Purchase Price

| ASSET | 31-May-02 Book Value | Deprec. 31-May | Monthly June - Oct. | Total Accum. Deprec. | Nov. 15, 02 Net Book Value | Nov. 15, 2002 Acquired By SinoFresh HealthCare | Nov. 15, 2002 Sold To SinoFresh Res. Labs | Nov. 15, 2002 Net Assets Acquired by SF HealthCare |
|---|---|---|---|---|---|---|---|---|
| **Vehicles:** | | | | | | | | |
| 1990 GMC Truck | 7,500 | 3,900 | 690 | 4,590 | - | - | - | - |
| 1997 GMC Truck | 22,500 | 7,960 | 2,070 | 10,030 | 12,470 | - | 8,685 | - |
| 1989 Pace Trailer | 2,450 | 1,274 | 225 | 1,499 | 951 | - | 500 | - |
| Total | 32,450 | 13,134 | 2,985 | 16,119 | 16,331 | - | 9,185 | - |
| | | | | | | | | |
| Furniture & Fixtures | 119,788 | 46,454 | 10,825 | 57,279 | 62,509 | 62,509 | - | 25,000 |
| | | | | | | | | |
| **Other:** | | | | | | | | |
| Computer & Phone Equipment | 10,305 | 4,724 | 659 | 5,383 | 4,922 | 4,922 | - | 2,000 |
| Water System | 10,858 | 1,552 | 695 | 2,247 | 8,611 | - | 2,500 | - |
| Packaging Equipment | 25,636 | 3,663 | 1,641 | 5,304 | 20,332 | - | 5,000 | - |
| Total | 46,799 | 9,939 | 2,995 | 12,934 | 33,865 | 4,922 | 7,500 | 2,000 |
| | | | | | | | | |
| **TOTAL** | 199,037 | 69,527 | 16,805 | 86,332 | 112,705 | 67,431 | 16,685 | 27,000 |

Approved: _____

Initials _____

Initials _____

## SinoFresh Laboratories, Inc.
### Asset List as of 5/31/02

| Items | Cost | Date Acquired | Market Value |
|---|---|---|---|
| **Equipment** | | | |
| Hot Stamp Coder (remaining balance) | $500.50 | 06/08/01 | $500.50 |
| Fabricate Tool for tray molding (cutting die) | $7,175.00 | 06/13/01 | $7,175.00 |
| Cutting die for display box | $895.70 | 10/18/01 | $845.00 |
| Book binder | $224.26 | 11/01/01 | $224.26 |
| Pallet Jack | $299.00 | 11/07/01 | $299.00 |
| Cutting Die Tool (Premier Pack) | $1,630.00 | 11/20/01 | $1,630.00 |
| Art & Prep Plates | $3,844.12 | 11/20/01 | $3,844.12 |
| Art & Prep Plates | $1,782.50 | 11/30/01 | $1,782.50 |
| Cutting Die Tool (Premier Pack) | $750.00 | 11/30/01 | $750.00 |
| 100 Gallon Tank | $800.00 | 12/05/01 | $800.00 |
| Copier, scanner, fax (Lisa) | $432.01 | 01/01/02 | $432.01 |
| Industrial Laboratory Scale | $3,995.38 | 04/22/02 | $3,995.38 |
| Hand-filling equipment (EFD), Transdermatech | $1,834.13 | 05/09/02 | $1,834.13 |
| 18" DD 37 1/2 Gallon Tank (Alloy Products) | $1,473.35 | 05/22/02 | $1,473.35 |
| | $25,635.95 | | $25,585.25 |
| | | | |
| **Water System** | | | |
| See attached for separate items purchased | $10,658 | 11/07/01 | $25,000.00 |
| | | | |
| **BALANCE FORWARD 2001** | $162,543 | | |
| Additions for 6/1/02 - 11/15/01 | $0.00 | | |
| | | | |
| **Total Cost/Book Value** | **$199,037** | | |

02/01/01    $92,000.00

| Filling Machine | Cost | Market Value |
|---|---|---|
| 45" Diam SS Turntable | 4,500.00 | 4,500.00 |
| 15' SS Chain Conveyor | 4,500.00 | 6,000.00 |
| 4 Head Overflow Filler | 18,000.00 | 25,000.00 |
| Computorque Capper | 18,000.00 | 22,000.00 |
| 20' SS Chain Conveyor | 6,000.00 | 8,000.00 |
| Sorter Bowl | 4,500.00 | 8,000.00 |
| SS Overflow Tank | 800.00 | 800.00 |
| Labeler Sealer | 28,700.00 | 35,000.00 |
| Air Compressor | 800.00 | 800.00 |
| 200 Gallon Mixer | 1,700.00 | 1,700.00 |
| Case Taper | 4,500.00 | 4,500.00 |
| | $92,000.00 | 116,300.00 |

SinoFresh Laboratories Asset List
As of May 31, 2001

| Items | Cost | Date Acquired | Market Value |
|---|---|---|---|
| 1000 stir plate/ hotplate | $25.00 | 02/15/01 | $300.00 |
| model 8000 ph meter | $350.00 | 08/15/00 | $350.00 |
| **Warehouse** | | | |
| Auto Cartoning machine | $10,000.00 | 11/15/00 | $150,000.00 |
| 2 SS Tables | $50.00 | 02/15/01 | $50.00 |
| 35 plastics totes | $375.00 | 04/15/00 | $375.00 |
| 11 plastic totes | $110.00 | 06/14/00 | $110.00 |
| Pallet Racking | $150.00 | 05/10/01 | $600.00 |
| Compressor | $300.00 | 05/10/01 | $30,000.00 |
| Cleanroom Hood | $100.00 | 05/10/01 | $3,500.00 |
| Stability Chamber | $100.00 | 05/10/01 | $1,500.00 |
| 2 folding tables | $250.00 | 06/10/00 | $250.00 |
| 2 8ft folding tables | $160.00 | 05/15/00 | $160.00 |
| 2 metal file drawers | $200.00 | 05/15/00 | $500.00 |
| wood desk | $50.00 | 05/15/00 | $50.00 |
| Metal shelves | $150.00 | 05/15/00 | $150.00 |
| wood counter cabinet | $50.00 | 05/15/00 | $50.00 |
| 2 yellow (fire) cabinets | $100.00 | 02/15/01 | $1,000.00 |
| metal cabinet | $100.00 | 02/15/01 | $100.00 |
| metal shelving | $10.00 | 02/15/01 | $10.00 |
| cabinets/black top | $100.00 | 02/15/01 | $400.00 |
| 100 gallon blending tank | $100.00 | 02/15/01 | $500.00 |
| laboratory equipment & warehouse shelving | $1,096.00 | 02/15/01 | $1,096.00 |
| orange dolly | $50.00 | 02/15/01 | $200.00 |
| green dolly | $50.00 | 02/15/01 | $200.00 |
| gray dolly | $50.00 | 02/15/01 | $200.00 |
| **Vehicles** | | | |
| 1997 GMC Pickup Truck | $22,500.00 | 02/01/01 | $32,000.00 |
| 1999 Pace/Enclosed Trailer | $2,450.00 | 04/15/00 | $2,450.00 |
| 1990 GMC Truck | $7,500.00 | | |
| **Telephone System** | | | |
| Star Plus Phone System | $1,000.00 | 06/14/00 | $1,000.00 |

Total Cost    $162,543              $367,470.38  Total MV

### SinoFresh Laboratories Asset List
### As of May 31, 2001

| Items | Cost | Date Acquired | Market Value |
|---|---|---|---|
| **CEO's Office** | | | |
| Exec Desk | $500.00 | 06/14/00 | $500.00 |
| Exec High Back Chair | $100.00 | 06/14/00 | $100.00 |
| Exec Credenza | $500.00 | 06/14/00 | $500.00 |
| Exec Hutch | $250.00 | 06/14/00 | $250.00 |
| Exec Computer Work Station | $150.00 | 06/14/00 | $150.00 |
| TV Stand | $50.00 | 07/01/00 | $50.00 |
| 4 Drawer Deluxe Wood File Cabinet | $100.00 | 05/15/00 | $100.00 |
| Hanging Picture (Imagination) | $35.00 | 02/20/00 | $35.00 |
| HP Color Deskjet Printer | $350.00 | 01/28/00 | $350.00 |
| | | | |
| **Hallway Area** | | | |
| 4 Drawer Fireproof File Cabinet | $50.00 | 02/15/01 | $50.00 |
| Table | $50.00 | 01/01/01 | $50.00 |
| Refrigerator | $350.00 | 04/06/99 | $350.00 |
| | | | |
| **Executive Assistant** (Lisa) | | | |
| Executive Chair | $195.00 | 09/21/00 | $195.00 |
| Double Lateral File Drawer | $129.99 | 09/21/00 | $129.99 |
| Double File Drawer | $129.99 | 09/21/00 | $129.99 |
| Jr. Exec Credenza | $129.99 | 09/21/00 | $129.99 |
| Jr. Exec Hutch | $129.99 | 09/21/00 | $129.99 |
| Postage Meter (Pitney Bowes) | | | Leased |
| 2 Wooden Bookcases | $243.78 | 09/21/00 | $243.78 |
| Dell Computer | $4,304.70 | 01/28/00 | $4,304.70 |
| (monitor, scanner, surge protector ) | | | |
| | | | |
| HP Office Jet G85 Copier/Scanner/Fax | $644.00 | 05/10/01 | $644.00 |
| Wooden Black Printer Stand | | | |
| Oak Printer Stand | $43.00 | 05/14/01 | $43.00 |
| Wood desk | $100.00 | 09/21/00 | $100.00 |
| Misc supplies | $150.00 | 07/01/00 | $150.00 |
| Computer Work station | $110.00 | 04/15/00 | $110.00 |
| | | | |
| | | | |
| **Filling Room** | | | |
| White Glass Cabinet | $12.50 | 02/15/01 | $500.00 |
| Misc Parts in glass cabinets | $6,000.00 | 02/01/01 | $6,000.00 |
| Filling Machine (includes: 2 conveyors, | $92,000.00 | 02/01/01 | $116,300.00 |
| control panel, capper, 2 sorter tables, | | | |
| labeler, compressor, boxing machine | | | |
| | | | |
| **Lab Area** | | | |
| Model 7600 50lb scale | $1,209.63 | 04/10/01 | $1,209.63 |
| SS Desk | $25.00 | 02/15/01 | $25.00 |
| 2 orange barrel dollies | $70.00 | 02/15/01 | $70.00 |
| 3 cabinet counters | $150.00 | 02/15/01 | $150.00 |
| White glass cabinets with supplies | $12.50 | 02/15/01 | $12.50 |

**SinoFresh Laboratories Asset List**
**As of May 31, 2001**

| Items | Cost | Date Acquired | Market Value |
|---|---|---|---|
| **Accounting** (John) | | | |
| Dell Dimension 4100 Computer | $1,442.36 | 05/01/01 | $1,442.36 |
| MFC-P2500 Brother Laser Printer | $419.95 | 09/15/00 | $419.95 |
| Brother GX-6750 Typewriter | $90.00 | 08/12/00 | $75.00 |
| Rolling File Cabinet | $25.00 | 05/15/00 | $25.00 |
| black 5 drawer metal desk | $250.00 | 07/01/01 | $250.00 |
| Leather exec chair | $107.00 | 06/01/00 | $107.00 |
| Framed mirror | $50.00 | 06/01/00 | $50.00 |
| TI-5045 II calculator | $25.00 | 06/01/00 | $25.00 |
| 2 wall files | $12.00 | 05/15/01 | $12.00 |
| 25 pairs of scrubs | $397.50 | 05/21/01 | $397.50 |
| | | | |
| **Supply Closet** | | | |
| Misc. supplies | $125.00 | 03/15/01 | $125.00 |
| | | | |
| **Lobby/Conference Area** | | | |
| Display table | $25.00 | 07/01/00 | $25.00 |
| Magazine rack | $25.00 | 07/01/00 | $25.00 |
| 2 Artificial Plants | $100.00 | 07/01/00 | $100.00 |
| Rolling Coat Rack | $15.00 | 02/15/01 | $15.00 |
| Wall coat rack/shelve | $35.00 | 03/15/01 | $35.00 |
| SinoFresh Sign | $100.00 | 06/01/00 | $100.00 |
| Conference Table | $1,000.00 | 07/01/00 | $1,000.00 |
| 9 Conference Chairs | $1,000.00 | 07/01/00 | $1,000.00 |
| Sharp ZX-605 Typewriter | $35.00 | 08/14/00 | $35.00 |
| Rolling Typewriter Stand | $25.00 | 05/15/00 | $25.00 |
| Canon CC5500 Fax Machine | $350.00 | 06/01/00 | $175.00 |
| Fax Stand w/ wheels | $150.00 | 06/01/00 | $150.00 |
| Lab coats (36) | $20.00 | 02/15/01 | $275.00 |
| Oriental Rug | $50.00 | 06/01/00 | $100.00 |
| | | | |
| **Traffic Manager** (Frank) | | | |
| 5 drawer off-white metal desk | $250.00 | 07/01/00 | $250.00 |
| Black Exec chair | $99.00 | 02/15/01 | $99.00 |
| 3 Wall Files | $18.00 | 03/15/01 | $18.00 |
| wall shelves (2) | $12.00 | 03/15/01 | $12.00 |
| | | | |
| **Open Office** | | | |
| 4 Drawer Hanging File Cabinet | $60.00 | 02/10/01 | $350.00 |
| Presentaion Easel | $125.00 | 05/15/00 | $125.00 |
| White Ink Erasable Chalk Board | $35.00 | 01/15/01 | $35.00 |
| | | | |
| **VP** (Bob) | | | |
| Wooden Desk | $100.00 | 01/15/01 | $100.00 |
| Black Exec Chair | $79.00 | 01/15/01 | $79.00 |
| Metal 4 Drawer Hanging File Cabinet | $100.00 | 01/25/01 | $250.00 |

**SinoFresh Laboratories, Inc.**
**Detail of Liabilities**
**As of November 15, 2002**

## Accounts Payable:

| | |
|---|---:|
| Acculab, Inc. | 221.00 |
| Ace Hardware | 124.43 |
| ACT Teleconferencing Services, Inc. | 156.15 |
| Advanta Business Card | 3,217.51 |
| Airborne Express | 74.14 |
| AmCOMP Preferred Ins. Co. | 857.75 |
| AT&T | 13.35 |
| City of Venice | 85.76 |
| Comcast Adverstising Sales | 3,228.00 |
| Discover Card Services | 1,423.08 |
| FedEx | 2,374.10 |
| First USA Bank | 254.53 |
| Forbes Design Group, Inc. | 4,326.00 |
| FPL | 569.94 |
| Keeton's Office Supply Co., Inc. | 132.01 |
| Lab Safety Supply, Inc. | 128.18 |
| Leighton B. Deming, Jr., P.C. | 1,209.14 |
| Microbac Laboratories, Inc. | 250.00 |
| MSC | 35.31 |
| Olsson, Frank & Weeda Esq., P.C. | 582.98 |
| Time Warner Cable | 7,035.84 |
| UPS | 77.30 |
| Venice Area Chamber of Commerce | 2,500.00 |
| Verizon | 474.06 |
| Verizon Internet Solutions | 37.45 |
| Worldwide Express | 949.75 |

| | |
|---|---:|
| **Total Accounts Payable** | 30,335.76 |
| **Allowance for Unrecorded Liabilities** | 10,000.00 |
| **Net Accounts Payable** | 40,335.76 |

## Notes Payable:

| | | |
|---|---:|---:|
| Joseph Elkourie (a) | 50,000.00 | |
| John Hallman (employee) | 10,500.00 | |
| **Total Notes Payable** | | 60,500.00 |
| **Total Liabilities** | | 100,835.76 |

## Contingent Liabilities:

| | |
|---|---:|
| Cabral - Alleged Consulting Fees (b) | 34,000.00 |

## Accounts Payable Transferrable to SinoFresh Research Laboratories, LLC:

| | | |
|---|---:|---:|
| Thomas, Kayden, Horstmeyer & Risley LLP | 50,735.09 | |
| **Total A/P Transferred to SinoFresh Research Laboratories, LLC** | | 50,735.09 |

(a) Will attempt to convert to stock.
(b) This claim is the subject of a lawsuit against Labs. Labs and its counsel have informed SFHC that the claim is of no material concern and that its management has a high degree of confidence and its successful defense of these aims. Labs has agreed to indemnify and hold harmless SFHC from and against any and all claims or liability associated with any claims by Mr. Cabral.

Approved:
Initials _____
Initials _____

## PATENT ASSIGNMENT

ASSIGNMENT made as of October 24 , 2002 by Charles Fust, an individual residing at 313 S. Seaboard Ave. Venice, FL ("Assignor"), to Xzanadu, Ltd. a corporation organized under the laws of the British Virgin Islands with offices at c/o Sargon Capital, Inc. with offices at c/o Sargon Capital, Inc. 7820 South Holiday Drive, Suite 320 Sarasota, Fl 34231 ("Assignee").

Letters patent of the United States have been issued to the Assignor for a composition for freshening sinus cavities, including a carrier of the ingredients and a masking agent for concealing or eliminating odors emanating from the sinus cavities and further including an anti-septic or anti-infective constituent, which letters patent are numbered 6,344,210 B2 and dated February 5, 2002.

The Assignor is the sole owner of said patent and of all rights thereunder.

The Assignee wishes to acquire all interest in the improvement and the patent.

Now therefore, in consideration of the sum of ten dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignor hereby assigns to the Assignee all of Assignor's interest in said letters patent, said interest to extend to the full end of the term for which the letters patent or any reissues, renewals, or extensions thereof are or may be granted.

In witness whereof the Assignor has executed this instrument.

_____
Charles Fust

State of Florida          }
County of Sarasota     } ss.:

On the 30th day of October 2002, before me personally came Charles Fust, who acknowledged that he resides at 313 S. Seaboard Ave., Venice, FL and he is the individual who executed the accompanying Patent Assignment.

_____
Notary

```
OFFICIAL NOTARY SEAL
DONNA M BLANK
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD071295
MY COMMISSION EXP. NOV. 12,2005
```

EXHIBIT B
ASSUMED LIABILITIES

The following liabilities of LABS, pursuant to the terms and conditions of this Agreement, are being assumed by SinoFresh:

**[List of liabilities to be inserted]**

1

)

**SinoFresh HealthCare, Inc.**
**7820 South Holiday Drive, Suite 320**
**Sarasota, FL  34231**
**941-925-2500  *  941-925-2503 Fax**

November 15, 2002

Mr. Charles Fust
SinoFresh Laboratories, Inc.
313 S. Seaboard Avenue
Venice, FL 34292

Dear Charles:

In conjunction with the Asset Purchase Agreement between SinoFresh HealthCare, Inc. ("SFHC") and SinoFresh Laboratories, Inc. ("Labs"), the following items are required, and the closing of the transaction is contingent upon Labs agreeing to the following;

1) The vehicles, trailer, water system, packaging equipment and any and all other production related assets will be transferred to SinoFresh Research Laboratories, LLC ("Research"). These assets are not needed, required, nor deemed necessary for SFHC.

2) All administrative assets, (desks, office equipment, etc) will be acquired and scheduled at closing at a cost basis of fair market value or replacement cost by SFHC including;

- The Furniture & Fixtures have a Net Book Value ("NBV") of $62,509. The current value of these assets has been determined to be $25,000.

- The Computer & Phone Equipment has a NBV of $4,922. The current value of these assets has been determined to be $2,000;

3) The Accounts Receivable is anticipated to be approximately $13,824.80 at closing. SFHC will assume these receivables and record a $1,000 Allowance for Bad Debts;

4) The Accounts Payable has a balance of approximately $81,070.85. Of this balance, $50,735.09 relates to Thomas, Kayden, et al and associated patent costs. Therefore, this balance will transfer to and be assumed by Research. In addition, the note receivable from certain officers will be assumed by Research.

5) A maximum Allowance for Unrecorded Liabilities will be recorded in the amount of up to $10,000 by SFHC. Labs will indemnify SFHC and its related entities, for any amount exceeding this allowance.

6) The consulting fees allegedly due Mr. Cabral will not be assumed by SFHC or its related entities. It is understood that Labs will vigorously defend the alleged claims by Mr. Cabral, and that in the opinion of counsel that these claims are of no material concern and that management has a high degree of confidence of its successful defense of these claims. Furthermore, Labs will indemnify SFHC and its related entities for any and all obligations as a result of these claims. SFHC will provide and make available up to $ 50,000 in funds to Labs as part of the transaction to pay for associated legal costs related to this claim and other legal costs related to other matters. Only as required, will SFHC record any potential contingent liability related to these claims, understanding that SFHC has been indemnified by Labs and is not a party to, nor is subject to, at this time, any claim or agreement with Mr. Cabral.

7) All debt related to InvestLinc will be assumed by SFHC as agreed to between the parties.

Sincerely,


Andrew Badolato
President

FEB-18-2004 16:13        S D M & C LLP                    212 935 4865    P.43/50

<u>EXHIBIT C</u>

# BILL OF SALE

## AND

## ASSIGNMENT AND ASSUMPTION

This Bill of Sale and Assignment and Assumption Agreement (this "<u>Bill of Sale</u>"), dated as of November 15, 2002 (the "<u>Effective Date</u>") by and between SinoFresh Laboratories, Inc., an Alabama corporation ("<u>LABS</u>")("<u>Transferor</u>"), and SinoFresh, HealthCare Inc., a Delaware corporation ("<u>SinoFresh</u>" or "<u>Acquiror</u>").

<u>Recitals</u>:

A.  LABS and SinoFresh entered into that certain Asset Purchase Agreement, December ____, 2002 (the "<u>Agreement</u>"), which provides, on the terms and conditions set forth therein, for the transfer by Transferor and purchase by Acquiror of certain assets of Transferor as set forth in the Agreement.  Capitalized terms used herein without definition shall have the meanings ascribed to them in the Agreement.

B.  The assets being sold by Transferor and purchased by Acquiror include, but are not limited to, certain of Transferor's tangible and intangible property (the "<u>Purchased Assets</u>") as set forth in the Agreement.

C.  Acquiror desires to obtain all right, title and interest in and to any and all of the Purchased Assets.

D.  This Bill of Sale is being executed and delivered in order to effect the transfer of the Purchased Assets to Acquiror, as provided in the Agreement.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Transferor agree as follows:

1.  <u>Assignment</u>.  Transferor hereby sells, grants, conveys, bargains, transfers, assigns and delivers to Acquiror, and to Acquiror's successors and assigns, all of Transferor's rights, titles and interests, legal and equitable, throughout the world, in and to the Purchased Assets, to have and to hold the same forever.  This is a transfer and conveyance by Transferor to Acquiror of good and marketable title to the Purchased Assets, free and clear of all encumbrances except as provided in the Agreement or on the Schedules thereto.  Subject to the conditions and limitations contained in the Agreement, Transferor hereby covenants and agrees to warrant and defend title to the Purchased Assets against any and all claims whatsoever to the extent represented and warranted to in the Agreement.

1

2. **Assumption.** Acquiror, in consideration of the assignment, hereby assumes and undertakes to discharge, as appropriate in accordance with their terms, all of the Assumed Liabilities except as otherwise set forth in the Agreement. Except as provided for in this Paragraph 2, Acquiror is not hereby assuming, and the Acquiror shall not assume or otherwise be obligated to pay, perform, satisfy or discharge, any liabilities or obligations of Transferor or the Business.

3. **Further Assurances.** Transferor agrees that it will, at Acquiror's request at any time and from time to time after the date hereof and without further consideration, do, execute, acknowledge and deliver or will cause to be done, executed, acknowledged and delivered all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and other instruments and assurances as may be considered by Acquiror, its successors and assigns, to be necessary or proper to better effect the sale, conveyance, transfer, assignment, assurance, confirmation and delivery of ownership of the Purchased Assets to Acquiror, or to aid and assist in collecting and reducing to the possession of Acquiror, any and all Purchased Assets.

4. **Amendment or Termination; Successors and Assigns.** This Bill of Sale may not be amended or terminated except by a written instrument duly signed by each of the parties hereto. This Bill of Sale shall inure to the benefit of, and be binding upon, each of the parties hereto and their respective successors and assigns.

5. **No Third Parties.** Nothing in this Bill of Sale, expressed or implied, is intended or shall be construed to confer upon or give to any person, firm or corporation other than Acquiror and Transferor, their successors and assigns, any remedy or claim under or by reason of this instrument or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this instrument shall be for the sole and exclusive benefit of the Acquiror and Transferor, their successors and assigns.

6. **Construction.** This Bill of Sale, being further documentation of a portion of the conveyances, transfers and assignments provided for in and by the Agreement, neither supersedes, amends, or modifies any of the terms or provisions of the Agreement nor does it expand upon or limit the rights, obligations or warranties of the parties under the Agreement. In the event of a conflict or ambiguity between the provisions of this Bill of Sale and the Agreement, the provisions of the Agreement will be controlling.

7. **Governing Law.** The rights and obligations of the parties under this Bill of Sale will be construed under and governed by the internal laws of the State of Florida (regardless of its or any other jurisdiction's conflict-of-law provisions).

8. **Counterparts.** This Bill of Sale may be executed by facsimile in one or more counterparts and by facsimile, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Bill of Sale as of the Effective
Date.

TRANSFEROR:          **SINOFRESH LABORATORIES, INC.**
                     An Alabama corporation

                     By: _____

                     Name: _CHARLES A. FUST_

                     Its: _CHAIRMAN /CEO_


ACQUIROR:            **SINOFRESH HEALTHCARE, INC,**
                     a Delaware corporation

                     By: _____

                     Name: _Andrew Badolato_

                     Its: _President_

3

## EXHIBIT D

## MUTUAL RELEASE AGREEMENT

This Mutual Release Agreement (this "Release Agreement"), dated as of November 15, 2002(the "Effective Date"), by and between SinoFresh Laboratories, Inc., an Alabama corporation ("LABS") and SinoFresh HealthCare, Inc., a Delaware corporation ("SinoFresh").

## RECITALS

WHEREAS, LABS and SinoFresh are parties to that certain Asset Purchase Agreement, dated November __, 2002 (the "Asset Purchase Agreement"), and this Release Agreement is that certain Release Agreement as that term is defined in the Asset Purchase Agreement; and

WHEREAS, LABS and SinoFresh now wish to enter into this Release Agreement with respect to the consummation of the Asset Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.   Definitions.  Any capitalized term used in this Release Agreement without definition shall have the meaning given to such term in the Asset Purchase Agreement.

2.   Release by LABS.  LABS hereby fully, forever, irrevocably, and unconditionally releases and discharges SinoFresh, including, as applicable, all past and present officers, directors, stockholders, affiliates (including, but not limited to, parent, subsidiary and affiliated corporations), agents, employees, representatives, lawyers, administrators, spouses, and all persons acting by, through, under, or in concert with them, from any and all claims, damages or other sums, including attorneys' fees and costs, which LABS may have against them, or any of them, which could have arisen out of any act or omission occurring from the beginning of time to the effective date of this Agreement, whether now known or unknown, and whether asserted or unasserted.

3.   Release by SinoFresh.  SinoFresh hereby fully, forever, irrevocably, and unconditionally releases and discharges LABS, including, as applicable, all past and present officers, directors, stockholders, affiliates (including, but not limited to, parent, subsidiary and affiliated corporations), agents, employees, representatives, lawyers, administrators, spouses, and all persons acting by, through, under, or in concert with them, from any and all claims, damages or other sums, including attorneys' fees and costs, which SinoFresh may have against them, or any of them, which could have arisen out of any act or omission occurring from the beginning of

1

Release Agreement, in any one or more instance, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Release Agreement on any future occasion. All remedies, either under this Release Agreement, by law or otherwise, will be cumulative and not alternative.

       4.5    <u>Headings</u>. The headings of the sections of this Release Agreement are for convenience and reference only and are not to be used to interpret or define the provisions hereof.

       4.6    <u>Counterparts</u>. This Release Agreement may be executed by facsimile and in two (2) or more counterparts, each of which shall be deemed an original and all of which shall constitute one (1) instrument.

[SIGNATURE PAGE FOLLOWS]

3

IN WITNESS WHEREOF, each of the parties has caused this Release Agreement to be executed as of the Effective Date.

LABS:                         **SINOFRESH LABORATORIES, INC.**
                              An Alabama corporation

                              By:   _Charles Fust_
                              Name: _CHARLES A. FUST_
                              Its:  _General / CEO_


SinoFresh:                    **SINOFRESH HEALTHCARE, INC,**
                              a Delaware corporation

                              By:   _Andrew Badolato_
                              Name: _Andrew Badolato_
                              Its:  _Director, President_


4

FEB-18-2004  16:15       S D M & C LLP                        212 935 4865   P.50/50

## SCHEDULE 4.2.1
## CONSENTS

**[Insert agreements which are being assigned]**

1

# GREENBERG
### ATTORNEYS AT LAW
# TRAURIG

January 30, 2004

**Via Federal Express - Standard Overnight Delivery and Via Facsimile**

Mr. Steve Bannon
The Firm
9465 Wilshire Boulevard
Suite 600
Beverly Hills, CA 90212

Dear Mr. Bannon:

SinoFresh Healthcare, Inc. ("Company") shareholders holding shares representing more than a majority of votes ("Shareholders") acting under Florida law have acted by written consent and elected to terminate your directorship. The Company intends to pursue listing on a national securities exchange and the Shareholders have concluded that your involvement with Mr. Badolato presents difficulties in achieving that goal. The exchanges (including NASDAQ and AMEX) have stringent requirements for independence and the Shareholders were of the opinion that the majority of outside directors should be totally independent of all Sargon/Badolato issues.

Since the Company is planning several SEC filings in the near future (including most importantly, an SB-2) it may be necessary to have to deal in detail with the subject of the cessation of your directorship. If you were, however, to send a letter or resignation, we would probably be able to avoid lengthy explanations of the termination in the SB-2. Although we encourage you to submit a resignation, whether or not you submit such a resignation is totally up to you. If you wish to resign I would need to know that by 1:00 P.M. Eastern time on Tuesday, February 3, 2004.

The Company thanks you for your services and anticipated cooperation. Please direct any correspondence and/or communication to me.

Very truly yours,



Randolph H. Fields

/mmb
cc:   Charles A. Fust, Chairman & CEO

\\orl-srv01\FILES\DSR\237659-021\09\02_.DOCU/2004/45571.9}}0000

GREENBERG TRAURIG, P.A.
P.O. Box 4923 Orlando, Florida 33802-4923
407-420-1000 Fax 407-420-5909 www.gtlaw.com
450 South Orange Avenue, Suite 450 Orlando, Florida 32801
MIAMI  NEW YORK  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  TYSONS CORNER  CHICAGO  BOSTON  PHOENIX  WILMINGTON  LOS ANGELES  DENVER
FORT LAUDERDALE  BOCA RATON  WEST PALM BEACH  ORLANDO  TALLAHASSEE

**EXHIBIT**
" C "



THE **OTTO** LAW GROUP
A PROFESSIONAL LIMITED LIABILITY COMPANY

David M. Otto
dotto@ottolaw.com

February 2, 2004

**VIA FACSIMILE AND REGULAR MAIL**
Facsimile No. (407) 420-5909

Randolph H. Fields
Greenberg Traurig
450 South Orange Avenue, Suite 650
Orlando, Florida 32801

Re: SinoFresh Healthcare, Inc. (the "Company")

Dear Mr. Fields:

I am in receipt of your letter dated January 30, 2004, regarding certain shareholders of the Company having acted by written consent to elect to terminate my directorship and your suggestion that I consider resigning as a director of the Company. Mr. Steve Bannon has informed me that you have also delivered to him a letter substantially similar in content to that delivered to me. Prior to any discussion of your suggestion that I consider resigning as a director of the Company, please deliver to me a copy of the written consent to which you refer, certified by the Chief Executive Officer of the Company.

Additionally, I would mention that the unilateral resignations of Steve Bannon and me as directors of the Company presents certain difficulties in that such acts would leave the Company without any outside or independent directors. The Company represented to investors in connection with its recent private placement of $2.5 million of its Series C Preferred Stock and $1.6 million of its Warrants that such investors would have the right to have outside directors serve on the Company's Board of Directors and oversee the activities of the Company. As such, Mr. Bannon and I served as the investors' representatives to the Board of Directors. Please confirm which outside directors, if any, will be replacing Mr. Bannon and me or what actions the Company plans with respect to identifying suitable replacements for Mr. Bannon and me. Without Mr. Bannon or me serving as directors, the only remaining directors (Charles Fust, Mr. Fust's wife, Stacey Maloney, and Mr. P. Robert DuPont) would be either affiliates of the Company or otherwise have insider status.

Further, prior to any resignation, Mr. Bannon and I need to identify and address certain actions which appear to have been taken during our tenure as directors, but never received either board review or approval.

900 Fourth Avenue, Suite 3140   Seattle, WA 98164   TEL 206-262-9545   FAX 206-262-9513   WEB www.ottolaw.com



**EXHIBIT**

"D"

        With respect to your insinuation that I have not been "totally independent of all Sargon/Badolato issues," I note that you fail to state any alleged facts which would indicate that either Mr. Bannon or I have not served our duties as completely independent directors or that our status as directors would somehow interfere with the Company listing its securities for trading on the NASDAQ or AMEX.  I am left, therefore, to speculate as to what alleged facts you might have in mind.  This, without more, leaves me to wonder whether you simply either (i) did not feel like taking the time to explain why you are suggesting that Mr. Bannon and I resign or (ii) are relying on false and/or unreliable information.  Certainly, I would expect anyone drawing your conclusions and making your assertions, directly and through innuendo, to provide at least some form of explanation.

        I will contact you after I have reviewed the information requested in this letter.

                                    Very truly yours,

                                    David M. Otto


cc:  Charles A. Fust
     Steve Bannon



THE **OTTO** LAW GROUP
A PROFESSIONAL LIMITED LIABILITY COMPANY

David M. Otto
dotto@ottolaw.com

February 10, 2004

**VIA FACSIMILE AND REGULAR MAIL**
Facsimile No. (407) 420-5909

Randolph H. Fields
Greenberg Traurig
450 South Orange Avenue, Suite 650
Orlando, Florida 32801

Re: SinoFresh HealthCare, Inc. (the "Company")

Dear Mr. Fields:

I am writing this letter on behalf of the independent directors of the Company's Board of Directors, Steve Bannon and myself. On February 2, 2004, I faxed and delivered via regular mail to you my response to your letter dated January 30, 2004, regarding certain shareholders of the Company having acted by written consent to elect to terminate the directorships of the independent directors and your suggestion that the independent directors consider resigning as directors of the Company. To date, I have placed several phone calls to you and still have not received a response from you.

Since the Company has not filed an information statement on Securities and Exchange Commission ("SEC") Schedule 14C, pursuant to SEC Regulation 14C, with respect to the alleged shareholder consent or a copy of the alleged shareholder consent under which you represent shareholders "holding shares representing more than a majority of votes" have acted to remove the Company's only independent directors, the Company's only independent directors have concluded that Mr. Fust's actions and your letter of January 30, 2004 were nothing more than attempts to intimidate and otherwise coerce the Company's independent directors into resigning.

Since the Company's Board of Directors has never called a meeting to discuss hiring either you or your firm, and the Company's board has never agreed to retain you, either on behalf of the Company or the Board of Directors, you have never and do not now represent the Company or its board. As the Company's only independent directors, Mr. Bannon and I assume you represent individual shareholders and are acting on their behalf. Any payment to you, therefore, must come from the shareholder(s) you represent.

Further, since February 2, 2004, it has come to my attention that various shareholders have alleged that Charles Fust, the Company's Chairman and Chief Executive Officer, has

900 Fourth Avenue, Suite 3140   Seattle, WA  98164   TEL 206-262-9545   FAX 206-262-9513   WEB www.ottolaw.com



**EXHIBIT**
"E"

)                                )

represented to certain shareholders of the Company that neither Mr. Bannon nor I are currently serving as directors of the Company. This is untrue. Such allegations, should they continue, are problematic for the Company in its obligation to provide full and fair disclosure to the public and problematic for Mr. Fust, individually, from a fiduciary duty standpoint.

With respect to the foregoing, the independent directors have called a special meeting of the Board of Directors, for 7:00 p.m., Eastern Standard Time, Friday, February 13, 2004. Attached please find a copy of the notice of the special meeting.

Finally, as Mr. Bannon and I remain duly appointed and incumbent directors of the Company, please submit to Mr. Bannon and me for our review and approval, the information statement on Schedule 14C which the Company intends to file with the SEC.

Please contact me if you have further questions.

Very truly yours,

David M. Otto

cc: Charles A. Fust
Steve Bannon

## NOTICE OF SPECIAL MEETING
### OF
## THE BOARD OF DIRECTORS
### OF
## SINOFRESH HEALTHCARE, INC.

To: Each of the directors of SinoFresh Healthcare, Inc., a Florida corporation (the "Corporation"): Charles Fust (Chairman), Stacey Maloney, P. Robert DuPont, Steven Bannon and David Otto.

David M. Otto, a director of the Corporation, hereby notifies you that the Board of Directors of the Corporation will hold a special meeting at 7:00 p.m., Eastern Standard Time, February 13, 2004, at the Corporation's administrative offices, located at 516 Paul Morris Drive, Englewood, Florida 34223, and via teleconference call. To participate in the meeting via teleconference call, please call the following number at 7:00 p.m., Eastern Standard Time, on February 13, 2004: (800) 491-0954, passcode 629922.

DATED this 10th day of February, 2004.

_____
David M. Otto, Director

Sinofresh Healthcare, Inc.                                              Page 2 of 9

**SCHEDULE 14C**
**(RULE 14c-101)**

**INFORMATION REQUIRED IN INFORMATION STATEMENT**

**SCHEDULE 14C INFORMATION**

**INFORMATION STATEMENT PURSUANT TO SECTION 14(C)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

CHECK THE APPROPRIATE BOX:

☒ PRELIMINARY INFORMATION STATEMENT       ☐ CONFIDENTIAL, FOR USE OF THE COMMISSION
                                            ONLY (AS PERMITTED BY RULE 14C-5(D)(2))
☐ DEFINITIVE INFORMATION STATEMENT

**SINOFRESH HEALTHCARE, INC.**

**(NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)**

Payment of Filing Fee (Check the appropriate box):

☒  No fee required.
☐  Fee computed on table below per Exchange Act Rules 14c-5(g) and 0-11.

   (1)   Title of each class of securities to which transaction applies:

         _____

   (2)   Aggregate number of securities to which transaction applies:

         _____

   (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth
         the amount on which the filing fee is calculated and state how it was determined):

         _____

   (4)   Proposed maximum aggregate value of transaction:

         _____

   (5)   Total fee paid:

         _____

☐  Fee paid previously with preliminary materials.
☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which
   the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or
   Schedule and the date of its filing.

   (1)   Amount Previously Paid:

**EXHIBIT**

"F"

)                                    )

Sinofresh Healthcare, Inc.                                    Page 3 of 9

_____

(2)   Form, Schedule or Registration Statement No.:

_____

(3)   Filing Party:

_____

(4)   Date Filed:

_____

)                                                           )

Sinofresh Healthcare, Inc.                                          Page 4 of 9

## SINOFRESH HEALTHCARE, INC.

516 Paul Morris Drive
Englewood, Florida 34223

### INFORMATION STATEMENT

**February \_\_\_\_, 2004**

### INTRODUCTION

This Information Statement is being furnished to shareholders of SinoFresh HealthCare, Inc. ("SinoFresh" or the "Company") in connection with the Shareholder Actions taken by the written consent of the holders of in excess of a majority of the voting power of the shareholders of the Company. Accordingly, all necessary corporate approvals required in connection with the matters referred to herein have been obtained, and this Information Statement is furnished solely for the purpose of informing shareholders, in the manner required under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of these Shareholder Actions.

### WE ARE NOT ASKING YOU FOR A PROXY AND

### YOU ARE REQUESTED NOT TO SEND US A PROXY.

This Information Statement is first being sent to shareholders on or about February      , 2004.

### SHAREHOLDER ACTION TAKEN

As authorized by the necessary approvals of the holders of a majority of our outstanding voting stock ("Consenting Shareholders"), we have approved the removal of Steven K. Bannon and David Otto as directors and officers of the Company.

The written consent of the Consenting Shareholders removing Messrs. Bannon and Otto as directors and officers (the "Shareholder Action") was executed on various dates and delivered to the Company February 10, 2004, ("Consent Date"). The status of the other three directors remains unchanged and Charles Fust, Robert DuPont and Stacey Maloney-Fust remain as the directors of the Company. This Information Statement is being provided to all shareholders of record who were entitled to give an authorization or a written consent in regard to the Shareholder Action on January 30, 2004 (the "Record Date").

The removal of the two directors will position the Company to add new directors who will allow the Company to meet independence and financial expertise standards which the Company intends to impose.

Under Florida law, the Shareholder Action described in this Information Statement will not entitle the Company's shareholders with the opportunity to dissent from the actions described herein and to receive an agreed or judicially appraised value for their shares.

### OUTSTANDING SECURITIES AND VOTING RIGHTS

*Outstanding Securities*

As of the Record Date, the Company had issued and outstanding 13,314,323 shares of common stock. All holders of common stock have one vote per share of common stock. As of the Record Date, there were also issued and outstanding 858,170 shares of Company Series A convertible preferred stock ("Series A Preferred Stock"), 1,500,000 shares of Company Series B convertible preferred stock ("Series B Preferred Stock") and 1,218,711 shares of Company Series C convertible preferred stock ("Series C Preferred Stock"). Unless as otherwise provided by law, all holders of the Company's issued and

)                                              )

Sinofresh Healthcare, Inc.                                    Page 5 of 9

outstanding preferred stock vote with holders of common stock as

-2-

one class on matters presented to the Company's shareholders for a vote. Holders of Series A Preferred Stock have one vote per share of Series A Preferred Stock they hold. Holders of Series B or Series C Preferred Stock have two votes for every share of Series B or Series C Preferred Stock they hold. The Company's issued and outstanding shares of common stock, Series A, Series B and Series C Preferred Stock are hereinafter referred to collectively as the "Voting Stock."

Therefore, all holders of shares of the Company's Voting Stock are entitled to receive this Information Statement. The Consenting Shareholders who consented in writing to the Shareholder Action held a majority of the Voting Stock.

### Voting Rights and Action by Written Consent

The Company is incorporated under the laws of the State of Florida. Under Florida law, any action that may be taken at a shareholders' meeting may be taken by written consent of the requisite number of shareholders required to take such action. The removal of directors require the written consent of the holders of a majority of the Company's outstanding voting stock. The requisite number of written consents to take the Shareholder Actions were executed on various dates and delivered to the Company by the Consenting Shareholders on February 10, 2004.

### Summary of Reasons for the Shareholder Action.

The Consenting Shareholders concluded that the two removed directors were not sufficiently independent and that their removal would enable the Company to meet independence and financial expertise standards which the Company intends to impose.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information regarding the beneficial ownership of our shares of Voting Stock as of January 30, 2003 by: (i) each person who is known by us to beneficially own more than 5% of our issued and outstanding shares of common stock; (ii) our Chairman and Chief Executive Officer; (iii) our directors; and (iv) all of our executive officers and directors as a group. For purposes of the beneficial ownership calculations below, the Series A Stock, which is convertible into common stock on a 1-for-1 basis, the Series B Preferred Stock, which is convertible into common stock on a 1-for-2 basis, and Series C Preferred Stock, which is convertible into common stock on a 1-for-2 basis are included on an as converted basis, such that the total issued and outstanding Voting Stock becomes 19,609,915. Unless otherwise indicated, the persons named below have sole voting and investment power with respect to all shares beneficially owned by them, subject to community property laws where applicable.

| Name of Beneficial Owner(1)(2) | No. of shares | Percentage |
|---|---|---|
| Charles Fust, Chairman and CEO | 8,411,400(3) | 42.78% |
| Robert DuPont, Vice President and a Director | 406,000(4) | 2.06% |
| Russell Lee, CFO | 5,000(5) | * |
| William Wilferth, Vice President | 37,500(6) | * |
| Moty Hermon | 1,229,723(7) | 6.27% |
| David Otto, General Counsel, Secretary and a Director(8) | 50,000 | * |
| Steven Bannon, Vice President and a Director(9) | 375,000(10) | 2.16% |
| Stacey Maloney-Fust, Vice President and a Director | 8,411,400(11) | 42.78% |
| All officers and directors as a group (7 persons) | 9,284,900(12) | 46.75% |

\*    Represents less than 1% of all issues and outstanding Voting Stock of the Company.

(1)    Unless otherwise noted, the address of each person or entity listed is c/o SinoFresh Healthcare, Inc. 516 Paul Morres
       Drive, Englewood, FL 34223.
(2)    Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and
       generally includes voting or investment power with respect to securities. Shares of common stock subject to options,
       warrants or convertible securities that are currently exercisable, or exercisable within 60 days of January 30, 2003, are
       deemed outstanding for computing the percentage of the person holding such options, warrants or convertible
       securities but are not deemed outstanding for computing the percentage of any other person. Except as indicated by
       footnote and subject to community property laws where applicable, the persons named in the table have sole voting
       and investment power with respect to all shares of common stock shown as beneficially owned by them.
(3)    Represents 5,356,400 shares of common stock owned by the Charles Fust Florida Limited Partnership for which
       Mr. Fust is the general partner, 1,500,000 shares of Series B preferred stock held by the Charles Fust Florida Limited
       Partnership , which is entitled to two votes per share, 5,000 beneficially owned by Mr. Fust's spouse, Stacey Maloney-
       Fust, a Vice President and a Director of the Company, and 50,000 shares of common stock issuable to Mr. Fust's
       spouse pursuant to options exercisable within the next 60 days.
(4)    Represents 250,000 shares of common stock held directly, 10000 shares of Series A Preferred stock held directly and
       146,000 shares of common stock issuable pursuant to options exercisable within the next 60 days.
(5)    Represents 5,000 shares of common stock issuable pursuant to options exercisable within the next 60 days.
(6)    Represents 25,000 shares of common stock and 12,500 shares of Preferred Series C Preferred Stock.
(7)    Represents 1,229,723 shares of common stock Mr. Moty Hermon has a right to acquire pursuant to a put option ,
       which put option is guaranteed by Mr. Charles Fust who has pledged his shares in the same amount.
(8)    Mr. Otto's address is 900 Fourth Avenue, Suite 3140, Seattle, WA 98164. Mr. Otto's removal as a director and officer
       was approved by a holders of a majority of the voting capital stock of the Company by written consent executed and
       delivered on February 10, 2004.
(9)    Mr. Bannon's address is 11601 Wilshire Blvd., Suite 2040, Los Angeles, CA 90025. Mr. Bannon's removal as a
       director and officer was approved by holders of a majority of the voting capital stock of the Company by written
       consent executed and delivered on February 10, 2004.
(10)   Includes 50,000 shares of common stock issuable pursuant to options exercisable within the next 60 days.
(11)   Represents 5,000 shares of common stock held directly, 50,000 shares of common stock issuable pursuant to options
       exercisable within the next 60 days, 5,356,400 shares owned by the Charles Fust Florida Limited Partnership for which
       Charles Fust, Ms. Maloney-Fust's spouse, is the general partner, and 1,500,000 shares of Series B preferred stock held
       by Ms. Maloney-Fust's spouse, which is entitled to two votes per share.
(12)   Includes 251,000 shares of common stock issuable pursuant to options that are exercisable within the next 60 days.

*Change of Control*

   On September 8, 2003, SinoFresh Corp., a Florida corporation formerly known as e-Book Network, Inc. ("SinoFresh"),
SinoFresh Acquisition Corp., a Florida corporation ("Acquisition Sub"), SinoFresh Healthcare, Inc., a Delaware corporation
("Healthcare") and the sole director and majority shareholder of SinoFresh entered into a Merger Agreement. In addition,
SinoFresh amended its Articles of Incorporation authorizing the issuance of up to 700,000,000 shares of no par value capital
stock, consisting of 500,000,000 shares of common stock and 200,000,000 shares of preferred stock. The amended Articles
also designated 858,170 shares of the preferred stock as Series A Preferred Stock with each share convertible into one
common shares and possessing one vote. In addition, 1,500,000 shares of the preferred stock were designated as Series B
Preferred Stock with each share convertible into two common shares and possessing two votes. Another 1,250,000 shares of
preferred stock was designated as Series C Preferred Stock with each share convertible into two common shares and
possessing two votes.

   Under the Merger Agreement, SinoFresh acquired all of the issued and outstanding capital stock of Healthcare consisting
of 21,536,980 shares of Common Stock; 1,716,399 shares of Series A Preferred Stock; 6,000,000 shares of Series B Preferred
Stock and 4,874,843 shares of Series C Preferred Stock in exchange for 10,768,490 shares of SinoFresh Common Stock;
858,170 shares of SinoFresh Series A Preferred Stock; 1, 500,000 shares of SinoFresh Series B Preferred Stock and
1,218,711 shares of SinoFresh Series C Preferred Stock. In connection with the Agreement, the sole director and majority
shareholder of SinoFresh agreed to tender 19,616,667 shares in SinoFresh common stock back to SinoFresh for cancellation.
In addition, Healthcare exchanged options to purchase 3,000,000 common shares and warrants to purchase 900,000 common
shares for SinoFresh options to purchase 1,500,000 shares and SinoFresh warrants to purchase 450,000 common shares.

   Subsequent to the merger, Acquisition Sub, which changed its name to SinoFresh Corporation, remains the operating
subsidiary of the Company (which changed its name from SinoFresh Corp. to SinoFresh Healthcare, Inc.). As a result of the
merger, the former shareholders of Healthcare obtained approximately 81% the Company's common stock and additional

)                                    )

Sinofresh Healthcare, Inc.                                    Page 8 of 9

voting control by virtue of the voting rights of the preferred stock, providing a total voting interest of 91%. Since the former officers and directors of Healthcare also obtained management control of

-4-

)                                          )

Sinofresh Healthcare, Inc.                                          Page 9 of 9

the Company, the merger transaction was treated as a recapitalization of Healthcare, with Healthcare as the acquirer for financial accounting purposes. Accordingly, the pre-merger shareholders of SinoFresh were deemed to be issued approximately 2,483,000 common shares.

By Order of the Board of Directors

/s/ Russell Lee
_____

Russell Lee, Chief Financial Officer and Secretary

Dated: February 13, 2004.

U.S. Securities and Exchange Commission

Washington, D.C. 20549

Form 10-QSB

|X| QUARTERLY REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2003

|_| TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE EXCHANGE ACT

For the transition period from January 1, 2003 to September 30, 2003

Commission file number 0-49764

SinoFresh HealthCare, Inc.
(Exact name of small business issuer as specified in its charter)

| | |
|---|---|
| Florida | 65-1082270 |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification Number) |

516 Paul Morris Drive
Englewood, Florida 34223
(Address of principal executive offices)

941-488-5008
(Issuer's telephone number)

Check whether the issuer (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes |X| No |_|

The number of shares outstanding of each of the issuer's classes of common equity as of September 30, 2003:

Common Stock, $.0001 Par Value 10,768,490 shares

Transitional Small Business Disclosure Format (check one):

Yes |_| No |X|

EXHIBIT

"G"

Table of Contents

# SINOFRESH HEALTHCARE INC.

**Index**                                                                                                        **Page**

**Part I.**       **Financial Information**
              Item 1.   <u>Financial Statements</u>

                        Condensed balance sheet – September 30, 2003 (Unaudited) and December 31, 2002          3

                        Unaudited condensed income statements – Three - and Nine-months ended
                        September 30, 2003 and 2002                                                             4

                        Unaudited condensed statements of cash flows Nine-months ended September 30,
                        2003 and 2002                                                                           5

                        Notes to unaudited condensed financial statements                                       6

              Item 2.   Management's Discussion and Analysis of Financial Position and Results of
                        Operations                                                                              8

              Item 3.   Controls and Procedures                                                                 11

**Part II.**      **Other Information**                                                                             12

              Item 6.   Exhibits and Reports on Form 8-K                                                        13

**Signatures**                                                                                                     14

**Certifications**                                                                                                 15

Part I Financial Information

SINOFRESH HEALTCARE, INC.
BALANCE SHEET
September 30, 2003 (unaudited) and
December 31, 2002

ASSETS

|  | September 30, 2003 | December 31, 2002 |
|---|---|---|
|  | (Unaudited) | (Audited) |
| CURRENT ASSETS: |  |  |
| Cash | $ 1,013,062 | $ 245,685 |
| Accounts receivable, net of allowances | 173,274 | 18,144 |
| Inventory | 287,521 | 93,645 |
| Other current assets | 98,691 | 11,935 |
| TOTAL CURRENT ASSETS | 1,572,548 | 369,409 |
|  |  |  |
| FURNITURE AND EQUIPMENT, NET | 138,074 | 25,875 |
|  |  |  |
| PATENTS, NET | 2,807,700 | 2,985,300 |
|  |  |  |
| GOODWILL | 2,409,401 | 2,336,796 |
|  |  |  |
| OTHER ASSETS | 14,308 | 20,675 |
|  | $ 6,942,031 | $ 5,738,055 |

LIABILITES AND STOCKHOLDERS' EQUITY

|  | | |
|---|---|---|
| CURRENT LIABILITIES |  |  |
| Notes payable | $ 338,000 | $ --- |
| Accounts payable and accrued expenses | 837,381 | 482,690 |
| Deferred revenue | 293,366 | 17,678 |
| Current portion of long term debt | 293,075 | 443,367 |
| TOTAL CURRENT LIABILITIES | $ 1,761,822 | $ 943,735 |
|  |  |  |
| Long-term debt, net of current maturities | 86,389 | 78,977 |
| TOTAL LIABILITIES | 1,848,211 | 1,022,712 |
|  |  |  |
| COMMITMENTS AND CONTINGENCIES | - |  |
|  |  |  |
| STOCKHOLDERS' EQUITY: |  |  |
| Common stock, no par value; 500,000,000 shares authorized; 4,000,000 shares issued and outstanding and 6,768,490 shares issuable at December 31, 2002; 10,768,490 shares issued and outstanding at September 30, 2003 | (1,084) | 2,154 |
| Preferred Stock, no par value; 200,000,000 shares authorized |  |  |
| Series A Convertible, Voting; 858,170 shares authorized; 808,170 and 858,170 shares issued and outstanding at December 31, 2002 and September 30, 2003 | 1,716,339 | 1,616,339 |
| Series B Convertible, Voting; 1,500,000 shares authorized, issued and outstanding | 3,000,000 | 3,000,000 |
| Series C Convertible, Voting; 1,250,000 shares authorized; 337,500 shares issued and outstanding at December 31, 2002 and 1,218,711 shares issued and outstanding at September 30, 2003 | 2,266,141 | 608,712 |
| Common stock warrants, net of deferred consulting and compensation fees of $285,261 | 1,631,603 |  |
| Accumulated deficit | (2,867,179) | (511,862) |
|  | 5,745,820 | 4,715,343 |
| Warrant subscriptions receivable | (652,000) | --- |
| TOTAL STOCKHOLDERS' EQUITY | 5,093,820 | 4,715,343 |
|  | $ 6,942,031 | $ 5,738,055 |

See notes to condensed financial statements.

SINOFRESH HEALTHCARE, INC.
CONDENSED STATEMENT OF OPERATIONS (unaudited)

| | Three Months Ended September 30, 2003 | (Predecessor Company) Three Months Ended September 30, 2002 | Nine Months Ended September 30, 2003 | (Predecessor Company) Nine Months Ended September 30, 2002 |
|---|---|---|---|---|
| REVENUE | 687,442 | 73,833 | 1,054,167 | 141,694 |
| COST OF REVENUE | 178,724 | 3,421 | 271,516 | 35,422 |
| GROSS PROFIT | 508,718 | 70,412 | 782,651 | 106,272 |
| OPERATING EXPENSES | | | | |
| General and administrative expenses | 835,035 | 213,586 | 2,047,145 | 661,254 |
| Marketing expenses | 429,421 | 19,341 | 742,303 | 274,630 |
| Research and development expenses | 73,939 | -- | 129,874 | 3,896 |
| TOTAL OPERATING COSTS AND EXPENSES | 1,338,395 | 232,927 | 2,919,322 | 939,780 |
| LOSS FROM OPERATIONS | (829,677) | (162,515) | 2,136,671 | (833,508) |
| OTHER INCOME (EXPENSES); | | | | |
| Interest expense | (23,136) | | (65,134) | |
| Other income (expense) | (153,922) | (12,014) | (153,512) | (34,002) |
| TOTAL OTHER INCOME (EXPENSE) | (177,059) | (12,014) | (218,646) | (34,002) |
| NET LOSS | $ 1,006,736 | $ (174,529) | $ 2,355,317 | $ (867,510) |
| NET LOSS PER COMMON SHARE -basic | $ (0.09) | $ (0.02) | $ (0.21) | $ (0.08) |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING -basic | 11,356,639 | 11,356,639 | 10,996,694 | 10,996,694 |

See notes to condensed financial statements.

SINOFRESH HEALTHCARE, INC.
CONDENSED STATEMENT OF CASH FLOWS (unaudited)

| | Nine Months Ended September 30, 2003 | (Predecessor Company) Nine Months Ended September 30, 2002 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net loss | $  (2,355,317) | $  (867,510) |
| | | |
| Adjustments to reconcile net loss to net cash used in operations: | | |
| Amortization and depreciation | 187,796 | 35,459 |
| Stock and options issued for services | 70,294 | |
| Options issued as loan fees | 5,360 | |
| Stock issued as settlement cost | 100,000 | |
| Bad debt expense | 14,000 | |
| | | |
| Changes in assets and liabilities net of effects from acquisition: | | |
| Accounts receivable | (169,130) | (7,843) |
| Inventory | (193,875) | 34,557 |
| Other current assets | (86,757) | 20,375 |
| Other assets | (66,238) | (47,228) |
| Accounts payable and accrued expenses | 396,687 | 69,557 |
| Deferred revenue | 275,688 | 12,565 |
| NET CASH USED IN OPERATING ACTIVITIES | (1,821,312) | (750,068) |
| | | |
| INVESTING ACTIVITIES: | | |
| Payments for purchases of property and equipment | (122,345) | (13,465) |
| | | |
| NET CASH USED IN INVESTING ACTIVIES | (122,345) | (13,465) |
| | | |
| FINANCING ACTIVITIES: | | |
| Proceeds from issuance of stock | 2,561,380 | 678,886 |
| Proceeds from long-term debt | 397,847 | 104,096 |
| Repayment of long-term debt | (248,193) | --- |
| | | |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | 2,711,084 | 782,982 |
| | | |
| NET DECREASE IN CASH | 767,377 | 19,449 |
| | | |
| CASH - beginning of period | 245,685 | 48,544 |
| | | |
| CASH - end of period | $  1,013,062 | $  67,993 |
| | | |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION: | | |
| | | |
| Cash paid during the period for interest | $  33,571 | $  105,236 |

See notes to condensed financial statements

4

SinoFresh HealthCare, Inc.
Notes to Unaudited Condensed Financial Statements

**Note 1. Basis of Presentation**

The accompanying unaudited financial statements of SinoFresh HealthCare, Inc. (the "Company") have been prepared in accordance with generally accepted accounting principles and the rules and regulations of the United States Securities and Exchange Commission for interim financial information. Accordingly, they do not include all of the information and footnotes necessary for a comprehensive presentation of financial position and results of operation.

The Company's business is subject to various risks and uncertainties and the Company's ability to continue, as a going concern is dependant on its ability to market and distribute its products and utilize the technology underlying its patents. All of these activities are capital intensive and, since the Company just commenced its national marketing campaign, it has assessed these risks as of December 31, 2002 and September 30, 2003. While the Company has a working capital deficit at September 30, 2003 of $189,274, incurred a net loss of $2,355,317 and has consumed $1,821,312 of cash in operations for the nine months then ended, Management believes that these risks are mitigated by the growth in revenues and the recent capital funding. The rate of the Company's future growth and success will be dependant on its ability to generate the necessary resources through product sales or otherwise. The accompanying statements do not include any adjustments that might be necessary if the Company is unable to generate these revenues and continue as a going concern.

In the opinion of management, all adjustments, consisting of normal recurring adjustments, have been made in the September 30, 2003 financial statements, which are necessary for a fair financial statement presentation. The results for the three and nine months ended September 30, 2003 and 2002 are not necessarily indicative of financial information for the full year.

For further information, refer to the financial statements and footnotes included in the Company's Current Report on Form 8-K as filed with the Securities and Exchange Commission for the period October 15 (date of inception) to December 31, 2002.

**Note 2:  Merger**

On September 8, 2003, (the "Merger Date") SinoFresh Healthcare, Inc. ("Company"); SinoFresh Acquisition Corp. ("Acquisition"); SinoFresh Corp. ("SinoFresh"), formerly known as e-Book Network, Inc., and the sole director and majority shareholder of SinoFresh entered into a Merger Agreement. In addition, SinoFresh amended its Articles of Incorporation authorizing the issuance of up to 700,000,000 shares of no par value capital stock, consisting of 500,000,000 shares of common stock and 200,000,000 shares of preferred stock. The amended Articles also designated 858,170 shares of the preferred stock as Series A Preferred Stock with each share convertible into one common share and possessing one vote. In addition, 1,500,000 shares of the preferred stock were designated as Series B Preferred Stock with each share convertible into two common shares and possessing two votes. Another 1,250,000 shares of preferred stock was designated as Series C Preferred Stock with each share convertible into two common shares and possessing two votes.

The amended Articles stipulate that the Company will register approximately 2,915,340 shares of common stock with the Securities and Exchange Commission. Series A and Series C Preferred shareholders will have the right to register 70% of their common shares obtained upon conversion.

Under the Merger Agreement, SinoFresh acquired all of the outstanding capital stock of the Company consisting of 21,536,980 shares of Common Stock; 1,716,399 shares of Series A Preferred Stock; 6,000,000 shares of Series B Preferred Stock and 4,874,843 shares of Series C Preferred Stock in exchange for 10,768,490 shares of SinoFresh Common Stock; 858,170 shares of SinoFresh Series A Preferred Stock; 1,500,000 shares of SinoFresh Series B Preferred Stock and 1,218,711 shares of SinoFresh Series C Preferred Stock.  In connection with the Agreement, the sole director and majority shareholder of SinoFresh agreed to tender 19,616,667 shares in SinoFresh back to SinoFresh for cancellation. In addition the Company exchanged options to purchase 3,000,000 common shares and

warrants to purchase 900,000 common shares for SinoFresh options to purchase 1,500,000 common shares and SinoFresh warrants to purchase 450,000 common shares.

All share and per share data in the accompanying financial statements has been retroactively changed to reflect this transaction.

Subsequent to the merger, Acquisition, which changed its name to SinoFresh Corporation, remains the operating subsidiary of the Company. The shareholders of the Company obtained approximately 81% of the common stock and additional voting control by virtue of the voting rights of the preferred stock, providing a total voting interest of 91%. Since the Company also obtained management control, the merger transaction was treated as a recapitalization of the Company, with the Company as the acquirer for financial accounting purposes. Accordingly the shareholders of SinoFresh were deemed to be issued approximately 2,483,000 common shares. The balance sheet subsequent to the merger consists of the balance sheet of both companies at the merger date and the operations reflect the historical operations of the Company, and the operations of SinoFresh from the Merger Date.

**Note 3:** Shareholders' Equity

In July 2003 the Company issued 50,000 Series A preferred shares as a settlement and recorded a settlement expense of $100,000 based on the recent $2.00 per share valuation.

In July, the Company also granted warrants to purchase 250,000 common shares at an exercise price of $1.00 to an investment-banking firm for consulting and placement costs. The warrants were valued at $.058 using the fair value method of SFAS 123 resulting in a charge to statement paid-in capital of $2,320 and consulting expense of $26,680.

On July 31, 2003, the Company entered into a Settlement Agreement with a former employee and shareholder in a predecessor company to resolve certain alleged claims. Under the Agreement, the Company agreed to pay $56,000 in the aggregate, $16,000 upon execution and $2,000 per month for twenty months thereafter and to issue 50,000 shares of Series A Preferred Stock to the former employee/shareholder. In exchange the former employee/shareholder agreed to drop all claims against the Company and return all shares previously issued in the Company, its predecessor and affiliated companies. At June 30, 2003 the balance due was $38,000. The Company recognized a settlement expense of $100,000 based on the $2.00 per share value of the Series A Preferred Stock issued.

Effective September 1, 2003, the Company sold 5-year callable warrants to purchase 1,333,333 shares of the Company's common stock. The investors paid $1.20 for each warrant for a total of $1,600,000. As of September 30, 2003, there was $652,000 of subscriptions receivable related to these sales of which $452,000 are represented by 60-day, 4% promissory notes. The Company may call, based upon a stipulated schedule, up to 25% of the warrants at one time, and may require the holders to exercise 25% of their warrants, if the trading price of the Company's stock is maintained at or above a level of $7.50 for 20 consecutive days. Upon expiration of 90 days after such call, the Company may again call and require exercise of another 25% based upon the same criteria. This continues until all warrants have been called. The holder has 30 days to exercise upon which if not exercised, a designee or principal stockholder may purchase such warrants from the holder for $0.10 per warrant. However, such calls are not permitted unless the underlying common stock has been registered under the Securities Act of 1933.

For one investor who purchased 667,000 warrants for cash of $400,000 and a 60-day, 4%, $400,000 promissory note, the warrant life is one year. If no warrants are exercised prior to August 31, 2004 the Company will cancel such warrants and issue to the investor new warrants exercisable at $0.001 per share or an aggregate of $667 for 667,000 shares.

On September 1, 2003, the Company granted warrants to purchase 425,950 shares of Common Stock to its Medical Advisory Board and other service providers at $1.00 per share. These warrants were valued using SFAS 123 and resulted in a total value of $28,875, which will be recognized over a twelve month period.

The Company also granted options on 1,500,000 common shares to employee officers and directors of the company exercisable at $1.00 and $3.00 at September 1, 2003. Those options were valued under APB 25 and resulted in a total value of $300,000, which will be recognized over periods of up to three years.

**Item 2. Management's Discussion and Analysis of Financial Condition or Plan
of Operations**

**Forward-Looking Statements and Associated Risks**

*THIS QUARTERLY REPORT ON FORM 10-QSB CONTAINS FORWARD-LOOKING STATEMENTS THAT
HAVE BEEN MADE PURSUANT TO THE PROVISIONS OF THE PRIVATE SECURITIES LITIGATION
REFORM ACT OF 1995. THESE FORWARD-LOOKING STATEMENTS ARE BASED ON MANAGEMENT'S
CURRENT EXPECTATIONS, ESTIMATES AND PROJECTIONS, BELIEFS AND ASSUMPTIONS. WORDS
SUCH AS "ANTICIPATES," "EXPECTS," "INTENDS," "PLANS," "BELIEVES," "SEEKS,"
"ESTIMATES," VARIATIONS OF SUCH WORDS AND SIMILAR EXPRESSIONS ARE INTENDED TO
IDENTIFY SUCH FORWARD-LOOKING STATEMENTS. THESE STATEMENTS ARE NOT GUARANTEES OF
FUTURE PERFORMANCE AND ARE SUBJECT TO CERTAIN RISKS, UNCERTAINTIES AND
ASSUMPTIONS THAT ARE DIFFICULT TO PREDICT; THEREFORE, ACTUAL RESULTS MAY DIFFER
MATERIALLY FROM THOSE EXPRESSED OR FORECASTED IN ANY SUCH FORWARD-LOOKING
STATEMENTS. THESE RISKS AND UNCERTAINTIES INCLUDE THOSE DISCUSSED IN "PART I -
ITEM 1 - DESCRIPTION OF BUSINESS - RISK FACTORS" AND "PART II - ITEM 6 -
MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATIONS" CONTAINED IN THE
COMPANY'S FORM 10-KSB FOR THE 45 DAY TRANSITION PERIOD ENDED DECEMBER 31, 2002, AS
FILED WITH THE SECURITIES AND EXCHANGE COMMISSION. UNLESS REQUIRED BY LAW, THE
COMPANY UNDERTAKES NO OBLIGATION TO UPDATE PUBLICLY ANY FORWARD-LOOKING
STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.
INVESTORS SHOULD REVIEW THIS QUARTERLY REPORT IN COMBINATION WITH THE COMPANY'S
ANNUAL REPORT ON FORM 10-KSB IN ORDER TO HAVE A MORE COMPLETE UNDERSTANDING OF
THE PRINCIPAL RISKS ASSOCIATED WITH AN INVESTMENT IN THE COMPANY'S STOCK.*

**Overview**

SinoFresh HealthCare, Inc. produces, markets, sells and distributes SinoFresh® products in North America,
Central and South America and the Caribbean. SinoFresh® Nasal & Sinus Care and SinoFresh® Oral & Throat Care
are US Food and Drug Administration (FDA) registered products specially formulated to cleanse and freshen the
nose, throat and sinus cavities by killing and washing away the bacteria colonizing in these membranes. Molds and
bacteria have been scientifically proven to be at the root cause of many sinus and asthma-related conditions in
mammals.

Test marketing of the Nasal & Sinus Care product commenced in a limited test area, mainly southwest
Florida, in June 2002 and culminated in the national launch of that product in October 2003 when the company
began shipping to national retail drug and food chain stores, principally Walgreen's, Eckerd, CVS, Rite Aid
pharmacies and Publix supermarkets. SinoFresh Nasal & Sinus Care retails for approximately $15.95 for a 1-fluid
ounce bottle. Test marketing for the Company's reformulated SinoFresh Oral & Throat Care brand is expected to
begin in the fourth quarter of 2003, and the product is expected to reach retail store shelves at national drug and food
chain stores in 2004. The retail price for the Oral product has not been established.

SinoFresh products have been formulated to provide symptomatic relief for chronic sinusitis and other
sinus-related conditions. According to figures published by the Center for Disease Control (CDC) over 37 million
Americans are affected by chronic sinusitis. The formulations of SinoFresh products include .05% Cetylpyridinium
chloride (CPC), the active ingredient, aromatics, and carriers that kill bacteria on contact. According to reports
published by the FDA, CPC has a 50-year history of safety and efficacy, and is an active ingredient in many popular
items such as toothpaste and mouthwash.

The company's strategy is to expand the number of on-label claims for its products by conducting safety
and efficacy studies in conjunction with leading institutions and research institutes designed to advance the science.
In this regard, the Company is currently conducting two safety studies in collaboration with the Silverstein Institute
of Sarasota, and one validation study in collaboration with the University Of Pennsylvania School Of Dentistry. The

results of these studies are expected to lead to an application for an investigative new drug (IND) with the FDA, and ultimately to an NDA (new drug application) that would set the Company apart in relationship to its product claims.

Company shares are traded on the Over-the-Counter-Bulletin Board under the symbol, SFSH.

## Results of Operations

Revenues for the quarter ended September 30, 2003 amounted to $687,442 as compared to $73,833 in the predecessor company for the period ended September 30, 2002. Revenues for the nine months ended September 30, 2003 was $1,054,167, or an increase of $912,473(743.97%) over revenues for $141,964 for the same period in the predecessor company. These significant increases, amounting to $613,609 and $912,473, respectively, resulted from the commencement of alpha and beta testing in southwest Florid of the Company's two products in 2003. For the ten years prior to 2003, the Company and its predecessor had focused its efforts almost exclusively on the research and development work that gave rise to its patented and patent-pending formulations, and two commercial products, SinoFresh Nasal & Sinus Care and SinoFresh Oral & Throat Care.

Gross profits for the quarter and the nine-month period ended September 30, 2003 were $508,718 (or 74.1%) and $782,651 (or 80.1%), compared to $70,412 (or 75%) and $106,272 (or 76%) for the corresponding period in 2002. These margins are the result of the favorable costs of the ingredients in the end product and to efficient production methods.

In 2003, the Company invested significantly in building the SinoFresh brand and in infrastructure. Management believes that spending in these two categories will pay significant dividends to the Company and its shareholders over the next several years, in the form of sales and profits, as well as in the quality of its management team. Marketing expenditures for the quarter and nine months ended September 30, 2003 were $429,421 and $742,303, respectively, in comparison to $19,341 and $274,630 for the corresponding periods in 2002. Marketing expenditures for the quarter and nine months represented 32.08% and 25.43% of total General and Administrative (G&A) spending for the quarter and nine months ended September 30, 2003 as compared to 8.3% and 29.22% in the predecessor company for the same periods in 2002. The increase in marketing expenditures of $410,000 and $468,000 for the quarter and nine month period ended September 30, 2003 over the corresponding periods in the predecessor company in 2002 reflect in great part spending related to the national product launch in the second quarter of 2003 the marketing and promotional costs associated with branding the SinoFresh name. G&A expenses, consisting of executive salaries, employee wages, rent and occupancy costs, communications and other expenses related to the operations amounted to $835,035 and $2,047,145 for the quarter and nine month period, respectively, ended September 30, 2003. G&A expenses for the corresponding period in the predecessor company in 2002 amounted to $213,586 and $661,254. The significant increase (390% for the quarter and 310% for the nine month periods) in absolute dollars for 2003 over 2002 reflect several factors, among them: an increase in the number of personnel and executive management, employee benefits costs, higher legal and regulatory expenses resulting directly to the company's becoming listed on the OTC Bulletin Board, advertising, capital expenditures for new office equipment, the one time cost associated with the company's relocation from Vcnice to its new offices in Englewood, Florida and the cost and expense of building an infrastructure as the basis for future growth. G & A also reflects certain other costs associated with the relocation of the company's offices, certain one-time legal and audit expenses associated with "going public", certain write-downs and write-offs, settlement costs, and consulting and other expenses related to the company's fund-raising efforts in 2003.

Research and development are the lifeblood of our company. Expenditures in this category reflect the cost associated with basic research, product development, clinical testing, and the costs associated with regulatory compliance, patent applications and maintenance, trademark registration, product enhancement and the development of new products related and unrelated to our current product line. F0r the quarter and nine months ended September 30, 2003; the company's R&D expenditures amounted to $73,939 and $129, 874, respectively. R&D expenditures are expected to increase significantly over the next several years, both in absolute terms and as a percentage of all spending. These increases are reflective of the company's commitment to market only the best-in-breed, to advance the science of Rhinology, and to stay ahead of the competition in its field and on the leading edge in the science.

For the quarter and nine months ended September 30, 2003, the company reported operating losses of $1 million and $2.4 million and overall losses of $1.05 million and $2.6 million, respectively, compared to losses of $175,000 and $868,000 in the predecessor company for the corresponding periods in 2002.

Losses per common share were $0.09 and $0.21 for the quarter and the nine month period ended September 30, 2003, as compared with $0.02 and $0.08 in the predecessor company for the corresponding periods in 2002.

At the end of the nine-month period on September 30, 2003, the company had total assets of $6.9 million (unaudited), compared to $5.7 million (audited) at December 31, 2002.

At September 30, 2003 and December 31, 2002, current liabilities were $1.8 million and $943,000, respectively. Long-term debt at September 30, 2003 was $86,000, compared to $80,000 at the end of December 2002. And stockholders' equity amounted to $5.1 million at the end of September as compared with $4.7 million at December 31, 2002. Cash increased by $767,000 from $246,000 at December 31, 2002 to more than $1 million at September 30, 2003; accounts receivable increase by $155,000 to $173,000 at the end of the nine month period, inventory increase $194,000, from $94,000 on December 31, 2002 to $288,000 at September 30, 2003. Overall, current liabilities increased by $818,000 from $944,000 at December 31, 2002 to $1.77 million at September 30, 2003. The greatest increases in this category were Note Payable, which increased by $338,000 and trade accounts payable, which increased by $355,000, from $483,000 to $837,000. At the same time, the current portion of long term debt decreased by $150,000 from $443,000 on December 31, 2002 to $$293,000 on September 30, 2003.

At September 30, 2003 long-term debt was $86,000, a modest $7,000 increase from $79,000 at December 31, 2002.

Shareholder equity increased by $3.5 million from equity financings, but these increases were partially offset by operating losses of $2.4 million, leaving a balance of $5.1 million at September 30, 2003, up $378,000 fro $4.7 million at December 31, 2002.

## Inflation And Currency Fluctuation

Inflation and currency fluctuations have not previously had a material impact upon the results of operations and are not expected to have a material impact in the near future.

## Cash and Sources of Liquidity

The Company historically has satisfied its operating cash requirements primarily through cash flow from operations, from borrowings and from trade and equity financings. At September 30, 2003, the company had $1 million in cash on hand, $173,000 in accounts receivable, and $652,000 in subscriptions receivable from equity financings.

The Company has been in discussion with banks and other financial institutions during the period, and expects that it will be able to secure short term, asset-based financing under favorable and acceptable terms in the coming months. Any such financing will more than likely be secured by accounts receivable and inventories on hand.

The Company is also continuing to explore opportunities for long-term debt and equity financing. Funds received from these financings, if and when available, will be used as working capital to finance the growth of the Company, and to provide financing for the clinical trials and new product development management contemplates.

Item 3. Controls and Procedures

     The Company's Chief Executive Officer and Chief Financial Officer evaluated the Company's disclosure controls and procedures within 90 days of the filing date of this quarterly report. Based upon the evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in ensuring that material information required to be disclosed is included in the reports that it files with the Securities and Exchange Commission.

     There were no significant changes in the Company's internal controls or, to the knowledge of the management of the Company, in other factors that could significantly affect internal controls subsequent to the evaluation date.

## PART II - OTHER INFORMATION

**Item 2.**        **Changes in Securities.**

(b)        On September 8, 2003, the board of directors and a majority of the shareholders of the Registrant (i) approved an amendment to the Articles of Incorporation of the Registrant pursuant to which, among other things, Series A, Series B and Series C preferred shares were authorized (the "Preferred Shares"), and (ii) issued certain shares of the Preferred Shares. Registered shares of the common stock of the Registrant have been materially limited or qualified by the issuance of the Preferred Shares by virtue of the liquidation preference of the Preferred Shares. The liquidation preference of the Preferred Shares provides that common stock shareholders of the Registrant shall not receive a distribution (either as to dividends, or upon liquidation, dissolution or winding up) unless the Series A, Series B and Series C preferred shareholders shall have first received $2.00 per share.

(c)

| Date | Title | Amount | Name | Transaction Description/ Type and Amount of Consideration | Section/Rule Under Which Registrant Claimed Exemption | Terms of Conversion or Exercise of Securities |
|---|---|---|---|---|---|---|
| 9/1/03 | Options | 1,500,000 | Employees | Services | 4(2) | $1.00 strike price |
| 7/03 | Warrant | 120,000 | Bristol Partners | Services | 4(2) | $1.00 exercise price |
| 7/03 | Warrant | 230,000 | SinoFresh Management, LLC | Services | 4(2) | $1.00 exercise price |
| 6/03 | Warrant | 50,000 | D&J Properties | Financing | 4(2) | $1.00 exercise price |
| 6/03 | Warrant | 50,000 | D&J Properties | Financing | 4(2) | $5.00 exercise price |
| 9/03 | Warrant | 87,500 | Medical Advisory Board | Services | 4(2) | $1.00 - $2.00 exercise price |
| 7/03 | Common stock | 11,900 | Eric P. Littman | Services | 11 U.S.C. § 1145 | N/A |
| 7/03 | Common stock | 11,900 | Dennis Sturm | Services | 11 U.S.C. § 1145 | N/A |

**Item 4.**        **Submission of Matters to a Vote of Security Holders.**

| Date of Meeting | Type of Meeting | Name of Each Director Elected at Meeting | Description of Meeting | Votes Cast for Matters Presented at Meeting |
|---|---|---|---|---|
| 9/8/03 | Special | Charles Fust; P. Robert DuPont; David Otto; Steve Bannon; Stacey Maloney. | Authorizing merger with SinoFresh HealthCare, Inc., a Delaware corporation; appointing new board of directors. | Approved by a Majority of the shareholders of the Registrant. |
| 9/8/03 | Special | N/A | Adopting amendment to Articles of Incorporation (i) increasing authorized common stock to 500,000,000, (ii) increasing authorized preferred stock to 200,000,000, and (iii) designating terms of Series A, B and C preferred shares. | Approved by a Majority of the shareholders of the Registrant. |

**Item 6.**          **Exhibits and Reports on Form 8-K.**

(a)  Exhibits.

Exhibit Number                    Title of Document                    Location of Document

(b)  Reports on Form 8-K.

During the period ended September 30, 2003, the Company filed the following reports on Form 8-K:

Date of Event Reported                    Items Reported
September 23, 2003                         1, 2 and 7
November 14, 2003 (8-K/A)                  7

**Items 3 and 5 are not applicable and have been omitted.**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SINOFRESH HEALTHCARE, INC.

November ___, 2003                    By _____

                                          Charles A. Fust, Chief Executive Officer


November ___, 2003                    By _____

                                          Steves Rodriquez, Chief Financial Officer

CERTIFICATIONS OF CEO PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT

Exhibit 31.1

## CERTIFICATIONS

I, Charles Fust, certify that:

1. I have reviewed this quarterly report on Form 10-QSB of SinoFresh HealthCare, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

November 13, 2003


_____
Charles Fust
Chief Executive Officer

CERTIFICATIONS OF CFO PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT

Exhibit 31.2

# CERTIFICATIONS

I, Steves Rodriguez, certify that:

1. I have reviewed this quarterly report on Form 10-QSB of SinoFresh HealthCare, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

November 13, 2003

---

Steves Rodriguez
Chief Financial Officer

CERTIFICATIONS OF CEO AND CFO PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT

Exhibit 32

## CERTIFICATIONS PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
## (18 U.S.C. SECTION 1350)

In connection with the Quarterly Report of SinoFresh HealthCare, Inc., a Florida corporation (the "Company"), on Form 10-QSB for the quarter ended September 30, 2003, as filed with the Securities and Exchange Commission (the "Report"), Charles Fust, Chief Executive Officer of the Company and Steves Rodriguez, Chief Financial Officer of the Company, respectively, do each hereby certify, pursuant to § 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1350), that to his knowledge:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.


_____
Charles Fust
Chief Executive Officer
November 13, 2003


_____
Steves Rodriguez
Chief Financial Officer
November 13, 2003

[A signed original of this written statement required by Section 906 has been provided to SinoFresh HealthCare, Inc. and will be retained by SinoFresh HealthCare, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.]

**SINOFRESH HEALTHCARE, INC.**
**Statement of Cash Flows**

| | For the Period October 15 (date of inception) to December 31, 2002 | For the Six Months Ended June 30. | |
| --- | --- | --- | --- |
| | | 2003 | 2002 (Predecessor Company) |
| | (Audited) | (Unaudited) | (Unaudited) |
| Operating activities: | | | |
| Net (loss) | $ (511,862) | $ (1,348,581) | $ (699,293) |
| Adjustments to reconcile net (loss) to net cash provided by (used in) operating activities | | | |
| Depreciation and amortization | 15,825 | 124,410 | 11,911 |
| Stock based settlement loss | 154 | | |
| Bad expense debt | | 9,000 | |
| Provision for affiliate uncollectibles | 71,703 | 103,463 | |
| Changes in operating assets and liabilities, net of effect of acquisition. | | | |
| Accounts receivable | (5,453) | (37,554) | (4,323) |
| Inventories | (50,339) | (102,738) | (30,350) |
| Prepaid expenses and other current assets | (5,752) | (154,739) | 25,779 |
| Other | (10,001) | 3,828 | (2,304) |
| Goodwill | | (72,605) | 0 |
| Accounts payable | 198,568 | 123,308 | (13,868) |
| Accrued expenses | 116,790 | 331,363 | 108,954 |
| Deferred revenue | | (17,199) | 488 |
| Net cash provided by (used in) operating activities | (180,367) | (1,038,044) | (603,006) |
| Investing activities | | | |
| Acquisition of SinoFresh Laboratories, Inc., net of cash | (55,240) | | 0 |
| Payments for purchases of property and equipment | | (4,737) | (40,594) |
| Advances to affiliates | (71,703) | (103,463) | |
| Net cash provided by (used in) investinga activities | (126,943) | (108,200) | (40,594) |
| Financing activities | | | |
| Proceeds from the issuance of stock | 560,710 | 1,337,259 | 555,536 |
| Repayment of long-term debt and notes payable | (7,715) | (106,764) | 0 |
| Proceeds from long-term debt and notes payable | | 300,000 | 0 |
| Net cash provided by (used in) financing activities | 552,995 | 1,530,495 | 555,536 |
| Net increase (decrease) in cash and cash equivalents | 245,685 | 384,251 | (88,064) |
| Cash and cash equivalents | | | |
| Beginning of period | --- | 245,685 | 4,852 |
| End of period | $ 245,685 | $ 629,936 | $ 21,188 |
| Supplemental disclosure of cash flow information: | | | |
| Cash paid during the period for interest | | | |
| Cash paid during the period for income taxes | --- | | |
| Supplemental disclosure of non-Cash Investing and Financing Activities. | | | |
| Debt settled for capital stock | $ 50,000 | --- | --- |
| Assets acquired and liabilites assumed | $ 4,616,339 | --- | --- |
| Capital lease obligations | --- | $ 5,434 | $ 5,434 |
| Deferred loan fee | --- | $ 759 | $ 759 |

The accompanying notes are an integral part of the financial statements.

**SINOFRESH HEALTHCARE, INC.**
Notes to Financial Statements
For the period October 15 (date of inception) to December 31, 2002 (Audited)
and for the six months ended June 30, 2003 (Unaudited)

**Note 1:**     Nature of Business and Summary of Significant Accounting Policies

**Nature of Business**: SinoFresh Healthcare Inc. ("Company") was incorporated in the State of Delaware on October 15, 2002. In November 2002 the Company entered into an asset purchase agreement whereby it received certain assets and liabilities of SinoFresh Laboratories, Inc. effective at the close of business on November 15, 2002 in exchange for 808,170 shares of its Series A preferred stock (*See* Note 2).

The Company is engaged in the research, development, production and marketing of proprietary products in North and South America for the prevention and treatment of sinusitis and related disorders. SinoFresh® Nasal and Sinus Care and SinoFresh® Oral Care are products which were being distributed by the Company in a limited geographical area in Florida until March 2003 at which time the Company entered into an agreement with National In-Store to obtain national distribution of its nasal products through various national drugstores and grocery store chains. As of September 30, 2003 the Company has distribution agreements, which enable it to place its product in 17,500 retail locations across the country.

The Company's business is subject to various risks and uncertainties and the Company's ability to continue, as a going concern is dependant on its ability to market and distribute its products and utilize the technology underlying its patents. All of these activities are capital intensive and, since the Company just commenced its national marketing campaign, it has assessed these risks as of December 31, 2002 and June 30, 2003. While the Company has a working capital deficit at June 30, 2003 of $605,281, incurred a net loss of $1,245,118 and has consumed $1,038,044 of cash in operations for the six months then ended, Management believes that these risks are mitigated by the growth in revenues and the recent capital funding. The rate of the Company's future growth and success will be dependant on its ability to generate the necessary resources through product sales or otherwise. The accompanying statements do not include any adjustments that might be necessary if the Company is unable to generate these revenues and continue as a going concern.

**Basis of Presentation**: The accompanying unaudited financial statements at and for the six months ended June 30, 2003 have been prepared in accordance with generally accepted accounting principles and the rules and regulations of the United States Securities and Exchange Commission (SEC) for interim financial information. Accordingly, they do not include all the information and footnotes necessary for a comprehensive presentation of financial position and results of operations.

In the opinion of the management, all material adjustments, consisting of normal recurring adjustments, have been made in the June 30, 2003 financial statements, which are necessary for a fair financial statement presentation. The results for the interim period are not necessarily indicative of the results to be expected for the year.

**Accounting Estimates**: The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. The Company's estimates and assumptions primarily arise from risks and uncertainties associated with potential future product returns, the uncollectibility of accounts and other receivables, inventory obsolescence, valuation of acquired assets for purposes of allocating the purchase price, subsequent recoverability analysis, the realization of deferred tax assets, and estimated accruals relating to legal contingencies.

**Concentration of Risk**: Financial instruments that potentially subject the Company to significant concentrations of credit risk consist primarily of cash and cash equivalents and accounts receivable. The Company's investment policy is to invest in low risk, highly liquid investments. At June 30, 2003, thirty-five percent (35%) of net accounts receivable were due from one customer.

The Company's business is dependent on its ability to utilize the technology underlying the patents. (See Note 13)

A third party manufacturer provides all of the Company's manufacturing capacity.

**SINOFRESH HEALTHCARE, INC.**
Notes to Financial Statements
For the period October 15 (date of inception) to December 31, 2002 (Audited)
and for the six months ended June 30, 2003 (Unaudited)

All sales during 2002 were to customers in Florida. For the six months ended June 30, 2003 two customers accounted for 53% and 7% of sales (unaudited).

**Cash and Cash Equivalents**: The Company considers all highly liquid investments with maturity of three months or less when purchased to be cash equivalents.

**Fair Value of Financial Instruments**: All financial instruments are carried at amounts that approximate fair value.

**Accounts Receivable and Allowance for Doubtful Accounts**: Accounts receivable result from the sale of the Company's products at sales prices, net of estimated sales returns and other allowances. The Company estimates an allowance for doubtful accounts based on a specific identification basis and additional allowances based on historical collections experience.

**Inventories**: Inventories are valued at the lower of cost (determined on a first-in, first-out basis) or market. Inventory reserves have been established for potential product obsolescence.

**Property and Equipment.** Property and equipment are stated at cost. Equipment is depreciated using the straight-line method over three to five years. Leasehold improvements are amortized over the lesser of the estimated useful life of the improvement or the term of the lease.

**Patents**: Patents are stated at cost and are amortized over thirteen years using the straight-line method.

**Goodwill**: The Company's goodwill was established as a result of the asset acquisition (Note 2). Goodwill is carried at lower of cost or market and is subject to annual impairment evaluation, or interim impairment evaluation if an interim triggering event occurs, which indicates that the carrying amount of goodwill may not be recoverable.

**Long-Lived Assets**: The Company reviews long-lived assets, including intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of long-lived assets is measured by comparison of its carrying amount to the undiscounted cash flows that the asset or asset group is expected to generate. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the property, if any, exceeds its fair market value.

**Revenue Recognition**: Revenue from sales is recognized at the time products are shipped less estimated sales returns, certain promotional costs and other allowances.

Occasionally, new customers require the Company to initially ship product on a consignment basis. Those verbal arrangements generally expire in one year or less depending on the product sell through attained by the new customers. Consignment sales are not recognized until the customer sells the product. At December 31, 2002 the Company did not have any product sold on a consignment basis. As of June 30, 2003, the amount of inventory sold on consignment amounted to $33,889.

**Sales Incentives and Consideration Paid to Retailers**: The Company accounts for certain promotional costs such as sales incentives, promotional funds, and consumer coupon redemptions as a reduction of net sales.

**Shipping and Handling Costs**: Shipping and handling costs are classified as a cost of sales and those billed to customers are recorded as revenue on the statement of operations.

**Stock-Based Compensation**: The Company accounts for employee stock-based compensation arrangements in accordance with the provisions of Accounting Principles Board Opinion ("APB") No. 25, "Accounting for Stock Issued to Employees," and complies with the disclosure provisions of Statement of Financial Accounting Standards (SFAS) No. 148, "Accounting for Stock-Based Compensation". Under APB No. 25, compensation cost is determined based on the difference, if any, on the measurement date, which is generally the grant date, between the fair value of the Company' stock and the amount an employee must pay to acquire the stock.

**SINOFRESH HEALTHCARE, INC.**
Notes to Financial Statements
For the period October 15 (date of inception) to December 31, 2002 (Audited)
and for the six months ended June 30, 2003 (Unaudited)

The fair value of each stock option or grant issued to non-employees is estimated on the measurement date using the fair value method of SFAS 123, "Accounting for Stock Based Compensation."

**Income Taxes**: Deferred tax assets and liabilities and the resultant provision for income taxes are determined based on the difference between the financial statements and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. Deferred tax assets are recognized when management determines that it is more likely than not that the asset will be realized.

**Net Income (Loss) Per Share**: Basic net income (loss) per share and diluted net income (loss) per share have been computed based upon the weighted average number of common shares outstanding during the year. Assumed common stock equivalents were excluded from the net loss per share computation, as their effect is antidilutive. Common stock equivalents could potentially dilute basic earnings per share in future periods if the Company generates net income. At December 31, 2002 there were 50,000 warrants to purchase common stock and 2,645,670 preferred shares convertible to 4,483,170 common shares which may dilute future EPS. At June 30, 2003 there were 250,000 warrants and 3,366,881 preferred shares convertible to 5,925,592 common shares which may dilute future EPS.

**Recent Accounting Pronouncements:** In November 2002, the Financial Accounting Standards Board ("FASB") issued Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others" (FIN 45). FIN 45 requires that upon issuance of a guarantee, a guarantor must recognize a liability for the fair value of an obligation assumed under a guarantee. FIN 45 also requires additional disclosures by a guarantor in its interim and annual financial statements about the obligations associated with guarantees issued. The recognition provisions of FIN 45 are effective for any guarantees issued or modified after December 31, 2002. The disclosure requirements are effective for financial statements of interim or annual periods ending after December 15, 2002. The adoption of this pronouncement did not have a material effect on the earnings or financial position of the Company.

In January 2003, the FASB issued Interpretation No. 46 ("FIN 46"), "Consolidation of Variable Interest Entities." FIN 46 requires that if an entity has a controlling financial interest in a variable interest entity, the assets, liabilities, and results of activities of the variable interest entity should be included in the consolidated financial statements of the entity. FIN 46 requires that its provisions are effective immediately for all arrangements entered into after January 31, 2003. For those arrangements entered into prior to January 31, 2003, the FIN 46 provisions are required to be adopted at the beginning of the first interim or annual period beginning after June 15, 2003. The Company has not identified any variable interest entities to date and will continue to evaluate whether it has variable interest entities that will have a significant impact on its consolidated balance sheet and results of operations.

**Note 2:**  Asset and Business Acquisition

On November 16, 2002 (Acquisition Date) the Company acquired the business and substantially all of the assets of SinoFresh Laboratories, Inc. (the "Seller") and assumed certain liabilities in exchange for 808,170 shares of Series A Preferred Stock valued at $2.00 per share based on the recent predecessor offering. The Company also agreed to pay up to $50,000 of any future legal fees relating to a lawsuit brought against the Seller. This amount will be added to the purchase price as incurred. For the six months ended June 30, additional acquisition costs of $72,605 were capitalized to goodwill (unaudited). At the Acquisition Date, SinoFresh Laboratories was a research and development company engaged in the development of sinus related products for the health and beauty aid (HBA) market. Over the past two years, SinoFresh Laboratories had developed a test market for its two main products, SinoFresh Nasal & Sinus Care and SinoFresh Oral and Throat Care. At the time of the acquisition, SinoFresh Laboratories operated a single 10,000 square foot facility in Venice, Florida.

In connection with the acquisition, the Company entered into an agreement with the founder of SinoFresh Laboratories, whereby, the Company was assigned the North, South and Latin American rights to three US patents covering the formulations for solutions related to freshening the nose and throat with an antiseptic spray in exchange

## SINOFRESH HEALTHCARE, INC.
Notes to Financial Statements
For the period October 15 (date of inception) to December 31, 2002 (Audited)
and for the six months ended June 30, 2003 (Unaudited)

for 1,500,000 Shares of Series B Preferred Stock valued at $2.00 per share. The aggregate $3,000,000 fair value of the intangible assets acquired was based on the contemporaneous cash sales price of Series C Preferred Stock.

The Company accounted for this acquisition using the purchase method of accounting in accordance with SFAS No. 141 "Business Combinations." The purchase price of $4,616,339 and acquisition costs of $107,777 exceeded the fair value of net assets acquired by $2,336,796. The excess has been allocated to goodwill. The results of operations of the acquired business are included in the results of operations of the Company from the Acquisition Date.

The fair market value of the assets acquired and liabilities assumed were as follows:

| | | |
|---|---|---:|
| Cash | $ | 52,537 |
| Other current assets | | 62,180 |
| Patents | | 3,000,000 |
| Goodwill | | 2,336,796 |
| Other non-current assets | | 37,674 |
| Total assets | $ | 5,489,187 |
| | | |
| Accounts payable and accrued expenses | $ | 167,334 |
| Other current liabilities | | 17,678 |
| Capital lease obligation | | 14,686 |
| Notes payable | | 565,373 |
| Total liabilities | $ | 765,071 |
| | | |
| Purchase price and acquisition costs of assets, patents and liabilities | $ | 4,724,116 |

The following unaudited pro forma results of operations have been prepared as if the acquisition of SinoFresh Laboratories had occurred as of the inception date of SinoFresh HealthCare, Inc., which was October 15, 2002:

| | From October 15 (date of inception) To December 31, 2002 |
|---|:---:|
| Revenues | $50,534 |
| Net Income (loss) | ($573,913) |
| Net Loss per Share from continuing operations | $0.10 |

Pro forma data does not purport to be indicative of the results that would have been obtained had these events actually occurred at the beginning of the periods presented and is not intended to be a projection of future results.

**Note 3:** Inventories

Inventories at December 31, 2002 and June 30, 2003 consisted of the following:

| | December 31, 2002 (Audited) | June 30, 2003 (Unaudited) |
|---|:---:|:---:|
| Raw materials | $77,057 | $ 95,253 |
| Finished Product | 16,588 | 101,130 |
| | $93,645 | $196,383 |

On February 4, 2003 the Company entered into an agreement to have a third party, who is a registered Federal Drug Administration and a cGMP (current Good Manufacturing Practices) qualified manufacturer, to manufacture its products.

4

## SINOFRESH HEALTHCARE, INC.
Notes to Financial Statements
For the period October 15 (date of inception) to December 31, 2002 (Audited)
and for the six months ended June 30, 2003 (Unaudited)

This agreement, which expires in December 2004, provides for minimum annual purchases by the Company of approximately $39,000 and provides the manufacturer with a security interest in all products and proceeds thereof for which the manufacturer has not been paid.

Note 4: Advertising and Publication

The Company entered into an agreement, effective February 1, 2003, with a company to provide certain telephone sales and marketing services to periodontists and dentists on a national basis. The agreement called for a per-call charge and a percentage of gross sales to the targeted customers during the contract. The Company incurred $98,685 in costs through June 30, 2003, which were the total costs incurred prior to the contract having been mutually terminated in September 2003.
The Company also entered into a six-month agreement with Rubenstein Communications Inc. ("Rubenstein"), effective February 19, 2003. Under this agreement, which automatically renews on a monthly basis, Rubenstein agreed to publicize the Company and its activities and provide public relations advice and guidance. The Company incurred fees of $50,215 for the six months ended June 30, 2003 in connection with those services.

Effective March 1, 2003, the Company has entered into a three year National Sales and Broker Contract with National In-Store Marketing, Inc. ("NIS"). Under this contract NIS became the Company's exclusive broker, with minor exception, to all retail accounts in the United States. In addition, NIS agreed to develop a marketing plan and provide certain other services. The Company incurred $100,000 and $18,083 of fees for those services during the period October 15 to December 31, 2002 and the six months ended June 30, 2003, respectively.

Advertising and publication expense was $18,786 and $155,424 for the period October 15 (date of inception) to December 31, 2002 and the six months ended June 30, 2003, respectively.

Note 5: Property and Equipment

Property and equipment are summarized by major classification as follows:

|  | December 31, 2002 (Audited) | June 30, 2003 (Unaudited) |
|---|---|---|
| Furniture and fixtures | $27,000 | $37,171 |
| Less: accumulated depreciation | (1,125) | (5,625) |
|  | $25,875 | $31,546 |

Depreciation expense was $1,125 and $4,500 for the period October 15 (date of inception) through December 31, 2002, and the six months ended June 30, 2003, respectively.

Note 6: Intangible Assets

Patents consist of the following:

|  | December 31, 2002 (Audited) | June 30, 2003 (Unaudited) |
|---|---|---|
| Patents | $3,000,000 | $3,000,000 |
| Loss: accumulated amortization | (14,700) | (134,610) |
|  | $2,985,300 | $2,865,390 |

Patents are being amortized over 13 years based on the estimated remaining legal life of such patents.
Amortization expense was $14,700 and $119,910 for 2002 and for the period January 1, 2003 to June 30, 2003, respectively.

**SINOFRESH HEALTHCARE, INC.**
Notes to Financial Statements
For the period October 15 (date of inception) to December 31, 2002 (Audited)
and for the six months ended June 30, 2003 (Unaudited)

The estimated aggregate amortization expense for each of the succeeding five calendar years is as follows:

|  | December 31, 2002 | June 30, 2003 |
|---|---|---|
| 2003 | $230,760 | $115,385 |
| 2004 | $230,760 | $230,760 |
| 2005 | $230,760 | $230,760 |
| 2006 | $230,760 | $230,760 |
| 2007 | $230,760 | $230,760 |

**Note 7:**  Short Term Notes Payable

On June 13, 2003, the Company obtained a $300,000 inventory-financing loan. The loan bears interest at 10%. The Company must repay the principal and accrued interest with 30% of the revenues received from the sale of inventory and all unpaid principal and accrued interest is due 120 days from the advancement date of June 30, 2003. The loan is collateralized by accounts receivable, inventory and future proceeds from the sale of inventory subordinated to the first lien on such assets held by the creditor of the $360,000 and $140,000 notes (*See* Note 8).

In connection with the inventory financing agreement, the Company executed a consulting agreement with an affiliate of the lender for services previously performed. The agreement requires payment of $100,000, all of which was included in accrued expenses at June 30, 2003.

**Note 8:** Long-Term Debt

In connection with the asset purchase from SinoFresh Laboratories, Inc., the Company entered into an agreement to assume responsibility for a $360,000 secured convertible note and a $140,000 secured convertible note. . The two notes are collateralized by substantially all assets of the Company.

In connection with the assumption, the Company entered into several other agreements with the noteholders. Under the Consulting Agreement, the Company secured certain consulting services in exchange for issuing the noteholders a warrant to purchase 50,000 common shares at $1.00 per share. The warrant expires on February 1, 2005. The Company issued 1,536,980 shares of its common stock to the noteholders under a Stock Purchase Agreement. Under a Registration Rights Agreement, the Company offered the noteholders the right to piggyback registration of those shares on any registration of shares with the Securities and Exchange Commission ("SEC") initiated by the Company. In addition, the noteholders have the right to demand, six months after an initial public offering of the Company's shares, the registration of some or all of the noteholders common shares with the SEC.

The Company executed two Allonges modifying certain terms and conditions of the notes. As a result, the maturity of the notes was extended and the repayment schedules were modified. The Allonges provide for additional principal reductions to the extent that twenty percent (20%) of any cash raised in equity offerings subsequent to the assumption exceeds the then outstanding principal balances. Under the modified terms, the notes are convertible into Series C Preferred Stock at the lowest cash price paid by other Series C Preferred shareholders.

The covenants, as modified, provide that, among other things, (1) the Company may not dilute the noteholder's equity position until the notes' principal and interest are paid off and (2) that the Company not incur any other indebtedness in excess of $1,000,000.

The notes are convertible, at the lender's option, into common shares at a rate equal to the outstanding principal amount divided by the conversion price. The conversion price is the lowest price at which Series C shares are sold, as adjusted for any recapitalization.

## SINOFRESH HEALTHCARE, INC.
Notes to Financial Statements
For the period October 15 (date of inception) to December 31, 2002 (Audited)
and for the six months ended June 30, 2003 (Unaudited)

The Company also assumed notes payable of $50,000 payable to an individual and a $10,500 note payable to an employee of the Company. In December 2002 the $50,000 note was settled in exchange for 50,000 Series C Preferred shares valued at the current sale price of $1.00 per share. The $10,500 note was paid in May 2003. At December 31, 2002 and June 30, 2003 long-term debt consists of the following:

|  | December 31, 2002 (Audited) | June 30, 2003 (Unaudited) |
|---|---|---|
| 10% convertible note, principal and interest payable $72,000 on execution of the Allonge, $72,000 on February 15, 2003 and $54,000 quarterly thereafter, with final maturity on February 15, 2004 | $360,000 | $291,026 |
| 10% convertible note, principal and interest payable $28,000 on execution of the Allonge, $28,000 on February 15, 2003 and $21,000 quarterly thereafter, with final maturity on February 15, 2004 | 140,000 | 112,710 |
| 7% note, principal and interest due on May 23, 2003 | 10,500 | --- |
| Capital lease obligations | 11,844 | 17,278 |
|  | 522,344 | 421,014 |
| Less current portion | (443,367) | (411,900) |
|  | $ 78,977 | $9,144 |

Maturities of long-term notes payable are as follows:

|  | December 31, 2002 | June 30, 2003 |
|---|---|---|
| 2003 | $435,500 | $328,736 |
| 2004 | 75,000 | 75,000 |
|  | $510,500 | $403,736 |

**Note 9:** Shareholder's Equity

**Convertible Preferred Stock**

Prior to the merger on September 8, 2003, (See Note 15), the Company authorized 858,170 Series A preferred stock, 1,500,000 Series B preferred stock, and 1,250,000 Series C preferred stock. All preferred stock ranked senior to common stock as to payment of dividends and distribution of assets and is automatically convertible upon registration of any class of equity securities with the Securities and Exchange Commission or a vote of 66.67% of the holders of such Series. The Series A and B ranked junior to Series C and Series A ranks junior to Series B as to payment of dividends and distribution of assets. All three Series of preferred stock have a liquidation value of $2.00 per share. Series A shares are convertible to common stock at a one-for-one basis, while Series B and C are convertible on a two-for-one basis and all have voting rights equivalent to the common stock into which they are convertible.

During the period October 15, 2002 (date of inception) to December 31, 2002, the Company issued 337,500 shares of Series C Preferred Stock for $2.00 per share or $558,712 cash and settlement of a $50,000 promissory note payable, net of offering costs of $66,288. During the six-month period ended June 30, 2003; the Company sold 721,211 shares of Series C Preferred Stock for $1,337,429, net of offering costs of $104,992.

On November 15, 2002 the Company issued 808,170 shares of Series A Preferred Stock to affect an asset purchase.

**SINOFRESH HEALTHCARE, INC.**
Notes to Financial Statements
For the period October 15 (date of inception) to December 31, 2002 (Audited)
and for the six months ended June 30, 2003 (Unaudited)

In December 2002, the Company issued 1,500,000 shares of Series B Preferred Stock to the predecessor's founder in exchange for certain patent assignments.

**Common Stock**

At inception, the Company issued 4,000,000 common shares to the founding group of shareholders for $800. In connection with an acquisition, the Company also issued 768,490 shares of Common Stock to induce its senior lenders to allow it to assume certain obligations of the predecessor company. A settlement expense of $154 was recognized based on the recent nominal value assigned to the common stock.

In addition, in connection with the employment arrangements offered to the Chief Executive Officer and certain other of his management team members in December 2002, the Company issued 6,000,000 shares of Common Stock in January 2003. The stock was valued at a nominal value at the issuance date and was paid for with $1,200.

**Note 10:** Warrants

The Company grants warrants to certain non-employee consultants or other service providers generally under contractual agreements. These warrant grants are accounted for using the fair value method of SFAS 123

A summary of the warrants granted as of December 31, 2002 (audited) and June 30, 2003 (unaudited), and changes during those periods is presented below:

|  | Shares Underlying Warrants | Range of Exercise Prices |
|---|---|---|
| Outstanding at October 15, 2002 (inception) | - | - |
| Granted | 50,000 | $1.00 |
| Exercised | - | - |
| Outstanding at December 31, 2002 | 50,000 | $1.00 |
| Granted (unaudited) | 200,000 | $1.00-$5.00 |
| Exercised | - | - |
| Outstanding at June 30, 2003 (unaudited) | 250,000 | $1.00-$5.00 |
| Weighted average fair value of warrants and options granted in 2002 | | None |
| Weighted average fair value of warrants and options granted in 2003 | | $0.03 |

Using an expected life of sixty months, a risk free interest rate of 3.14% and no expected volatility, no expense was incurred for the period October 15 (date of inception) to December 31, 2002, relating to the 50,000 warrants granted to a consultant.

**Note 11:** Stock Option Plan

In December 2002, the Company adopted a Stock Option Plan ("Plan"), which authorized granting of options for the issuance of 3,000,000 shares of common stock. The plan provides the issuance of incentive stock options and nonqualified stock options.

The Company did not issue any options through June 30, 2003. No options have been cancelled or exercised under the Plan.

**Note 12:** Related Party Information

The Company has advanced funds to three development stage companies to cover certain organizational and administrative costs. These developmental companies are all related to the Company through common shareholders.

**SINOFRESH HEALTHCARE, INC.**
Notes to Financial Statements
For the period October 15 (date of inception) to December 31, 2002 (Audited)
and for the six months ended June 30, 2003 (Unaudited)

The amounts advanced to these affiliate entities which were $71,703 for 2002 and $101,800 for the six months ended June 30,2003 were expensed as a provision for uncollectibles since collectively cannot be reasonably assumed until those entities commence operations and either generate revenues or raise capital.

One of the Company's attorneys served as Secretary and was a member of the Company's Board of Directors until April 2003. The Company had incurred legal fees with this law firm of approximately $101,760 and $16,769 during the period from October 15 (date of inception) through December 31, 2002 and for the six months ended June 30, 2003, respectively. The Company has legal fees of $29,697 and $46,466 payable to this firm at December 31, 2002 and June 30, 2003, respectively.

A director of the Company is the principal owner of a law firm that provides services to the Company. Expenses incurred and paid or due to that law firm were $21,955 in 2002 and $92,725 for the six months ended June 30, 2003

A former director of the Company provided consulting services directly and through his affiliate. Consulting expense for this consultant was $9,000 in 2002 and $33,550 for the six months ended June 30, 2003.

The Company paid consulting fees to an entity affiliated with a director/principal stockholder. Expenses incurred totaled $76,000 in 2002 and $33,000 (unaudited) for the six months ended June 30, 2003.

The Company leases its new facility starting in 2003 from an entity controlled by two of the Company's officers (See Note 13).

**Note 13:** Commitments and Contingencies

The Company leased two facilities in Florida. One of those facilities is leased at $3,127 per month, including utilities and other costs, through October 31, 2003. The other facility, which housed the Company's main operation, was leased for $4,875 per month on a month-to-month basis until August 2003. The Company entered into a five-year agreement to lease a new headquarters facility for $5,998 per month, effective April 2003. The property is leased from a company owned by an officer/shareholder and an employee/shareholder of the Company. The lease provides for two additional five-year terms with the Company.

Rental expense amounted to $11,190 and $39,671 for the period October 15, 2002 (inception) to December 31, 2002 and for the six months ended June 30, 2003, respectively.

The Company has employment agreements with its key officers ranging from one to five years in length. Under the employment agreement with its Chief Executive Officer, the Company has promised to maintain at least a 15% ownership position in the Company for him.

The Company has entered into a consulting agreement beginning in November 2002 with a term of three years. Monthly payments under this agreement approximate $8,000 with $96,000 due for years 2003 and 2004, and $80,000 due for 2005. The consulting agreement was revised September 8, 2003 extending the term to September 2006 and increasing compensation to include 0.5% of gross revenue and 0.67% of net income before taxes, interest and amortization. The changes are still subject to Board approval.

The Company has also made certain warrantees to a customer who requested such warranty of merchantability and proprietary ownership. Neither the Company nor its counsel believes that the Company will incur any claims under this warranty.

A shareholder of the predecessor company has commenced two actions against the Company. The first action is an arbitration seeking recovery of his investment of $150,000. The second lawsuit is a lawsuit against the Company, its officers and directors seeking unspecified damages due to non-performance by the Company of a consulting agreement entered into January 2000 with the predecessor company. The agreement was for five periods at $24,000 annually, of which only $23,000 was paid. The Company is in the process of defending this action and no outcome or resolution of the lawsuit or investment buyout is definitive or ascertainable at this time.

**SINOFRESH HEALTHCARE, INC.**
Notes to Financial Statements
For the period October 15 (date of inception) to December 31, 2002 (Audited)
and for the six months ended June 30, 2003 (Unaudited)

**Note 14:** Income Taxes

There was no current income tax provision for the period from October 15 (inception) to December 31, 2002 and for the six-months ended June 30, 2003 due to the Company's net losses. At December 31, 2002, the Company had net operating loss carry forwards of approximately $530,000 for income tax purposes, which may be available to offset future taxable income expiring on various dates through 2022. The Company's tax expense differs from the "expected" tax expense as follows:

|  |  | Period October 15 (date of inception) to December 31, 2002 |
| --- | --- | --- |
| Computed "expected" tax expense (benefit) | $ | (174,033) |
| Meals |  | 434 |
| Change in valuation allowance |  | 173,599 |
|  | $ | -- |

The tax effects of temporary differences that give rise to significant portions of deferred tax assets and liabilities are as follows:

|  |  | December 31, 2002 |
| --- | --- | --- |
| Deferred tax assets: |  |  |
|    Net operating loss carry forward |  | $180,220 |
|    Less valuation allowance |  | (173,599) |
| Net deferred tax assets |  | 6,621 |
| Deferred tax liabilities: |  |  |
|    Goodwill |  | (6,621) |
| Total deferred tax assets, net | $ | -- |

**Note 15:** Subsequent Events

In July 2003 the Company issued 50,000 Series A preferred shares as a settlement and recorded a settlement expense of $100,000 based on the recent $2.00 per share valuation.

In July, the Company also granted warrants to purchase 250,000 common shares at an exercise price of $1.00 to an investment-banking firm for consulting and placement costs. The warrants were valued at $.058 using the fair value method of SFAS 123 resulting in a charge to additional paid-in capital of $2,320 and consulting expense of $26,680.

On July 31, 2003, the Company entered into a Settlement Agreement with a former employee and shareholder in a predecessor company to resolve certain alleged claims. Under the Agreement, the Company agreed to pay $56,000 in the aggregate, $16,000 upon execution and $2,000 per month for twenty months thereafter and to issue 50,000 shares of Series A Preferred Stock to the former employee/shareholder. In exchange the former employee/shareholder agreed to drop all claims against the Company and return all shares previously issued in the Company, its predecessor and affiliated companies. At June 30, 2003 the balance due was $38,000. The Company recognized a settlement expense of $100,000 based on the $2.00 per share value of the Series A Preferred Stock issued.

On September 8, 2003, (the "Merger Date") SinoFresh Healthcare, Inc. ("Company"); SinoFresh Acquisition Corp. ("Acquisition"); SinoFresh Corp. ("SinoFresh"), formerly known as e-Book Network, Inc., and the sole director and majority shareholder of SinoFresh entered into a Merger Agreement. In addition, SinoFresh amended its Articles of

## SINOFRESH HEALTHCARE, INC.
Notes to Financial Statements
For the period October 15 (date of inception) to December 31, 2002 (Audited)
and for the six months ended June 30, 2003 (Unaudited)

Incorporation authorizing the issuance of up to 700,000,000 shares of no par value capital stock, consisting of 500,000,000 shares of common stock and 200,000,000 shares of preferred stock. The amended Articles also designated 858,170 shares of the preferred stock as Series A Preferred Stock with each share convertible into one common share and possessing one vote. In addition, 1,500,000 shares of the preferred stock were designated as Series B Preferred Stock with each share convertible into two common shares and possessing two votes. Another 1,250,000 shares of preferred stock was designated as Series C Preferred Stock with each share convertible into two common shares and possessing two votes.

The amended Articles stipulate that the Company will register approximately 2,915,340 shares of common stock with the Securities and Exchange Commission. Series A and Series C Preferred shareholders will have the right to register 70% of their common shares obtained upon conversion.

Under the Merger Agreement, SinoFresh acquired all of the outstanding capital stock of the Company consisting of 21,536,980 shares of Common Stock; 1,716,399 shares of Series A Preferred Stock; 6,000,000 shares of Series B Preferred Stock and 4,874,843 shares of Series C Preferred Stock in exchange for 10,768,490 shares of SinoFresh Common Stock; 858,170 shares of SinoFresh Series A Preferred Stock; 1,500,000 shares of SinoFresh Series B Preferred Stock and 1,218,711 shares of SinoFresh Series C Preferred Stock. In connection with the Agreement, the sole director and majority shareholder of SinoFresh agreed to tender 19,616,667 shares in SinoFresh back to SinoFresh for cancellation. In addition the Company exchanged options to purchase 3,000,000 common shares and warrants to purchase 900,000 common shares for SinoFresh options to purchase 1,500,000 common shares and SinoFresh warrants to purchase 450,000 common shares.

All share and per share data in the accompanying financial statements has been retroactively changed to reflect this transaction.

Subsequent to the merger, Acquisition, which changed its name to SinoFresh Corporation, remains the operating subsidiary of the Company. The shareholders of the Company obtained approximately 81% of the common stock and additional voting control by virtue of the voting rights of the preferred stock, providing a total voting interest of 91%. Since the Company also obtained management control, the merger transaction was treated as a recapitalization of the Company, with the Company as the acquirer for financial accounting purposes. Accordingly the shareholder's of SinoFresh were deemed to be issued approximately 2,483,000 common shares. The balance sheet subsequent to the merger consists of the balance sheet of both companies at the merger date and the operations reflect the historical operations of the Company, and the operations of SinoFresh from the Merger Date.

Effective September 1, 2003, the Company sold 5-year callable warrants to purchase 1,333,333 shares of the Company's common stock. The investors paid $1.20 for each warrant for a total of $1,600,000. As of September 30, 2003, there was $652,000 of subscriptions receivable related to these sales of which $452,000 are represented by 60-day, 4% promissory notes. The Company may call, based upon a stipulated schedule, up to 25% of the warrants at one time, and may require the holders to exercise 25% of their warrants, if the trading price of the Company's stock is maintained at or above a level of $7.50 for 20 consecutive days. Upon expiration of 90 days after such call, the Company may again call and require exercise of another 25% based upon the same criteria. This continues until all warrants have been called. The holder has 30 days to exercise upon which if not exercised, a designee or principal stockholder may purchase such warrants from the holder for $0.10 per warrant. However, such calls are not permitted unless the underlying common stock has been registered under the Securities Act of 1933.

For one investor who purchased 667,000 warrants for cash of $400,000 and a 60-day, 4%, $400,000 promissory note, the warrant life is one year. If no warrants are exercised prior to August 31, 2004 the Company will cancel such warrants and issue to the investor new warrants exercisable at $0.001 per share or an aggregate of $667 for 667,000 shares.

On September 1, 2003, the Company granted warrants to purchase 87,500 shares of Common Stock to its Medical Advisory Board at $1.00 and $2.00 per share. These warrants were valued using SFAS 123 and resulted in a total value of $28,875, which will be recognized over a twelve-month period.

**SINOFRESH HEALTHCARE, INC.**
Notes to Financial Statements
For the period October 15 (date of inception) to December 31, 2002 (Audited)
and for the six months ended June 30, 2003 (Unaudited)

The Company also granted options on 1,500,000 common shares to employees, officers and directors of the company and to a limited liability company controlled by two officers of the Company exercisable at $1.00 at September 1, 2003. Those options were valued under APB 25 and resulted in a total value of $300,000, which will be recognized over a periods of up to three years.

In September 2003, a former employee prepared a complaint alleging that the Company, among other things, breached his employment contract. The Company believes these claims are without merit and it intends to rigorously defend itself against the claims. It is also the Company's belief that the actions of this matter will not have a material impact on the Company's financial position.